No. 25-1924

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

WEST VIRGINIA RIVERS COALITION, INC.,

*Plaintiff-Appellee,*
and
LITTLE HOCKING WATER ASSOCIATION, INC.,
*Intervenor/Plaintiff-Appellee,*
v.

THE CHEMOURS COMPANY FC, LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court for
the Southern District of West Virginia
The Honorable Joseph R. Goodwin (No. 2:24-cv-00701)

**DEFENDANT-APPELLANT'S OPENING BRIEF**

Joseph A. Ford
Clifford F. Kinney, Jr.
Niall A. Paul
James A. Walls
SPILMAN, THOMAS &
  BATTLE, PLLC
P.O. Box 615
Morgantown, WV 26507-0615
(304) 720-3408
JFord@spilmanlaw.com

Allison B. Rumsey
Allon Kedem
Elisabeth S. Theodore
Dirk C. Phillips
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Allon.Kedem@arnoldporter.com

*Counsel for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Defendant-Appellant The Chemours Company FC, LLC, by and through undersigned counsel, hereby submits the following disclosure statement: Defendant The Chemours Company FC, LLC is a limited liability company and subsidiary of The Chemours Company. The Chemours Company, a publicly held corporation, owns 10% or more of the stock of The Chemours Company FC, LLC.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ................................................................i

Table of Contents..................................................................................ii

Table of Authorities ...........................................................................iv

Introduction..........................................................................................1

Jurisdictional Statement....................................................................3

Issues Presented for Review ..............................................................4

Statement of the Case ........................................................................5

    A.    Legal Background...........................................................5

    B.    Factual Background ........................................................6

    C.    Procedural History ......................................................11

    D.    The District Court's Decision ......................................19

Summary of Argument......................................................................22

Standard of Review ...........................................................................23

Argument............................................................................................24

I.    WVRC Lacks Article III Standing ................................................24

    A.    Exceeding a CWA Permit Does Not by Itself Confer Standing .........................................................................25

        1.    Violation of a plaintiff's statutory rights is insufficient to establish standing ...............................25

        2.    The district court erred by treating violation of the CWA as an Article III injury *per se*...............................28

        3.    The district court's rationale for its *per se* approach is unpersuasive.........................................................32

B.    WVRC's Lone Identified Member Lacks Article III Standing ........................................................................34

     1.    Chemours' permit exceedances do not affect Robinson's use of her tap water .............................................34

     2.    Robinson's offense at Chemours' alleged statutory violation does not constitute a cognizable injury in fact ...................38

II.   WVRC Failed To Establish Irreparable Harm.......................................41

   A.    The District Court Improperly Based the Preliminary Injunction on "Irreparable Harm to the Public" .........................42

     1.    An injunction must be based on irreparable harm to the plaintiff itself .............................................................42

     2.    The district court improperly relied on "irreparable harm to the public" ..............................................................45

     3.    The district court's reasons for relying on public harm are unpersuasive ..............................................................48

     4.    The district court's reliance on harm to the public requires reversal ..................................................................52

   B.    WVRC Failed to Establish Irreparable Harm to Robinson........53

     1.    The district court treated violation of the permit level as irreparable harm *per se*.......................................54

     2.    The district court conflated evidence about HFPO-DA with evidence about PFOA..............................................56

     3.    The district court improperly equated the permitted source with Robinson's tap water ....................................57

     4.    No credible evidence indicates that tap water drinkers face irreparable harm from Chemours' exceedances.................60

Conclusion.................................................................................................64

Statement Regarding Oral Argument ...............................................65

Certificate of Compliance ...............................................................66

Certificate of Service ......................................................................67

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. McVey,*
  37 F.4th 89 (4th Cir. 2022) ...................................................................24

*AK Futures LLC v. Boyd Street Distro, LLC,*
  35 F.4th 682 (9th Cir. 2022) .................................................................48

*Augustyn v. Wall Twp. Bd. of Educ.,*
  139 F.4th 252 (3d Cir. 2025)..................................................................53

*Baehr v. Creig Northrop Team, P.C.,*
  953 F.3d 244 (4th Cir. 2020)..................................................................28

*Beber v. NavSav Holdings, LLC,*
  140 F.4th 453 (8th Cir. 2025) ................................................42, 44, 45

*Beck v. McDonald,*
  848 F.3d 262 (4th Cir. 2017)..................................................................24

*Blue Water Baltimore, Inc. v. Mayor & City Council of
  Baltimore,*
  635 F. Supp. 3d 392 (D. Md. 2022) ......................................................50

*Centro Tepeyac v. Montgomery Cnty.,*
  722 F.3d 184 (4th Cir. 2013)..................................................................49

*Citizen Ctr. v. Gessler,*
  770 F.3d 900 (10th Cir. 2014)................................................................15

*Citizens United v. Fed. Election Comm'n,*
  130 S. Ct. 2731 (2010) ...........................................................................33

*City & Cnty. of S.F., Cal. v. EPA,*
  604 U.S. 334 (2025)...................................................................................5

*City of Hurricane, W. Va. v. Disposal Serv. Inc.*,
   No. CIV.A. 3:14-15850, 2014 WL 7005888
   (S.D.W. Va. Dec. 10, 2014) ................................................................50

*City of Newburgh v. Sarna*,
   406 Fed. App'x 557 (2d Cir. 2011) .................................................55

*City of Newburgh v. Sarna*,
   690 F. Supp. 2d 136 (S.D.N.Y. 2010)............................................55

*Coal. for a Liveable West Side, Inc. v. N.Y.C. Dep't of Env't Prot.*,
   No. 92 CIV 9011(DAB), 1998 WL 78285
   (S.D.N.Y. Feb. 24, 1998)...................................................................55

*Corp. for Pub. Broadcasting v. Fed. Emergency Mgmt. Agency*,
   Civil Action No. 25-740 (TJK), 2025 WL 1938198
   (D.D.C. July 15, 2025).......................................................................44

*Courtland Co. v. Union Carbide Corp.*,
   No. 2:21-cv-00101, 2021 WL 1255416 (S.D.W. Va. Apr. 5, 2021) ................50

*Di Biase v. SPX Corp.*,
   872 F.3d 224 (4th Cir. 2017).....................................................41, 42

*Dixon v. City of St. Louis*,
   950 F.3d 1052 (8th Cir. 2020)........................................................52

*Dreher v. Experian Info. Solutions, Inc.*,
   856 F.3d 337 (4th Cir. 2017)..........................................24, 27, 28

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
   528 U.S. 167 (2000)..........................................24, 31, 37, 39

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
   484 U.S. 49 (1987)...............................................................................6

*Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*,
   902 F.3d 432 (4th Cir. 2018)...........................................................46

*Hudson Riverkeeper Fund, Inc. v. Yorktown Heights Sewer Dist.*,
  949 F. Supp. 210 (S.D.N.Y. 1996)....................................................55

*Immigrant Legal Res. Ctr. v. City of McFarland*,
  827 Fed. App'x 749 (9th Cir. 2020).............................................43

*Jones v. D.C.*,
  177 F. Supp. 3d 542 (D.D.C. 2016) ..............................................45

*Kansas v. United States*,
  124 F.4th 529 (8th Cir. 2024) ......................................................43

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).............................................................39, 40

*Nat'l Wildlife Fed'n v. Burford*,
  835 F.2d 305 (D.C. Cir. 1987)......................................................15

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  886 F.3d 803 (9th Cir. 2018)........................................................43

*Northern Va. Hemp & Agriculture, LLC v. Virginia*,
  125 F.4th 472 (4th Cir. 2025) ........................................23, 52, 57

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013)...................................................41, 46

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
  131 F.4th 205 (4th Cir. 2025) ......................................................41

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
  575 F.3d 342 (4th Cir. 2009)...................................................33, 46

*Sackett v. EPA*,
  598 U.S. 651 (2023)......................................................................5

*Sanitary Bd. of City of Charleston, W. Va. v. Wheeler*,
  918 F.3d 324 (4th Cir. 2019).....................................................5, 6

*Sierra Club v. Morton*,
  405 U.S. 727 (1972).....................................................................39

vi

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)........................................1, 2, 25, 26, 29, 30, 32, 33

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024)........................................................42, 49

*Trump v. Casa*,
145 S. Ct. 2540 (2025) ...................................................31, 43, 44

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982)..............................................................55

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008).........................................2, 21, 41, 42, 44, 46, 48, 50, 51, 52

## Statutes and Regulations

15 U.S.C.
§ 1116(a) ..............................................................................48
§ 1681n(a) ............................................................................33

28 U.S.C.
§ 1292(a)(1) ..........................................................................3
§ 1331 ..................................................................................3

33 U.S.C.
§ 1319(a)(1) ..........................................................................6
§ 1342 ..................................................................................5
§ 1342(a)(1) ..........................................................................5
§ 1342(b)................................................................................5
§ 1362(11) ............................................................................62
§ 1365 ..................................................................................3
§ 1365(g) ..............................................................................49

40 C.F.R. § 141.2 ................................................12, 13, 61, 62

40 C.F.R. § 141.50(b) ..............................................................13

40 C.F.R. § 141.61(c)(2)(ii) .....................................................61

40 C.F.R. § 141.903 ..................................................................61

89 Fed. Reg. 32,532 (Apr. 26, 2024) ....................................................13

**Other Authorities**

Brief of Respondent, *Spokeo, Inc. v. Robins*,
    S. Ct. Case No. 13-1339 (Aug. 31, 2015), 2015 WL 5169094........................29

EPA, *Quarterly NPDES Noncompliance Report Search,*
    https://echo.epa.gov/facilities/npdes-noncompliance-search ......................45

Exposure Factors Handbook: 2011 Edition (Final). Washington,
    DC: Office of Research and Development, National Center for
    Environmental Assessment, EPA/600/R09/052A,
    https://www.epa.gov/expobox/exposure-factors-handbook-
    2011-edition ..........................................................................13

Respondent's Motion for Partial Vacatur, *Am. Water Works
    Ass'n v. EPA*, No. 24-1188 (D.C. Cir. Sept. 11, 2025)..................................13

**INTRODUCTION**

This case involves a preliminary injunction that was issued absent evidence of *any* harm, much less irreparable harm. West Virginia Rivers Coalition, Inc. (WVRC) filed a citizen suit under the Clean Water Act (CWA), alleging that The Chemours Company FC, LLC discharged a substance called hexafluoropropylene oxide dimer acid (HFPO–DA) into the Ohio River in excess of permitted limits. WVRC requested, and the district court granted, a preliminary injunction on the ground that Chemours' permit exceedances are causing irreparable harm to its members.

To support standing, WVRC relied on injury to one of its members, Charlise Robinson, whose tap water comes in part from the Ohio River. But Robinson does not drink the tap water; stopped drinking it two years before the alleged permit violations began; and says she will not resume drinking it regardless of what Chemours does. In any event, the water is filtered by Chemours before it reaches her and is safe to drink. Indeed, the one time she tested her tap water, levels of HFPO-DA were so low as to be undetectable.

The district court nevertheless found standing by treating the violation of a CWA permit as *per se* injury to every person who uses the affected water. This approach is irreconcilable with *Spokeo, Inc. v. Robins*, 578 U.S. 330

1

(2016), which held that a statutory violation fails to satisfy Article III unless it also harms the plaintiff in a concrete way. The court's repeated insistence that exposure to a substance discharged in violation of the CWA automatically establishes standing cannot be squared with *Spokeo* (which it failed even to cite).

The district court compounded its standing errors by ruling that when violation of a CWA permit occurs, a court "should *presume* irreparable harm" to "the public." JA1622 (emphasis added); JA1623. But *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), does not permit presumptions. It requires the plaintiff to establish that "*he* is likely to suffer irreparable harm in the absence of preliminary relief." *Id.* at 20 (emphasis added). The court's approach blurs the line between irreparable harm and the other *Winter* factors; if adopted, it would result in automatic injunctions for *any* statutory violation, regardless of actual harm to the plaintiff.

The district court also found that Robinson suffers irreparable harm "each time she is exposed to an unpermitted discharge of HFPO-DA." JA1619. But even if—contrary to fact—she drank her water (or would resume drinking it), evidence shows that it is safe. EPA has identified a concentration below which no harm is likely to occur, and HFPO-DA is present in the Ohio River

at roughly half that level (and far lower than that in her tap water). The court reached a contrary conclusion only by conflating HFPO-DA with another chemical, confusing river water with tap water, and ignoring the effects of filtration.

The district court's standing and irreparable-harm rulings are not merely wrong; they threaten to wreak havoc in both areas of law, enabling plaintiffs to obtain injunctive relief for even minor regulatory violations in any industry where federal law provides for citizen suits. That approach would work a revolution even if confined to the CWA context, where tens of thousands of permit violations occur each year. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 33 U.S.C. § 1365. The court granted a preliminary injunction on August 7, 2025, and Chemours appealed the same day. JA1645–1649. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED FOR REVIEW

**I.**   Whether a CWA plaintiff can establish a concrete injury in fact for purposes of Article III based solely on the defendant's permit exceedances.

**II.**   Whether, for standing purposes, the plaintiff can establish injury, causation, and traceability from a CWA violation if she does not claim that she avoids the affected water because of the defendant's conduct; that she would resume using the water if the defendant's conduct were enjoined; or that the contaminant at issue has ever been identified in her water in unsafe amounts.

**III.**   Whether the district court erred in granting a preliminary injunction based in substantial part on purported irreparable harm to the public, rather than to the plaintiff.

**IV.**   Whether the district court erred in finding irreparable harm from a CWA permit exceedance where the court confused the contaminant at issue with another substance; failed to distinguish between the permitted source (a river) and the plaintiff's tap water; and ignored EPA's regulatory assessment of the contaminant's risk profile.

4

## STATEMENT OF THE CASE

### A.    Legal Background

The Federal Water Pollution Control Act, commonly known as the Clean Water Act, 33 U.S.C. 1251 *et seq.*, is "the principal federal law regulating water pollution in the United States." *Sackett v. EPA*, 598 U.S. 651, 657–58 (2023). Broadly speaking, the CWA "prohibits 'the discharge of any pollutant' into 'navigable waters.'" *Id.* at 660 (quoting 33 U.S.C. §§ 1311(a), 1362(12)(A)).

The CWA also establishes the National Pollutant Discharge Elimination System (NPDES) permitting program. *See* 33 U.S.C. § 1342. NPDES permits can be approved "for the discharge of any pollutant, or combination of pollutants." *Id.* § 1342(a)(1). Among other things, these permits usually contain effluent limits, which "specify the quantities of enumerated pollutants that may be discharged" into federally regulated waters. *City & Cnty. of S.F., Cal. v. EPA*, 604 U.S. 334, 338 (2025) (citing 33 U.S.C. § 1362(11)).

Subject to EPA approval, a State may administer its own permit program under the CWA. 33 U.S.C. § 1342(b). State-developed standards are informed by and rely on EPA "guidance on acceptable water quality levels and measurement techniques." *Sanitary Bd. of City of Charleston, W. Va. v. Wheeler*, 918 F.3d 324, 328 (4th Cir. 2019). Once approved, state standards

5

supplant federal standards and "serve as a guideline for setting applicable limitations in the NPDES permits." *Id.* at 329 (cleaned up).

"The holder of a state NPDES permit is subject to both federal and state enforcement action for failure to comply." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 53 (1987). When EPA becomes aware that a state-issued permit has been violated, the agency must notify the issuing State; if the State fails to act within 30 days, EPA "shall issue an order requiring" the violator to comply, or "shall bring a civil action" seeking relief. 33 U.S.C. § 1319(a)(1). In addition, "[i]n the absence of federal or state enforcement, private citizens may commence civil actions against any person 'alleged to be in violation of' the conditions of either a federal or state NPDES permit." *Gwaltney*, 484 U.S. at 53 (quoting 33 U.S.C. § 1365(a)(1)). But this so-called "citizen suit" mechanism is intended "to supplement rather than to supplant governmental action." *Id.* at 60.

## B.    Factual Background

### 1.    Chemours' Washington Works facility

Chemours owns and operates the Washington Works facility, located in Wood County, West Virginia. JA459–460. The facility was previously owned by Chemours' predecessor, E.I. du Pont de Nemours and Co. (DuPont), which

used perfluorooctanoic acid (PFOA) at the facility to manufacture various products. JA460. PFOA is one of a broad family of chemicals, known as PFAS, useful for their resistance to heat, water, and stains. JA460; JA847.

In 2013, DuPont voluntarily transitioned away from using PFOA under an EPA-administered program, replacing it with HFPO-DA, which has a more-favorable toxicological profile. JA460. For example, whereas PFOA (also known as C8) has a half-life within the body of 2 to 10 years, HFPO-DA completely leaves the body in, at most, 14 days. JA1335; JA1352.

Chemours uses HFPO-DA as a fluoropolymer processing aid. JA460. Fluoropolymers are stable molecules critical to the medical-device, electric-vehicle, and semiconductor-manufacturing sectors—to name just a few. JA465–474. Materials produced at Washington Works are used in a variety of medical devices, such as pharmaceutical stoppers, syringe plungers, and inhalers, as well as coatings in medical guidewires essential for minimally invasive surgeries. JA469–470. Washington Works is also the only facility in the United States that produces certain products necessary for semiconductor fabrication, which accordingly have been identified as vital to U.S. national security and the economy. JA466; JA676–677; JA853; JA874–875; JA1153–1154.

### 2.     West Virginia issues a NPDES permit for HFPO-DA

When it switched from using PFOA to HFPO-DA, DuPont entered into a consent order with the West Virginia Department of Environmental Protection (WVDEP). JA701–702. The consent order limited the amount of HFPO-DA that Washington Works could discharge to the Ohio River. JA702. DuPont consistently complied with that limit. In 2015, Chemours was incorporated and took over the facility; it continued to comply with the consent order. JA460.

In 2018, West Virginia issued a new NPDES permit for Washington Works (the "NPDES Permit" or "Permit"). JA89. The Permit contains daily maximum and monthly average effluent limits for various compounds, including PFOA and HFPO-DA. JA110; JA120. As WVDEP explained, the agency chose these figures to be "protective of the State's narrative water quality criteria for human health." JA703. The chosen limits reflect a "goal for HFPO-DA (GenX) in drinking water at 140 nanograms per liter (ng/L) or parts per trillion (ppt)." JA703; JA1609–1610.

The Permit's effluent limits become progressively more stringent under a prescribed schedule. JA110; JA120; JA399. Chemours has been—and continues to be—proactive in working to meet these limits. Shortly after

8

issuance of the Permit, the company began identifying abatement projects, including proposing treatment systems for identified discharge points (known as Outfalls). JA461. By 2019, Chemours started designing projects based on its consultant's advice. JA461.

Throughout this process, Chemours regularly provided status updates to WVDEP and EPA. JA461. By the end of 2020, the company estimated it would achieve compliance with the upcoming PFOA limits. JA461. Less certain, however, was Chemours' ability to comply with the HFPO-DA limits, specifically during wet weather. JA461. This is because air deposition—the settling of HFPO-DA emissions on the ground—poses special challenges in wet weather. JA462.

In April 2021, Chemours notified WVDEP that it would be unable to comply with HFPO-DA limits during stormwater events by September 2021, the original effective date for the most-stringent limits. JA462. Chemours sought a compliance-deadline extension. JA461. WVDEP granted an extension to December 31, 2021. JA462. Meanwhile, Chemours continued its abatement efforts, meeting repeatedly with WVDEP and EPA. JA462.

The Permit's newly stringent limits began to apply on January 1, 2022. These limits prohibit Chemours from discharging effluent with HFPO-DA

concentrations greater than 2.3 micrograms per liter from Outfalls 002 and 005 on any given day. JA110; JA120. These limits are a significant decrease from the original allowable concentrations, which previously set a daily HFPO-DA limit for Outfall 002 at 32 micrograms per liter (14 times greater than the new benchmark) and for Outfall 005 at 43 micrograms per liter (18 times greater than the new limit). JA110; JA120.

Despite progress in implementing abatement systems, Chemours reiterated that it needed additional time to meet the newly stringent HFPO-DA restrictions. JA462. Chemours continued to take action addressing challenges from air deposition and wet weather by installing tertiary air emissions abatement systems. JA462–463. In February 2022, after days of rain and snowmelt, discharges from Washington Works first exceeded the new HFPO-DA Permit limits. JA463. Chemours promptly informed the appropriate officials. JA495.

### 3. Chemours continues its abatement efforts in cooperation with federal and state regulators

After continued discussions in 2022 and early 2023, EPA and Chemours reached agreement "to address the violations" through an Administrative Order on Consent. JA394–442. The order prescribes a process for Chemours to come into compliance with the Permit. Among other things, it requires

10

Chemours to: (1) implement a sampling plan for stormwater and wastewater at Washington Works, which has already been completed; (2) provide EPA with an implementation plan within 120 days, to ensure that discharges stay within Permit limits; and (3) implement the plan under a set schedule once EPA approves it. JA402–404.

Chemours timely submitted its plan to EPA along with a proposal for coming into compliance with the Permit. JA273–393. EPA recently largely approved the plan, after revisions. JA801–805. From the start, West Virginia has been involved in the process of creating and implementing the plan, which EPA designed "in consultation with" WVDEP. JA801. Chemours has also submitted a NPDES permit renewal application to WVDEP. JA465.

### C.    Procedural History

#### 1.    WVRC's complaint and request for preliminary injunction

On December 5, 2024, WVRC brought this action pursuant to the CWA's citizen-suit provision. JA22. WVRC principally alleges that Chemours discharged PFOA and HFPO-DA from four Washington Works outfalls to the Ohio River in excess of limits in Chemours' NPDES Permit. JA29–30. WVRC alleges that Chemours first exceeded HFPO-DA and PFOA Permit limits in October 2020 and exceeded the most-stringent limits for HFPO-DA and

PFOA (which became effective in January 2022) in February and July 2022, respectively. JA30; JA34–36.

On February 25, 2025—three years after Chemours allegedly began exceeding the most-stringent Permit limits for HFPO-DA—WVRC moved for a preliminary injunction as to Outfalls 002 and 005. D. Ct. Doc. 7. WVRC argued Chemours' alleged violations of the HFPO-DA limits in the Permit at those outfalls would cause its members irreparable harm in the form of degraded "drinking water." *See, e.g.*, D. Ct. Doc. 110 at 15–16 (WVRC member "is concerned about a river as her drinking water source"); *see also* D. Ct. Doc. 8 at 1.

To support its claim of harm from tainted drinking water, WVRC relied on a Maximum Contaminant Level (MCL) that EPA had set for HFPO-DA under the Safe Drinking Water Act (SDWA), 42 U.S.C. 300f *et seq.* D. Ct. Doc. 8 at 15; JA28–29. An MCL is "the maximum permissible level of a contaminant in water which is delivered to any user of a public water system." 40 C.F.R. § 141.2. EPA sets an MCL for a contaminant at the "level below which there are no known or anticipated adverse health effects over a lifetime of exposure, including sensitive populations and life stages, and allows for an

12

adequate margin of safety," 40 C.F.R. §§ 141.2, 141.50(b), with "lifetime" defined to mean roughly 70 years.[1]

In April 2024, EPA promulgated an MCL for HFPO-DA at 10 parts-per-trillion (ppt). *See* 89 Fed. Reg. 32,532 (Apr. 26, 2024).[2] In its preliminary-injunction motion, WVRC argued that because HFPO-DA has been detected in drinking water "in excess of the MCL," Chemours is harming the health of WVRC's members and the downstream public. D. Ct. Doc. 8 at 15 (citation omitted).

### 2.    Evidence regarding alleged harm to WVRC's member

The district court held a hearing on WVRC's preliminary-injunction motion. The parties presented evidence at and in advance of the hearing.

### a.    Charlise Robinson

WVRC identified a single member, Charlise Robinson, to support the organization's standing and claims of irreparable harm. Robinson provided a

---

[1] Exposure Factors Handbook: 2011 Edition (Final). Washington, DC: Office of Research and Development, National Center for Environmental Assessment, EPA/600/R09/052A, https://www.epa.gov/expobox/exposure-factors-handbook-2011-edition.

[2] In September 2025, EPA sought vacatur of the MCL for HFPO-DA in the D.C. Circuit. *See* Respondent's Motion for Partial Vacatur at 1, *Am. Water Works Ass'n v. EPA*, No. 24-1188 (D.C. Cir. Sept. 11, 2025).

declaration supporting the motion but did not attend the hearing. JA918–922; JA962; JA1119; JA1363.

According to her declaration, Robinson gets her household water from the Lubeck Public Service District (Lubeck), which is downstream from Washington Works. JA919. Lubeck draws from a groundwater aquifer near the Ohio River. JA685; JA637. Approximately 39% of Lubeck's pumped water originates from the river. JA619. But there is a significant "time lag" between when the water moves through the river and its infiltration into Lubeck's aquifer: "it takes time for that water that's moving from the Ohio River to move through the sediments and reach the location where [Lubeck is] pumping it out for use for drinking water." JA1398; *see* JA641 (showing time-of-travel paths from Ohio River to Lubeck aquifer).

Robinson's declaration states that she "stopped drinking [her] water directly distributed from a tap" due to her "concerns about PFAS, including HFPO-DA." JA920. The declaration does not say *when* she stopped, however, or whether it had anything to do with Chemours' exceedances of its HFPO-DA permit limits. JA918–922. The declaration also does not say whether Robinson would resume drinking the tap water if the exceedances stopped. JA918–922.

14

In a deposition, Robinson was asked whether she would "drink [her] tap water if Chemours no longer had any Clean Water Act violations at Washington Works." JA1549–1550. She responded:

> A.   Not me currently, I wouldn't, … but I would be relieved that they weren't having it for the many customers they have below them, downstream, you know, the downstream of the facility that use that as a water supply.

> Q.   Would you cook with your tap water if Washington Works – if the Washington Works facility had no more Clean Water Act violations?

> A.   Me cooking and drinking is a safe water concern, but this is a Clean Water Act, so I don't find it relevant, but, no, I wouldn't.

JA1550.[3] She also testified that she started avoiding drinking her tap water in 2018—approximately two years before the alleged HFPO-DA and PFOA violations identified in WVRC's Complaint and its Appendix A.[4]

---

[3] Robinson's deposition testimony was filed on the record the day before the preliminary-injunction ruling. JA18; JA1540–1552. This evidence goes to Article III jurisdiction. *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 313 (D.C. Cir. 1987) (appellate court "may properly turn to … affidavits which supply evidence" of standing even when filed with district court "*after* issuance of the preliminary injunction") (emphasis added); *accord Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014) ("[W]e can review the entire record to assess [plaintiff's] standing.")

[4] This portion of Robinson's deposition transcript, *see* Tr. 48:14–16, was not filed with the district court.

Robinson's declaration did not disclose that Chemours operates a granular activated carbon filtration system at Lubeck that treats the water delivered to Lubeck's customers. JA918–922; JA553; JA557. This system became operational in 2007, and Chemours has assumed responsibility for monitoring and maintaining it. JA557; JA560. The system includes two Calgon Model 10 units that operate in parallel, with each unit containing two 20,000-pound granular activated carbon vessels (a lead vessel and a lag/polishing vessel). JA557. Water pumped from the aquifer is split between the two units before it is distributed to customers. JA557. Chemours regularly samples treated water as it leaves each unit to measure the concentrations of PFOA and HFPO-DA. JA557–558.

Robinson's declaration also omits that she sampled her own household water in December 2024 for various contaminants, including HFPO-DA. JA918–922; JA1547; JA1536–1539. The lab analyzing her tap water concluded that all substances tested for, including HFPO-DA, were undetectable: "Good news. Water sample #14923 came back 'clean'. All 55 PFAS tested measured non-detect." JA1537.[5]

---

[5] Robinson's water-sample results were also filed on the record the day before the preliminary-injunction ruling. JA17–18; *See* p. 15 n.3, *supra*.

### b.    Catherine Boston

At the hearing, Chemours presented testimony from a board-certified toxicologist, Catherine Boston, regarding potential harm to Lubeck's customers from HFPO-DA discharges at Washington Works. JA1209; JA507; JA509. To evaluate the potential for such harm, Boston analyzed extensive sampling of Lubeck's finished drinking water to determine HFPO-DA concentrations in the water after passing through Lubeck's filtration system. JA511–512; JA1212–1213; JA885. The data, which span from March 2023 to November 2024, include 44 samples collected on 22 separate days. JA511–512.

In over half the samples (26 of 44), HFPO-DA measured at the "non-detect" level—meaning concentrations were less than 2.0 ppt and thus below the detection threshold. JA511–512. The highest sampling result (40 ppt) was from May 20, 2024. JA512. A second sample from the same day, collected from the parallel Calgon Model 10 treatment system, showed 11 ppt. JA512. Samples from the next date, June 17, were both non-detects. JA512. Using these samples, Boston calculated annual average concentrations in Lubeck's finished drinking water of well below 10 ppt—that is, below the MCL level for HFPO-DA set by EPA. JA512. For 2023, the annual average was 5.3 ppt; for 2024, it was 5.6 ppt. JA512. Boston concluded that the presence of HFPO-DA

at these levels is unlikely to produce adverse human health effects in users of Lubeck water. JA509; JA515; JA1233–1234.

Boston performed an additional analysis based on sampling of raw water from the Ohio River downstream of Washington Works. JA1234; JA513–514. She explained that the content of effluent discharged from Outfalls 002 and 005 is *not* reflective of what a person, like Robinson, would ingest through drinking water drawn from the river. Rather, sampling data collected from Lubeck's system are far more representative of such a person's potential exposure. JA516. The data, which reflected annual average HFPO-DA concentrations well below 10 ppt in the Ohio River, thus reaffirmed Boston's conclusion that there are no potential adverse human health effects from Washington Works's HFPO-DA discharges. JA1234–1237; JA513–514; JA516.

### c.    Jennifer Schlezinger

WVRC relied primarily on its expert witness, Jennifer Schlezinger, who testified at the preliminary-injunction hearing regarding the potential harm to Robinson from Chemours' permit exceedances. JA1119; JA659–674. Schlezinger opined, based in part on studies showing exposure to HFPO-DA elicits "fatty liver in mice," that Chemours' "noncompliance with the" Permit was likely to produce "imminent" harm to human health. JA1320; JA1318.

When asked how many times Robinson would need to consume water with an HFPO-DA concentration over 10 ppt (*i.e.*, the MCL) "for it to be likely that [Robinson is] going to suffer … liver disease," Schlezinger replied, "one day." JA1353–1354. Yet when Chemours' counsel later asked Schlezinger the same question—"are you telling me that if I have it one time in 63 years that it is likely that I am going to suffer a liver disease?"—she responded, "No." JA1355. She also testified that consuming water with HFPO-DA concentrations at or above 10 ppt "increases the risk," but she "cannot" say how much of an increased risk it causes. JA1354–1355.

The district court asked Schlezinger about Robinson's statement in her declaration that "she stopped drinking the water" but still "brushes her teeth" with it. JA1333. In light of that usage, the court asked "whether [Robinson] will continue to suffer additional harm or injuries if the level of the chemicals … continue at a level above the permitted level." JA1332. Schlezinger responded that she "cannot come to a conclusion" on whether Robinson would suffer such harm. JA1333.

## D.    The District Court's Decision

The district court granted WVRC's motion for a preliminary injunction. JA1645–1646. The court first concluded that WVRC had Article III standing

19

to represent the interests of its sole identified member, Robinson. JA1621. The court deemed each alleged Permit exceedance to be "a micro-injury" to Robinson, JA1615, causing her to "suffer[] an injury (standing) … each time she is exposed to an unpermitted discharge of HFPO-DA." JA1619. The court further reasoned that Robinson "fears" that her exposure to HFPO-DA will adversely affect her health; but if it orders Chemours "to comply with the Permit," then "Robinson's fears will be abated." JA1620. Finally, the court held that Robinson has standing because she is "offend[ed]" by the "know[ledge] of [Chemours'] unlawful discharges." JA1618.

Turning to the preliminary-injunction factors, the district court held that a "continuing violation of federal environmental law" always harms the public, such that when a violation occurs, a court "should presume irreparable harm." JA1622. The court recognized *Winter* requires "a plaintiff [to] establish 'that *he* is likely to suffer irreparable harm,'" a requirement that "[o]n its face … forecloses consideration of the irreparable harm to the *public*." JA1628 (quoting *Winter*, 555 U.S. at 20) (emphases added by district court). But the court decided such a literal reading of *Winter* "cannot be" right. JA1628.

The district court also found that WVRC established irreparable harm to Robinson, based primarily on Schlezinger's testimony. JA1623–1628. In the

20

court's view, "Robinson[,] and all those who use the Ohio River, suffer irreparable harm with each incremental exposure to HFPO-DA." JA1626. The court also relied on its read of the evidence: "once [HFPO-DA] enters [the body] it is 'very long-lived,'" and "a single exposure is likely to lead to at least one identified adverse health effect—that is, fatty liver, as studied in human exposure to PFOAs [sic]." JA1627. Noting Chemours' reliance on EPA's 10 ppt HFPO-DA MCL and the agency's use of annual averages to measure compliance, the court rejected what it called "a dangerous premise: exposure to a harmful pollutant like HFPO-DA is acceptable on some average." JA1626.

Finally, the district court held that WVRC made a clear showing it will likely succeed on the merits of its claim, the balance of equities favored an injunction, and an injunction was in the public interest. JA1634–1643. The court enjoined Chemours from discharging HFPO-DA in excess of the Permit's effluent limits at Outfalls 002 and 005 (the only outfalls raised in WVRC's motion) and ordered Chemours to take any actions necessary to achieve and maintain Permit compliance. JA1645–1646. A trial on the merits was originally set for September 16, 2025, JA957, but was stayed pending resolution of this appeal, JA1796.

## SUMMARY OF ARGUMENT

The district court's grant of a preliminary injunction to WVRC based on alleged harm to the public and Robinson warrants reversal.

**I.** WVRC failed to establish standing. The district court treated a CWA violation as automatically satisfying Article III. But that *per se* approach contravenes *Spokeo*, under which a statutory violation—even a violation of the plaintiff's "particularized" rights—is insufficient unless the plaintiff can show "concrete" harm apart from the violation itself.

WVRC also cannot establish standing based on harm to the sole member it has identified, Robinson. She admitted she does not drink the affected water; stopped drinking it before the alleged violations began; and would not resume drinking it regardless of what Chemours does. Even insofar as her tap water is relevant, the only test ever conducted individually on it showed levels of HFPO-DA so low as to be non-detectable.

**II.** The district court also erred in granting a preliminary injunction based on "presumed" harm to the "public" from a CWA violation. That ruling openly flouts *Winter*, which unequivocally requires irreparable harm to the plaintiff itself, rather than to the public at large. The ruling also conflates the

*Winter* factors, making injunctions nearly automatic for statutory violations— of which there are tens of thousands each year just under the CWA.

The district court also mishandled the scant evidence of harm to Robinson herself. Among other things, the court confused HFPO-DA with PFOA and conflated the Ohio River with Robinson's tap water. The court also relied on Schlezinger's testimony that Robinson will likely suffer liver damage if she consumes water in excess of 10 ppt for "one day." Yet even Schlezinger immediately backtracked from that outlandish position, which contradicts EPA's assessment in the MCL that a "lifetime" of exposure would be necessary. In any event, evidence shows that levels of HFPO-DA in the Ohio River are half the MCL and undetectably low in Robinson's tap water due to filtration by Chemours. WVRC failed to show *any* harm to Robinson—and certainly failed to make the requisite clear showing of irreparable harm.

## STANDARD OF REVIEW

"[S]tanding is a question of law that [this Court] review[s] de novo." *Northern Va. Hemp & Agriculture, LLC v. Virginia*, 125 F.4th 472, 489 (4th Cir. 2025) (citation omitted). This Court reviews orders granting preliminary injunctions "for abuse of discretion and the related legal conclusions involved

23

in that decision de novo." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 102 (4th Cir. 2022).

## ARGUMENT

### I.  WVRC LACKS ARTICLE III STANDING

Because WVRC seeks a preliminary injunction on behalf of its members, D. Ct. Doc. 8 at 8–9, it must identify at least one member with Article III standing in her own right. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000). To establish standing, the plaintiff must demonstrate "(1) an injury-in-fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017) (citation omitted). As "the party invoking federal jurisdiction," WVRC bears "[t]he burden of establishing … all three elements." *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017).

Here, WVRC failed to establish that any of its members would have standing to seek an injunction against Chemours. The district court treated

24

discharges in exceedance of a CWA permit as *automatically* establishing standing, but "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. And WVRC failed to demonstrate a concrete injury to the only member it identified, Robinson, who stopped drinking her tap water years before the alleged Permit exceedances began and would not resume even if the exceedances stopped. JA1549–1550. The only test of Robinson's tap water, moreover, showed HFPO-DA at an undetectably low level—certainly not enough to make avoidance of the water reasonable. JA1537.

### A.     Exceeding a CWA Permit Does Not by Itself Confer Standing

#### 1.   Violation of a plaintiff's statutory rights is insufficient to establish standing

In *Spokeo*, the Supreme Court rejected the argument that a plaintiff whose statutory rights are violated automatically has standing. At issue there were alleged violations of the Fair Credit Reporting Act (FCRA), which imposes liability for failing to comply with consumer-reporting requirements and authorizes suit by consumers whose information is reported incorrectly. 578 U.S. at 333-35. The defendant, an online search engine named Spokeo, allegedly violated the FCRA by providing inaccurate information about the plaintiff. *Id.* at 335-36. The court of appeals upheld the plaintiff's standing on

25

the ground that the violations implicated "*his* statutory rights, not just the statutory rights of other people," and because his "personal interests in the handling of his credit information [we]re individualized rather than collective." *Id.* at 337 (cleaned up).

The Supreme Court disagreed. "Injury in fact is a constitutional requirement," the Court explained, and "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Id.* at 339 (cleaned up). Such an injury in fact must be "both concrete *and* particularized." *Id.* at 340. A statutory violation is "particularized" if it "affect[s] the plaintiff in a personal and individual way," such as the plaintiff's allegation that Spokeo had provided false information about him in particular. *Id.* at 339 (cleaned up). But while "[p]articularization is necessary to establish injury in fact," the Court explained, "it is not sufficient." *Id.*

Instead, "[a]n injury in fact must also be 'concrete.'" *Id.* To qualify as concrete, the Supreme Court explained, the injury "must be '*de facto*'; that is, it must actually exist" separate and apart from the fact that the plaintiff's statutory rights were violated. *Id.* at 340 (citations omitted). The Court thus rejected the notion "that a plaintiff automatically satisfies the injury-in-fact

requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 341.

The Supreme Court accordingly overturned the Ninth Circuit's holding that the plaintiff had standing merely because he "allege[d] that Spokeo violated *his* statutory rights." *Id.* at 340 (citation omitted). Although Congress passed the FCRA "to curb the dissemination of false information by adopting procedures designed to decrease that risk," the Court explained, such a statutory violation by itself "cannot satisfy the demands of Article III." *Id.* at 342. To establish injury in fact, the plaintiff was required to allege something more—namely, that Spokeo's false reporting "entail[ed] a degree of risk sufficient to meet [Article III's] concreteness requirement." *Id.* at 343.

This Court's precedent is in accord. In *Dreher*, the plaintiff alleged injury as the result of being denied accurate information to which he was entitled under the FCRA. 856 F.3d at 345. Applying *Spokeo*, the Court held that "a statutory violation absent a concrete and adverse effect does not confer standing." *Id.* at 346. Because the plaintiff "failed to demonstrate how" the

27

statutory violation "adversely affected his conduct in any way," the Court ruled that he lacked standing. *Id.* at 347.

This Court similarly found a lack of concreteness in *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244 (4th Cir. 2020). The plaintiffs there alleged a kickback scheme in which the defendants paid for illegal business referrals, allegedly depriving the plaintiffs of "impartial and fair competition between settlement service[s] providers," in violation of the Real Estate Settlement Procedures Act (RESPA). *Id.* at 247 (cleaned up). This Court again rejected the claim under *Spokeo*: "[T]he deprivation of impartial and fair competition between settlement services providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under RESPA." *Id.* at 254. Because the plaintiffs failed to show they "suffer[ed] any real-world harm, much less a concrete injury from the deprivation of impartial and fair competition between settlement providers," they accordingly failed to establish Article III standing. *Id.* at 256.

## 2. The district court erred by treating violation of the CWA as an Article III injury *per se*

The district court's decision directly contravenes the principle articulated in *Spokeo* (which it failed even to cite). In an implicit acknowledgement that Robinson has not shown any actual harm, the court

28

repeatedly equated the violation of an environmental permit with injury to an individual plaintiff: "Where a statute identifies unlawful discharge of toxic pollutants like HFPO-DA as a harm, and where plaintiffs allege concrete exposure to that unlawful discharge," the court held, "such plaintiffs have asserted an injury in fact sufficient to support standing." JA1614; *see, e.g.*, JA1615 ("A defendant who violates a permit is not 'probably' harming the public—it is harming the public as a matter of law."); JA1615 (describing CWA permit exceedance as a "statutory violation that, by legislative design, affects real-world interests"); JA1615 ("By establishing clear effluent limitations and strict liability for noncompliance, Congress has created a substantive legal interest in waterways being free from unauthorized pollution.").

The district court's reasoning mirrors the argument rejected in *Spokeo*. There, the plaintiff argued that an FCRA violation satisfies Article III because "[t]he statute clearly identifies the interest Congress sought to vindicate" and "also clearly identifies the class of persons entitled to bring suit." Br. of Resp., S. Ct. Case No. 13-1339 (Aug. 31, 2015), 2015 WL 5169094 at *12. The plaintiff further argued that the violation implicated his "personal interests in the handling of his credit information," *Spokeo*, 578 U.S. at 334 (citation omitted),

which echoes the district court's emphasis on a plaintiff's claim of "exposure to [an] unlawful discharge[]," JA1614.

Yet as *Spokeo* explained, while a plaintiff's claim of particularized harm from a statutory violation "is necessary to establish injury in fact, … it is not sufficient." 578 U.S. at 339. Instead, "[a]n injury in fact must also be 'concrete,'" *id.*, requiring the plaintiff to show that the violation "entail[s] a degree of risk sufficient to meet the concreteness requirement," *id.* at 343. In the CWA context, the plaintiff must show that exposure to a contaminant in water in excess of permit limits at least placed the plaintiff at imminent risk of harm, or else that the plaintiff reasonably avoided the affected water as a result of the exceedance. As explained below, *see* Section I.B., *infra*, WVRC failed to make either showing here.

Adoption of the district court's *per se* approach to statutory violations would be radical and troubling. It would give plaintiffs a roving commission to bring suits for minor regulatory violations in any industry in which a federal statute provides for citizen suits; and it would allow them to do so even where—as here—there is no showing of concrete injury or causation. Such a decision would also contravene the established principle that Article III standing cannot be satisfied through reliance on injury to the public, rather

than to the plaintiff who brings the action. *See Friends of the Earth*, 528 U.S. at 169 ("The relevant showing for Article III standing is not injury to the environment but injury to the plaintiff."); *cf. Trump v. Casa*, 145 S. Ct. 2540, 2562–63 (2025) (rejecting "injunctions [that] are broader than necessary to provide complete relief to each plaintiff with standing to sue").

Indeed, eliminating the requirement of concrete harm (including actual risk) to the plaintiff would be particularly problematic under the CWA. One potential plaintiff might get 100% of his water *directly* from a permit-exceeding source, whereas another might draw his water 100 miles downstream where it has been diluted 1000-fold by other sources. *See* Part II.B.3., *infra*. Yet under the district court's approach, even the smallest exposure to water that derives from a permit-exceeding source—however indirectly and minutely—would suffice to confer standing, even where, as here, the plaintiff faces no meaningful risk as a result of the violation.

### 3. The district court's rationale for its *per se* approach is unpersuasive

The district court offered little to support its view that a CWA violation automatically gives rise to an Article III injury. The few reasons it did offer are unpersuasive.

***First***, the district court noted that Congress designed the CWA, and the WVDEP chose a standard for HFPO-DA under the CWA, "to 'be protective of the State's narrative water quality criteria for human health.'" JA1616; *see* JA1615 (describing CWA permit exceedance as a so-called "micro-injury: a concrete statutory violation that, *by legislative design*, affects real-world interests") (emphasis added).[6] But *all* legislation is designed to be protective of *some* interest. To establish standing, the plaintiff must still show the violation "actually" implicated his interests in a "concrete" way. *Spokeo*, 578 U.S. at 340. In *Spokeo*, for instance, the Supreme Court recognized that the FCRA was intended "to decrease th[e] risk" from the spread of "false information." *Id.* at 342. Nevertheless, the Court required the plaintiff to establish that the statutory violation "entail[ed] a degree of risk" to the

---

[6] To Chemours' knowledge, "micro-injury" is not a standard regulatory or legal term. It seems to have been invented by the district court.

32

plaintiff himself that was "sufficient to meet [Article III's] concreteness requirement." *Id.* at 342-43.

**Second**, the district court reasoned that "[the CWA], and the citizen suits it created, is different" because "the [CWA] is a congressional directive and enforcement statute for injunctive, forward-looking relief." JA1615. But whether a statute creates a *cause of action* is a distinct question from whether a violation of that statute confers *standing*. The statute at issue in *Spokeo*, for instance, also authorized suit by the plaintiff. 15 U.S.C. § 1681n(a). But that was not sufficient to confer Article III standing on him.

Moreover, there is no reason why a lesser standard of concreteness should be required "for injunctive, forward-looking relief." JA1615. If anything, the opposite should be true: A *more*-demanding showing of concreteness should be required for a suit that seeks the "extraordinary remedy" of an injunction, *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), overturned on other grounds following *Citizens United*, 130 S. Ct. 2731 (2010), as opposed to a statute authorizing a nominal amount of "statutory damages," *Spokeo*, 578 U.S. at 335 (FCRA authorizes "statutory damages of $100 to $1,000 per violation").

### B.     WVRC's Lone Identified Member Lacks Article III Standing

The district court also based its standing analysis in part on alleged harm to the only member WVRC identified as being exposed to water affected by the permit violation, Robinson. *See* JA1619 ("[F]or the Article III standing analysis, I consider the whole of injuries suffered only by the Plaintiff's member, Ms. Robinson."). Robinson's tap water comes from Lubeck, which draws less than half (39%) its water from the Ohio River. JA1620.

According to the district court, Robinson established two injuries based on Chemours' permit violations: (1) "the use of her own tap water is severely diminished" by her concerns about exposure to HFPO-DA; and (2) "she avoids any contact with the Ohio River" and "cannot enjoy [its] aesthetics." JA1616. Neither alleged injury satisfies Article III.

### 1. Chemours' permit exceedances do not affect Robinson's use of her tap water

The district court determined that Robinson has standing "because she has taken steps to avoid greater injury and harm to her health" by "abandoning ordinary uses of [her] water supply." JA1617. But WVRC introduced *no evidence* that Robinson avoids her tap water because of concerns about Chemours' permit exceedances. And in fact, the available evidence shows Robinson does not avoid drinking from the tap because of

34

Chemours' alleged violations and would not resume regardless of what Chemours does. *See, e.g.*, JA1549–1550. Evidence also shows Robinson's tap water is completely safe. *See, e.g.*, JA1537; JA509; JA511–515.

***First***, Robinson did not claim she began avoiding tap water because of Chemours' HFPO-DA exceedances. Her declaration states only that she "stopped drinking the water directly distributed from a tap" due to concerns "about PFAS, including HFPO-DA." JA920. But it does not say *when* she stopped, or whether her avoidance had anything to do with Chemours' exceedances of its HFPO-DA permit limit, which allegedly first occurred in 2020 and, for the current limits, in 2022. JA918–922; JA34–35.

In fact, Robinson's declaration strongly suggests her tap-water avoidance stemmed from concerns about a *different* PFAS chemical and that such concerns arose far earlier. She states that she became concerned by a "C8 [*i.e.*, PFOA] Science Panel's health study in 2006." JA919. She received "results from the blood sampling in the C8 Science Panel study," which found elevated "levels" of two C8 compounds in her blood. JA919. And she came to believe that this "C8 exposure" was "linked" to a 2005 incident of "preeclampsia which led to emergency induced labor of [her] child 5 weeks early." JA919.

35

Under those circumstances, it is highly likely Robinson stopped using tap water far earlier than Chemours' alleged permit exceedances. And her failure to say in her declaration when she stopped using tap water, or that she stopped because of anything Chemours did, is telling. At minimum, the declaration's failure even to *claim* that she stopped using tap water because of Chemours' conduct forecloses standing.

Indeed, Robinson's deposition testimony confirms what her artfully worded declaration attempts to conceal: She testified that she started avoiding her tap water in 2018, roughly two years *before* the alleged start of Chemours' violations. *See* p. 15, *supra*.

***Second***, Robinson also never claimed she would *resume* using tap water if Chemours complies with the permit levels. Her declaration is silent on the issue. JA918–922. And in her deposition, she made clear she *will not* resume drinking or cooking with her tap water regardless of what Chemours does:

> Q.     Would you drink your tap water if Chemours no longer had any Clean Water Act violations at Washington Works?
>
> A.     Not me currently, I wouldn't, … but I would be relieved that they weren't having it for the many customers they have below them, downstream, you know, the downstream of the facility that use that as a water supply.

> Q.    Would you cook with your tap water if Washington Works –
>       if the Washington Works facility had no more Clean Water
>       Act violations?
>
> A.    Me cooking and drinking is a safe water concern, but this is
>       a Clean Water Act, so I don't find it relevant, but, no, I
>       wouldn't.

JA1549–1550.

**Third**, even if Robinson *did* claim to avoid use of tap water based on

concerns about risks to her health from HFPO-DA permit exceedances, her

avoidance must be based on "*reasonable* concerns about the effects of those

discharges." *Friends of the Earth*, 528 U.S. at 183 (emphasis added). Here,

any concerns about Robinson's tap water would *not* be reasonable. Evidence

shows the Lubeck filtration system effectively removes HFPO-DA and that

the water is safe to drink. Robinson herself sampled her household water in

December 2024 for various contaminants, including HFPO-DA. JA1547. The

lab that analyzed her tap water concluded that all substances tested for,

including HFPO-DA, were undetectable: "Good news. Water sample #14923

came back 'clean'. All 55 PFAS tested measured non-detect." JA1537

(referring to HFPO-DA as "GenX"). Since EPA has determined there is no

significant health risk from consuming water with HFPO-DA at less than

10 ppt—even for sensitive groups over an entire lifetime, *see* Part II.B.4.,

*infra*—the undetectably low level in Robinson's tap water raises no "reasonable concerns."

These deficiencies prevent WVRC from establishing injury in fact, traceability, or redressability: There can be no standing where Robinson (a) does not drink the water at issue; (b) stopped drinking it years before Chemours' alleged permit violations; (c) does not claim she would resume drinking the water if Chemours changed its conduct; and (d) would not be exposed to a dangerous amount of HFPO-DA even if she resumed.

### 2. Robinson's offense at Chemours' alleged statutory violation does not constitute a cognizable injury in fact

The district court also found standing because Robinson "cannot enjoy the aesthetics of the Ohio River due to [Chemours'] excess discharges of HFPO-DA." JA1616. The court based that finding on her statement that "[e]ven looking at the Ohio River downstream of Chemours offends me because I know of the Company's unlawful discharges." JA1618 (quoting JA921).

But offense based on the plaintiff's knowledge that a CWA permit has been exceeded does not constitute an "aesthetic" injury sufficient to confer standing. To be sure, the Supreme Court has recognized that an injury in fact can be established by a plaintiff "'for whom the aesthetic and recreational

values of [an affected] area will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). But the "aesthetic" value referenced by the Court is something far more substantial and concrete than mere offense at the knowledge that the challenged activity is occurring.

For example, in *Sierra Club*, the Court considered the Sierra Club's standing to challenge the building of a road, power lines, and a ski resort in Sequoia National Park. 405 U.S. at 729. It recognized that standing could be based on the fact that "the development would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations." *Id.* at 734. The Court acknowledged "that this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing," though only where the club's members established "that they use [the park] in any way that would be significantly affected by the proposed" development. *Id.* at 734-35.

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Court rejected an organization's standing to challenge a rule interpreting the Endangered Species Act in a manner that, the organization alleged, would lead to the extinction of several endangered species. The Court acknowledged that

39

"the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Id.* at 562–63. But the organization failed to introduce "evidence showing, through specific facts, not only that listed species were in fact being threatened" by the challenged action, "but also that one or more of [the organization's] members would thereby be 'directly' affected apart from their 'special interest' in th[e] subject." *Id.* at 563 (citation omitted).

Here, Robinson does not allege that Chemours' permit exceedances—measured in micrograms per liter—actually change the aesthetics of the Ohio River. Instead, she claims only that her enjoyment of the river is tainted by her *knowledge* of Chemours' activity. *See* JA921 ("because I know of the Company's unlawful discharges"). That is a far cry from the concrete visual effects on Sequoia National Park expected to result from the significant development at issue in *Sierra Club*; and it is even further afield from the permanent disappearance of an animal species at issue in *Lujan*.

If accepted, the district court's approach to standing would make it trivially easy to establish standing in environmental cases: The plaintiff could simply allege that she avoids the affected area due to "offense" at the defendant's law-breaking. Nor would the mischief necessarily be confined to

the violation of environmental statutes. The plaintiff in *Spokeo* might have alleged, for instance, that he refrains from using online search engines because he is "offended" by the knowledge that they routinely violate the FCRA. Unsurprisingly, no other court has based standing on the plaintiff's claim that she changed her behavior because she was "offended" by the defendant's alleged statutory violation.

## II.    WVRC FAILED TO ESTABLISH IRREPARABLE HARM

A preliminary injunction is an "extraordinary and drastic" remedy. *Di Biase v. SPX Corp.*, 872 F.3d 224, 229 (4th Cir. 2017) (citation omitted). Accordingly, the burden on the party seeking one is "steep." *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 223 (4th Cir. 2025). To obtain a preliminary injunction, a plaintiff must make a "clear showing" that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm if preliminary relief is not granted; (3) the balance of equities favors him; and (4) an injunction is in the public interest. *Winter,* 555 U.S. at 20, 22. Each of these so-called *Winter* factors must be "separately consider[ed]" and "satisfied as articulated." *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013) (quotation marks omitted).

While the district court's ruling was deficient in multiple respects, Chemours focuses here on its failures concerning irreparable harm. To secure a prohibitory preliminary injunction, as WVRC has obtained, the movant must show that its alleged irreparable harm is likely to occur during the pendency of the lawsuit—here, between when WVRC filed its complaint in December 2024, and when the district court rules following trial on the merits (originally scheduled for September 2025, though now stayed pending the outcome of this appeal), JA957; JA1796. *See Di Biase*, 872 F.3d at 230.

WVRC failed to show any of its members would suffer harm—and certainly did not make a "clear showing" of *irreparable* harm—from Chemours' Permit exceedances during the pendency of this litigation.

### A. The District Court Improperly Based the Preliminary Injunction on "Irreparable Harm to the Public"

#### 1. An injunction must be based on irreparable harm to the plaintiff itself

*Winter* requires a plaintiff to establish that "*he* is likely to suffer irreparable harm in the absence of preliminary relief." 555 U.S. at 20 (emphasis added); *accord Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (same); *Beber v. NavSav Holdings, LLC*, 140 F.4th 453, 462 (8th Cir. 2025) ("When a preliminary injunction is sought, a federal court must consider

42

the threat of irreparable harm *to the movant*, or whether *the movant* is likely to suffer irreparable harm in the absence of preliminary relief.") (emphasis in original) (cleaned up); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) ("Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction.").

Harm to a third party therefore cannot satisfy the irreparable-harm requirement. *See, e.g.*, *Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) ("The irreparable-harm analysis focuses on the *moving* party, not the nonmoving party *or some third party*.") (emphases in original) (cleaned up); *Immigrant Legal Res. Ctr. v. City of McFarland*, 827 Fed. App'x 749, 751–52 (9th Cir. 2020) ("The district court abused its discretion in finding a likelihood of irreparable harm," focusing "its irreparable harm analysis on the prospect of harm to third parties. The standard for preliminary injunctions, however, requires irreparable harm to the plaintiffs themselves.") (cleaned up).

This requirement, based on principles of equity deeply embedded in the Anglo-American tradition, cannot be satisfied by a showing of harm to people *other than* the plaintiff. *See Trump v. Casa*, 145 S. Ct. at 2551-52; *id.* at 2551 ("Injunctions," under English law, were "suits to restrain the actions

of *particular* officers against *particular* plaintiffs") (cleaned up); *id.* at 2552 (emphasizing that "party-specific principles … permeate our understanding of equity"). Still less can the irreparable-harm requirement be satisfied by alleged harm to the "public" at large due to the mere fact of a statutory violation. *See, e.g.*, *Beber*, 140 F.4th at 463 (district court's "consideration of potential harm to [state] public policy, in its analysis of the irreparable-harm factor, was an abuse of discretion"); *Corp. for Pub. Broadcasting v. Fed. Emergency Mgmt. Agency*, --- F. Supp. 3d ---, 2025 WL 1938198, at *10 (D.D.C. 2025) ("any harm to the public is not [plaintiff's] own").

Basing irreparable harm on the mere existence of a CWA permit violation would be especially problematic. For one thing, it would mean an injunction could be granted in essentially *every* case where a permit limit was exceeded. That would contravene the Supreme Court's admonition that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.

It would also blur the irreparable-harm prong of the *Winter* test with the merits and public-interest prongs, often rendering them redundant. As the Eighth Circuit recently observed, "[t]he irreparable-harm factor is about the individual interests of each movant. The public-interest factor is about the

44

good of society as a whole. Both factors are components of the preliminary injunction test, *but they are not interchangeable*." *Beber*, 140 F.4th at 463 (emphasis added); *see Jones*, 177 F. Supp. 3d at 546 n.3 ("any alleged harm to third parties is properly addressed under the public interest prong of the injunctive relief calculus"). Indeed, if the existence of a statutory violation sufficed to establish success on the merits, irreparable harm, *and* harm to the public interest, then the multi-prong *Winter* test would essentially collapse into a single inquiry—a result foreclosed by controlling case law.

Such a holding, if accepted, would also radically transform CWA litigation, because permit violations are quite common. Indeed, *tens of thousands* of NPDES permit violations occur *each quarter* in the United States. *See* EPA, *Quarterly NPDES Noncompliance Report Search*, https://echo.epa.gov/facilities/npdes-noncompliance-search (EPA's dashboard providing "information on [NPDES permit] violations identified" per fiscal quarter). Yet federal courts do not issue preliminary injunctions for all such violations—or even for a large percentage of them.

### 2. The district court improperly relied on "irreparable harm to the public"

Here, the district court nevertheless based the injunction on the premise that Chemours' permit exceedances "wreck [sic] irreparable harm on the

public." JA1628. It held that whenever there has been a "continuing violation of federal environmental law," a court "should *presume* irreparable harm." JA1622 (emphasis added); *see* JA1622 ("The Supreme Court said injunctions are 'extraordinary,' but Congress already made the judgment that clean water is an extraordinary priority."). In other words, according to the district court, violation of a CWA permit constitutes irreparable harm to the public *per se*.

The notion that irreparable harm may be "presume[d]" is incompatible with *Winter*. The district court seemed to acknowledge as much: It noted *Winter*'s statement that "a plaintiff must establish 'that *he* is likely to suffer irreparable harm in the absence of preliminary relief,'" and further acknowledged that "[o]n its face, this forecloses consideration of the irreparable harm to the *public*." JA1628 (quoting *Winter*, 555 U.S. at 20) (emphasis added by district court). But the district court simply disagreed with what the Supreme Court said: "This cannot be." JA1628.

That was error. As this Court has repeatedly explained, "each of [the *Winter*] factors must be satisfied *as articulated*." *Real Truth About Obama*, 575 F.3d at 347 (emphasis added); *see Pashby*, 709 F.3d at 320-21 (similar); *Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432,

438–39 (4th Cir. 2018) (similar). Courts are not free to disregard or rewrite aspects of the *Winter* test with which they disagree.

The district court's irreparable-harm holding was apparently part of a self-conscious effort to counteract the contrary view of "many district courts" that the *Winter* factors "are reasonable in every context." JA1622. In the district court's opinion, "[i]n practice, [the *Winter* factors] amount to a slow suffocation of the Clean Water Act's citizen suit." JA1622. Treating public harm as irreparable harm, the court explained, is "a way through" this perceived difficulty. JA1622.

But it is up to Congress, not courts, to decide whether rigorous application of the *Winter* factors is appropriate in particular contexts. If Congress wants to apply a lower standard for injunctive relief to CWA cases, it knows how to do so. The Lanham Act, for instance, provides for precisely the type of abbreviated analysis the district court applied here—a presumption of harm based on a mere statutory violation: A plaintiff seeking an injunction "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion

47

for a preliminary injunction or temporary restraining order." 15 U.S.C. § 1116(a); *see AK Futures LLC v. Boyd Street Distro, LLC*, 35 F.4th 682, 694 (9th Cir. 2022) ("By statute, [plaintiff] is entitled to a rebuttable presumption of irreparable harm on its trademark claim because the company has shown it will likely succeed on the merits."). The lack of any similar statutory provision in the CWA forecloses the district court's approach.

### 3. The district court's reasons for relying on public harm are unpersuasive

The district court offered several justifications for its reliance on public harm instead of harm to the plaintiff in this case. None is persuasive.

***First***, the district court argued that a CWA violation is "different in kind" from the type of statutory violation at issue in *Winter*, which was a "*procedural action*" under the National Environmental Policy Act (NEPA). JA1628–1629 (emphasis in original). The issue in *Winter* was whether NEPA required the Navy to prepare an environmental impact statement prior to taking the action in question. 555 U.S. at 15-16, 32. The CWA, according to the district court, is different because it reflects a substantive "determin[ation]" by Congress that discharges in excess of permit limits "cause real, physical harm to human health and the environment." JA1629.

But *Winter* did not say or imply that its requirements apply only to cases involving procedural statutes like NEPA. And in fact, the *Winter* test is routinely applied where relief is sought under statutes that create substantive (not merely procedural) requirements. *See, e.g.*, *Starbucks Corp.*, 602 U.S. at 351 (applying *Winter* factors to National Labor Relations Board's request for preliminary injunction during pendency of administrative enforcement proceedings brought under the National Labor Relations Act); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191–92 (4th Cir. 2013) (applying *Winter* to plaintiffs' request to enjoin portion of county resolution requiring limited-service pregnancy resource centers to post signs with certain disclosures).

**Second**, the district court emphasized that a CWA plaintiff would still be required to satisfy "Article III standing and the statutory CWA citizen-suit provision," which it described as "high barriers." JA1629. That assertion— besides contradicting the court's earlier statement that "in the environmental litigation context, the standing requirements are not onerous," JA1614 (cleaned up)—conflates separate requirements. Standing and the CWA citizen-suit provision, *see* 33 U.S.C § 1365(g) (permitting suit by any person "having an interest which is or may be adversely affected"), speak to *who* may

49

file suit. The *Winter* factors instead speak to the kind of "remedy" that may be appropriate if a violation is found. 555 U.S. at 24. And in particular, they reflect the principle that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Id.*

Unsurprisingly, *Winter* is routinely applied where relief is sought under statutes that have citizen-suit provisions, including environmental statutes. *See, e.g.*, *Blue Water Baltimore, Inc. v. Mayor & City Council of Baltimore*, 635 F. Supp. 3d 392, 401 (D. Md. 2022) (preliminary-injunction request in CWA citizen suit); *Courtland Co. v. Union Carbide Corp.*, No. 2:21-cv-00101, 2021 WL 1255416, at *7 (S.D.W. Va. Apr. 5, 2021) (same); *City of Hurricane, W. Va. v. Disposal Serv. Inc.*, No. CIV.A. 3:14-15850, 2014 WL 7005888, at *4 (S.D.W. Va. Dec. 10, 2014) (preliminary-injunction request under Recourse Conservation and Recovery Act).

**Third**, the district court stated that the "preliminary injunction analyses consider the public harm in a variety of ways," including "in the other preliminary injunction elements." JA1630. But the fact that public harm must already be considered under a different *Winter* factor cuts *against* treating a statutory violation as sufficient to establish irreparable harm. It means that

the public's interests will be evaluated under the fourth *Winter* factor anyway, without the need to double-count them under the second factor as well.

*Fourth*, and somewhat contradictorily, the district court stated that "there is no overlap between this analysis and the other elements of a preliminary injunction." JA1631. Even if there were no overlap, that would not make it any more appropriate to relax *Winter*'s requirement that the plaintiff establish that "*he* is likely to suffer irreparable harm in the absence of preliminary relief." 555 U.S. at 20 (emphasis added). But the assertion of no overlap is *not* true. The public-interest prong requires "consideration of the overall public interest," *id.* at 26, which takes into account the same public interests in avoiding CWA permit violations.

The district court's argument to the contrary is incorrect. The court stated that "[i]n the irreparable harm prong, the court considers the harm to the public as a result of a defendant's actions," whereas "under public interest, the court considers the effect of an injunction on the defendant, the public, and the plaintiff." JA1631. But those are just opposite sides of the same coin: From the public's perspective, whatever "'pre-injunction' harm" that the plaintiff seeks to prevent is equivalent to the "'post-injunction' effect" of ordering the defendant to cease its activities. JA1631.

51

The district court's public-interest analysis bears out the equivalence. Indeed, the court *explicitly* stated that "[t]he public interest is coextensive with the statutory purpose." JA1643. That conclusion is identical to its irreparable-harm determination that "Plaintiff seeks to stop the precise conduct Congress has declared harmful." JA1629. Thus, none of the court's rationales for relying on public harm, instead of harm to the plaintiff (as *Winter* requires), is sound.

### 4. The district court's reliance on harm to the public requires reversal

The issuance of an injunction requires a court of equity to exercise "discretion," in which it "balance[s] the competing claims of injury and … consider[s] the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (cleaned up). When a court exercises discretion to balance competing considerations, reliance on an impermissible factor—like the district court's reliance here on irreparable harm to the public—automatically requires reversal. *See Northern Va. Hemp*, 125 F.4th at 492 ("A district court abuses its discretion when it applies an incorrect preliminary injunction standard" or "rests its decision on a clearly erroneous finding of material fact"); *Dixon v. City of St. Louis*, 950 F.3d 1052, 1055 (8th Cir. 2020) (abuse of discretion occurs in granting a preliminary junction "when

52

an irrelevant or improper factor is considered and given significant weight")
(cleaned up); *cf. Augustyn v. Wall Twp. Bd. of Educ.*, 139 F.4th 252, 262 (3d
Cir. 2025) (holding, in context of fee award, that district court abused its
discretion by considering "impermissible factors").

Reversal is particularly warranted here because the district court's
reliance on public harm was central to its ruling. Indeed, the court devoted the
most substantial part of its decision to this issue, which took up more pages
than any other issue. *See* JA1628–1634. Thus, the error cannot be considered
harmless.

### B.     WVRC Failed to Establish Irreparable Harm to Robinson

The district court also based its irreparable harm analysis in part on
supposed harm to Robinson, the lone identified WVRC member who uses
water even indirectly affected by Chemours' alleged permit violations. But as
explained, Robinson does not claim she stopped drinking her tap water after
Chemours' alleged violations began, nor does she claim she would resume
using tap water if Chemours were enjoined.

Even apart from those fatal flaws, the district court erred in its
determination that "*every day*" Robinson "suffer[s] irreparable harm" from
Chemours' permit violations. JA1623. That conclusion was based on the court's

impermissible assumption that CWA permit exceedances always create concrete health risks to those who (unlike Robinson) use the affected water. The actual evidence about Chemours' alleged HFPO-DA exceedances—which have largely been within a defined timeframe and of varying levels during which Chemours was engaged with both the federal and state regulatory agencies—shows they have not created significant risks for those who use Lubeck's highly filtered water.

1. **The district court treated violation of the permit level as irreparable harm *per se***

Echoing its ruling on "irreparable harm to the public," the district court treated violation of the Permit as sufficient, in itself, to establish irreparable harm to Robinson. Observing that the WVDEP "set a limit that" it viewed as "the 'appropriate level necessary to protect human health and the environment,'" the court stated that it was "led to a simple conclusion: when [Chemours] discharges pollutants in violation of those [state Permit standards]—the limits designed to protect the nation's waterways—the Defendant harms those waterways." JA1625; *see* JA1625 ("Based on the purposes of the CWA and [Chemours'] permit, excess discharge of HFPO-DA clearly causes irreparable harm.").

That holding yet again improperly turns every CWA permit violation into the basis for a preliminary injunction. But CWA permit violations do not, on their own, suffice for issuance of an injunction. Indeed, the Supreme Court expressly held, in the context of a CWA permit violation, that "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). To the contrary, the Court explained, "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.*

Other decisions applying the CWA are in accord. *See, e.g.*, *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 165, 173 (S.D.N.Y. 2010), *aff'd*, 406 Fed. App'x 557 (2d Cir. 2011) (denying preliminary-injunction motion because, although discharge permit was violated, movant's "evidence d[id] not clearly establish the likelihood of imminent irreparable injury"); *Hudson Riverkeeper Fund, Inc. v. Yorktown Heights Sewer Dist.*, 949 F. Supp. 210, 212 (S.D.N.Y. 1996) (denying preliminary-injunction motion because, although "the quantities of contaminants discharged … regularly exceed legally permissible limits," movant failed to provide "harder proof of real and immediate injury"); *Coal. for a Liveable West Side, Inc. v. N.Y.C. Dep't of Env't Prot.*, No. 92 CIV.

55

9011(DAB), 1998 WL 78285, at *4 (S.D.N.Y. Feb. 24, 1998) ("a violation of the NPDES, or even of the CWA, does not always present sufficient grounds for a permanent injunction"). And again, a contrary ruling would require issuance of tens of thousands of injunctions in response to the tens of thousands of CWA permit violations each year. *See* p. 45, *supra*.

### 2. The district court conflated evidence about HFPO-DA with evidence about PFOA

The district court further erred by relying on evidence about a different substance that was not at issue: PFOA. That mistake is significant. HFPO-DA was developed as a *substitute* for PFOA, pursuant to an EPA program aimed at ending PFOA use. JA460. The two substances, and the effects of exposure to them, are radically different. Evidence about PFOA accordingly provides no basis for a finding of irreparable harm based on Chemours' exceedance of the Permit limit for HFPO-DA.

The district court nevertheless repeatedly conflated the two substances. For example, the court stated that "once [HFPO-DA] enters [the body] it is 'very long-lived.'" JA1627. But that is not correct for HFPO-DA, even if comparing to PFOA: As WVRC's expert Schlezinger explained, PFOA has a half-life of 2 to 10 years, JA1335, whereas HFPO-DA leaves the human body within at most 14 days, JA1352.

56

The district court also invoked evidence that "a single exposure is likely to lead to at least one identified adverse health effect—that is, fatty liver, as studied *in human exposure to PFOAs*." JA1627 (emphasis added). Again, however, Chemours' predecessor voluntarily transitioned away from PFOA in 2013. JA460. A court's reliance on evidence about a different substance not at issue constitutes an abuse of discretion. *See Northern Va. Hemp*, 125 F.4th at 492 (in the preliminary-injunction context, "[a] district court abuses its discretion when it … rests its decision on a clearly erroneous finding of material fact").

### 3. The district court improperly equated the permitted source with Robinson's tap water

Even insofar as it actually considered evidence about HFPO-DA, the district court badly misconstrued it. According to the court, "[e]ach unlawful discharge of HFPO-DA is a direct toxic exposure to every person served by the affected water system." JA1627. The court thus treated every user of the Ohio River as if he was equally exposed via his drinking water at the permit-exceeding levels. That is plainly incorrect.

***First***, exposure to a discharged substance will vary depending on how much of the affected water is used and where it is drawn from. For instance,

57

Robinson's water system, Lubeck, draws less than half (39%) of its water from the Ohio River. JA1620.

In addition, river water reaches Lubeck's groundwater aquifer only after migrating through sediment, a process that can take a year or more. JA1398; JA1439. As a result, the concentration of HFPO-DA present in the aquifer could reflect the cumulative impact of years of air deposition and water discharges into the Ohio River—including discharges that *complied* with the higher Permit limits previously in place—and is not immediately affected by day-to-day discharges from Washington Works. JA1385; JA1398; JA1421; JA1430; JA1439; JA556.

In sum, a person who (unlike Robinson) uses tap water from Lubeck obviously does not face the same level of exposure as someone whose water system draws *all* of its water directly from the river. Treating "every person served by the affected water system" as interchangeable for purposes of establishing irreparable harm—as the district court did—makes no sense. JA1627.

***Second***, water systems routinely filter out contaminants. Here, Chemours monitors and maintains a top-of-line filtration system specifically designed to filter out HFPO-DA (among other substances) from water in

Lubeck. JA557–558. Chemours combines this system with routine sampling to ensure the system effectively filters out HFPO-DA. Chemours samples (1) Lubeck's untreated water, (2) the water after it passes through the lead carbon vessel of a unit, and (3) the water after it passes through the lag vessel of a unit. JA557–558. Sampling shows the Lubeck filtration system effectively removes HFPO-DA—so effectively, in fact, that it often reduces HFPO-DA to nondetectable levels (*i.e.*, to less than 2 ppt). *See* JA511–512. Indeed, the only time that Robinson tested her water, HFPO-DA was measured at undetectably low levels. JA1537.

True, as the carbon in the treatment vessels absorbs HFPO-DA, its capacity to remove those compounds diminishes over time, and levels in Lubeck's treated water slowly increase until the carbon media is replaced. JA558; *see, e.g.*, JA577 (showing post-lag sample at 3.4 ppt, up from non-detectable levels). But data show the average HFPO-DA concentration in Lubeck's water is safe and consistently compliant with annual averaging requirements under the 10 ppt MCL. JA885; JA515. Boston analyzed sampling results from Lubeck in performing her human health risk assessment. As she explained, they show Lubeck's treated water has on occasion exceeded 10 ppt but has averaged well under that level—specifically,

59

5.3 ppt in 2023 and 5.6 ppt in 2024. JA511–512. Even WVRC's expert, Schlezinger, conceded that "the HFPO-DA concentrations [in Lubeck tap water] may be compliant with the annual averaging requirements of EPA's maximum contaminant level." JA664.

In concluding that "[e]ach unlawful discharge of HFPO-DA is a direct toxic exposure to every person served by the affected water system," JA1627, the district court simply ignored these important differences between the permitted water source (here, the Ohio River) and the water to which the plaintiff is actually exposed (treated Lubeck tap water, if Robinson used it). In failing even to acknowledge that Lubeck's water is not immediately affected by Chemours' day-to-day discharges, and that its water is heavily filtered before reaching its users' taps, the court improperly concluded that any permit exceedance in the river automatically meant Robinson's tap water was "poisoned." JA1623.

### 4. No credible evidence indicates that tap water drinkers face irreparable harm from Chemours' exceedances

The district court further concluded that the evidence shows "harm occurs with every incremental exposure to HFPO-DA." JA1627. But the actual evidence—scant as it was—shows no such thing.

60

The only evidence invoked by the district court was testimony from Schlezinger, who opined that even "a single exposure [to HFPO-DA] is likely to lead to" adverse effects on liver tissue. JA1627. She based that testimony on EPA's MCL for HFPO-DA, opining that Robinson "likely" will suffer liver disease if she consumes water with HFPO-DA above 10 ppt for "one day." JA1354. But that opinion was not credible, as Schlezinger herself recognized: When asked whether she *really* believed that it "is likely that" a person exposed to HFPO-DA above the 10 ppt level on one occasion on one day will "suffer … liver disease," she answered "No." JA1355.

A far more credible source on the meaning of EPA's 10 ppt value, of course, is EPA itself. Per EPA's regulations, 10 ppt HFPO-DA is the "level below which there are no known or anticipated adverse health effects *over a lifetime of exposure*, including sensitive populations and life stages, [including] an adequate margin of safety." 40 C.F.R. §§ 141.2, 141.61(c)(2)(ii) (emphasis added). And EPA defines "lifetime" to mean roughly 70 years. *See* p. 13 n.1, *supra*. The agency thus measures compliance with the 10 ppt MCL using annual averages. 40 C.F.R. § 141.903.

As noted, Boston calculated annual averages of HFPO-DA both for Lubeck and for the Ohio River downstream from Washington Works. In both

locations, she found that annual average concentrations fall well below 10 ppt. JA511–514; JA885. Given annual averages well "below" the MCL, the agency's guidance means "no known or anticipated adverse health effects" are likely to occur. 40 C.F.R. § 141.2. And that is true even for "sensitive populations" who face "a lifetime of exposure" at those levels. *Id.* If exposure to HFPO-DA at those levels even for 70 years would be inadequate to produce anticipated adverse health effects, then "a single exposure" for "one day" would not remotely be enough.

The district court nevertheless called Chemours' reliance on the MCL a "dangerous premise," rejecting the notion that "exposure to a harmful pollutant like HFPO-DA is acceptable on some average." JA1626. But the very premise of the NPDES permitting regime—with its creation of specified "effluent limitation[s]" for particular substances—is that exposure to the substances at or below those specified "quantities, rates, and concentrations" would *not be* harmful. 33 U.S.C. § 1362(11).

In any event, it was WVRC, not Chemours, who first invoked the MCL. In its preliminary-injunction brief, WVRC claimed that "[u]ntreated source water from the Ohio River is already close to exceeding or actually exceeding the MCL for HFPO-DA." D. Ct. Doc. 8 at 15; *see* JA28–29. WVRC then

asserted: "EPA [has] determined that 'people who drink water containing HFPO-DA in excess of the MCL over many years may have increased health risks.'" D. Ct. Doc. 8 at 15. And WVRC's expert, Schlezinger, relied heavily on the 10 ppt value in assessing the putative risks of Chemours' Permit exceedances. JA1354. Having repeatedly invoked the MCL, WVRC cannot now disclaim EPA's assessment of what it actually *means*.

Contrary to the district court's assertion, moreover, MCLs and their compliance measurements are not just "some average." JA1626. There is no basis to ignore EPA's assessment of HFPO-DA and the level of exposure that, the agency has concluded, would be required to significantly increase the risk of harmful health effects.[7]

Finally, the district court ignored that WVDEP itself set the Permit's effluent limits based on a "goal for HFPO-DA (GenX) in drinking water at 140 nanograms per liter (ng/L) or parts per trillion (ppt)." JA703. That figure reflects WVDEP's judgment that 140 ppt is appropriately "protective of the

_____

[7] The district court accused Chemours of arguing that an increased risk cannot amount to irreparable harm unless it can be "exactly calculate[d]," JA1627, or that a plaintiff cannot sue if "symptoms have not yet emerged before trial," JA1628. Those have never been Chemours' arguments. Instead, Chemours argues that risk of harm must be *concrete*—substantial and reasonably likely to materialize—to constitute irreparable harm supporting preliminary-injunctive relief. D. Ct. Doc. 17 at 11–15.

State's narrative water quality criteria for human health." JA703. That level has *never* been found to have been exceeded—not in the Ohio River, not in the aquifer used by Lubeck, and certainly not in Lubeck's treated drinking water. The court's dismissiveness towards the 10 ppt MCL is thus irreconcilable with its insistence that violating the Permit's levels necessarily inflicts irreparable harm because WVDEP "designed [those levels] to protect the nation's waterways." JA1625.

## CONCLUSION

This Court should reverse the district court's order.

Dated: September 22, 2025                    Respectfully submitted,

Joseph A. Ford                    */s/ Allon Kedem*
Clifford F. Kinney, Jr.           Allison B. Rumsey
Niall A. Paul                     Allon Kedem
James A. Walls                    Elisabeth S. Theodore
SPILMAN, THOMAS &                 Dirk C. Phillips
  BATTLE, PLLC                    ARNOLD & PORTER
P.O. Box 615                        KAYE SCHOLER LLP
Morgantown, WV 26507-0615         601 Massachusetts Avenue, NW
(304) 720-3408                    Washington, DC 20001-3743
JFord@spilmanlaw.com             (202) 942-5000
                                  Allon.Kedem@arnoldporter.com

*Counsel for Defendant-Appellant*

64

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. Given the complexity and importance of the issues presented, Appellant believes that oral argument would assist the Court in its decisional process. See Loc. R. 34(a).

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,945 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 and is set in 14-point Century Expanded BT font.

Dated: September 22, 2025              /s/ Allon Kedem
                                       Allon Kedem
                                       ARNOLD & PORTER
                                         KAYE SCHOLER LLP
                                       601 Massachusetts Avenue, NW
                                       Washington, DC 20001-3743
                                       (202) 942-5000
                                       Allon.Kedem@arnoldporter.com

                                       Counsel for Defendant-Appellant

66

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2025, I electronically filed the foregoing document and accompanying materials with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Allon Kedem*
Allon Kedem

*Counsel for Defendant-Appellant*

67