No. 25-1924

IN THE

# United States Court of Appeals
# for the Fourth Circuit

WEST VIRGINIA RIVERS COALITION, INC.,

*Plaintiff-Appellee,*

v.

THE CHEMOURS COMPANY FC, LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of West Virginia
No. 2:24-cv-701
District Judge Joseph R. Goodwin

**BRIEF FOR *AMICI CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND AMERICAN CHEMISTRY COUNCIL**

| | |
|---|---|
| ANDREW R. VARCOE | SEAN MAROTTA |
| AUDREY DOS SANTOS | HOGAN LOVELLS US LLP |
| U.S. CHAMBER LITIGATION CENTER | 555 Thirteenth Street, N.W. |
| 1615 H Street, N.W. | Washington, D.C. 20004 |
| Washington, D.C. 20062 | (202) 637-4881 |
| (202) 463-5337 | sean.marotta@hoganlovells.com |

*Counsel for the Chamber of Commerce of the United States of America*

*Counsel for Amici Curiae*

ELLIOTT ZENICK
AMERICAN CHEMISTRY COUNCIL
700 2nd Street, N.E.
Washington, D.C. 20002
(202) 249-6744

*Counsel for American Chemistry Council*

September 29, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the undersigned counsel certifies the following:

The Chamber of Commerce of the United States of America ("Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

American Chemistry Council ("ACC") states that it is a non-profit, tax-exempt organization incorporated in New York.  ACC has no parent corporation, and no publicly held company has 10% or greater ownership in ACC.

/s/ Sean Marotta
Sean Marotta

September 29, 2025

i

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ........................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE*.................................................1

SUMMARY OF THE ARGUMENT ..................................................................3

ARGUMENT .................................................................................................4

I.    THE DISTRICT COURT MISAPPLIED THE SUPREME COURT'S AND THIS COURT'S PRELIMINARY INJUNCTION PRECEDENT IN THREE DISTINCT WAYS ....................................................................................................4

    A.  The district court incorrectly believed, contrary to decades of Supreme Court precedent, that a violation of a CWA effluent standard should almost always lead to injunctive relief............................6

    B.  The district court incorrectly granted a preliminary injunction based on the possibility, rather than likelihood, of irreparable harm.......16

    C.  The district court improperly considered harm to the public at large as part of its irreparable-harm analysis.....................................19

II.   THE DISTRICT COURT'S ERRORS, IF INCORPORATED INTO THIS COURT'S CASE LAW, WOULD THREATEN PERVERSE CONSEQUENCES, INCLUDING ADVERSE IMPACTS ON EFFECTIVE ENFORCEMENT OF THE CWA..................21

CONCLUSION ...........................................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

<u>Page</u>

**CASES:**

*American Fed. of Teachers v. Bessent,*
__ F. 4th __, 2025 WL 2313244 (4th Cir. Aug. 12, 2025)..................................5

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987)........................................................................................9

*Bethesda Softworks, L.L.C. v. Interplay Enter. Corp.,*
452 F. App'x 351 (4th Cir. 2011) ................................................................14

*Christopher Phelps & Assocs., LLC v. Galloway,*
492 F.3d 532 (4th Cir. 2007) .......................................................................15

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006).....................................................................................12

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.,*
528 U.S. 167 (2000).....................................................................................24

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,*
484 U.S. 49 (1987)........................................................................................24

*Hecht Co v. Bowles,*
321 U.S. 321 (1944)......................................................................................11

*Henderson v. Bluefield Hosp. Co.,*
902 F.3d 432 (4th Cir. 2018) .......................................................................16

*HIAS, Inc. v. Trump,*
985 F.3d 309 (4th Cir. 2021) .......................................................................20

*Huskey v. Ethicon, Inc.,*
848 F.3d 151 (4th Cir. 2017) .........................................................................6

*In re Microsoft Antitrust Litig.,*
333 F.3d 517 (4th Cir. 2003) .......................................................................20

*Kinney-Coastal Oil Co. v. Kieffer,*
277 U.S. 488 (1928)......................................................................................21

iii

# TABLE OF AUTHORITIES—Continued

Page

*League of Women Voters of N.C. v. North Carolina,*
769 F.3d 224 (4th Cir. 2014) ....................................................................20

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) .....................................................................................5

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ...............................................................................13, 18

*North Carolina ex rel. Cooper v. Tennessee Valley Auth.,*
615 F.3d 291 (4th Cir. 2010) ....................................................................25

*Real Truth About Obama, Inc. v. FEC,*
575 F.3d 342 (4th Cir. 2009) ....................................................................16

*Roe v. Department of Defense,*
947 F.3d 207 (4th Cir. 2020) ....................................................................16

*Salomon & Ludwin, LLC v. Winters,*
__ F.4th __, 2025 WL 2314652 (4th Cir. Aug. 12, 2025)................................19

*SAS Inst., Inc. v. World Programming Ltd.,*
874 F.3d 370 (4th Cir. 2017) ...................................................................6, 18

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024)................................................................................13, 14

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)....................................................................................24

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025).....................................................................................21

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982)........................................................................ 7, 9-11

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008)........................................................................ 5, 17-20

## TABLE OF AUTHORITIES—Continued

Page

*Yakus v. United States*,
   321 U.S. 414 (1944)..................................................................................8

**STATUTES:**

33 U.S.C. § 1319(b) ...............................................................................9, 14

33 U.S.C. § 1319(c) ....................................................................................9

33 U.S.C. § 1319(d) ....................................................................................9

33 U.S.C. § 1364(a) ....................................................................................9

33 U.S.C. § 1365(a) ..................................................................................14

33 U.S.C. § 1365(d) ..................................................................................14

42 U.S.C. § 7604(a)(1) .............................................................................26

42 U.S.C. § 7604(f) ..................................................................................26

**OTHER AUTHORITIES:**

William L. Andreen, *Motivating Enforcement: Institutional Culture and the Clean
   Water Act*, 24 Pace Env't L. Rev. 67 (2007) .....................................23

Claudia Copeland, Cong. Rsch. Serv., RL30030, *Clean Water Act: A Summary of
   the Law* (2016), https://www.congress.gov/crs-product/RL30030 ....................23

EPA, *History of the Clean Water Act* (June 10, 2025),
   https://perma.cc/R852-QZCK................................................................7

EPA, *National Enforcement and Compliance Initiative: Reducing Significant Non-
   Compliance with National Pollutant Discharge Elimination (NPDES) Permits*
   (Dec. 13, 2024), https://perma.cc/P8U4-652X .................................................22

EPA, *NPDES Noncompliance Annual Report*, https://echo.epa.gov/npdes-
   noncompliance-annual-report (visited Sept. 29, 2025) .....................................22

EPA, *NPDES Permit Basics* (June 3, 2025), https://bit.ly/4eNhUjM ....................23

# TABLE OF AUTHORITIES—Continued

<u>Page</u>

EPA, *NPDES State Program Authority* (Aug. 29, 2025),
  https://bit.ly/3UfLAOd ...................................................................................23

Richard K. Lattanzio, Cong. Rsch. Serv., RL30853, *Clean Air Act: A Summary of
  the Act and Its Major Requirements* (2022), https://www.congress.gov/crs-
  product/RL30853 ...........................................................................................25

Alexandria A. Polk, Comment, *The Clean Water Act and Evolving Due Process:
  The Emergence of Contemporary Enforcement Procedures*,
  65 Okla. L. Rev. 717 (2013) ..........................................................................23

11A Charles Wright, Arthur Miller, & Mary Kane, *Federal Practice & Procedure*
  § 2948.1 (2d ed. 1995) ...................................................................................17

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The Chamber of Commerce of the United States of America and American Chemistry Council respectfully submit this brief as *amici curiae*.[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

American Chemistry Council ("ACC") is a trade association representing leading companies engaged in the multibillion-dollar business of chemistry. ACC members apply the science of chemistry to make innovative products, technologies, and services that make people's lives better, healthier, and safer. ACC is committed to improved environmental, health, safety, and security

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. The West Virginia Rivers Coalition and Little Hocking Water Association have not consented to the filing of this brief; The Chemours Company has.

performance through Responsible Care®; common-sense advocacy addressing major public policy issues; and health and environmental research and product testing. ACC members and chemistry companies are among the largest investors in research and development, and are advancing products, processes, and technologies to address climate change, enhance air and water quality, and progress toward a more sustainable, circular economy.

A principal reason for *amici*'s interest in this case is that the district court badly misinterpreted and misapplied the Supreme Court's and this Court's precedent on the requirements for issuing preliminary injunctions. If the district court were affirmed, there is a substantial risk that preliminary injunctions would go from extraordinary remedies to routine interim relief in Clean Water Act (CWA) citizen-suit cases involving even technical violations of the statute—and, potentially, in analogous cases arising under other statutes. That, in turn, would threaten a variety of perverse and damaging consequences, including adverse impacts on effective enforcement of the CWA, and would impose unjustified harms on American businesses and other defendants in CWA cases.[2]

---

[2] This brief focuses only on irreparable harm, and does not analyze any other issue that Chemours raises in its opening brief.

2

## SUMMARY OF THE ARGUMENT

**I.**     The district court held that an injunction should result from an ongoing violation of a CWA permit in all but the most unusual cases. That holding is fatally flawed, for three distinct reasons.

*First*, the Supreme Court has repeatedly rejected arguments that an injunction automatically follows proof of a federal statutory violation—including in a case arising under the CWA. This Court has likewise rejected the subsidiary argument that proof of a violation of a federal statute creates a presumption of irreparable harm. The district court's manipulation of the preliminary-injunction standard was not a novel way to make preliminary injunctions available to environmental plaintiffs; it was a rehash of arguments that the Supreme Court and other courts have rejected for decades.

*Second*, the district court effectively found irreparable harm based on nothing more than a possibility of irreparable harm. The court did so by recasting the increased risks of harm created by exposures to chemicals attributed to Chemours as distinct "micro-injuries." But an increase in the chance of irreparable harm is not the same thing as a likelihood of irreparable harm. And to the extent it is difficult to know precisely when accumulated exposure to a substance goes from a possible risk of irreparable harm to a likely risk of irreparable harm, that simply

3

reflects that the preliminary-injunction standard is a high bar. Any difficulty in proving irreparable harm is not a warrant to twist the required likelihood standard.

*Third*, the district court improperly considered what it believed was irreparable harm to the public at large as part of its second-prong irreparable-harm analysis. Both the Supreme Court and this Court have repeatedly held that the second-prong inquiry—unlike the third and fourth prongs—looks at the harm to the plaintiff alone.

**II.**      If affirmed by this Court, the district court's errors could seriously distort CWA enforcement—and potentially, the enforcement of other similar statutes. Federal and state regulators, not private plaintiffs, are charged with the primary enforcement of environmental statutes. The district court's decision would empower environmental groups to seek preliminary injunctions for even technical violations of the Act, trumping government regulators' determinations that less-intrusive remedies are necessary and usurping these regulators' primary role in guiding enforcement policy.

If they are not rejected here, the district court's errors seem likely to infect more than CWA enforcement. The Clean Air Act (CAA), too, prominently features permitting requirements that can be enforced by citizen suits. And the district court's reasoning would seemingly turn any violation of any federal law relating to health or safety into a presumptive preliminary injunction. That

4

approach is simply not consistent with Supreme Court precedent on preliminary injunctions or the traditional four-factor test for determining whether a preliminary injunction should issue.

This Court should reverse.

## ARGUMENT

**I. THE DISTRICT COURT MISAPPLIED THE SUPREME COURT'S AND THIS COURT'S PRELIMINARY INJUNCTION PRECEDENT IN THREE DISTINCT WAYS.**

It is axiomatic—and nearly trite—that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (preliminary injunction is an "extraordinary and drastic" remedy). A preliminary injunction requires the movants to demonstrate "(1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that the injunction is in the public interest." *American Fed. of Teachers v. Bessent*, ___ F. 4th ___, 2025 WL 2313244, at *2 (4th Cir. Aug. 12, 2025). Furthermore, although a district court's grant or denial of a preliminary injunction is reviewed for an abuse of discretion, "[a] district court abuses its discretion when it 'relies on incorrect legal conclusions.' " *SAS Inst., Inc. v. World Programming*

5

*Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017) (quoting *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 158 (4th Cir. 2017)).

The district court here applied the wrong preliminary-injunction standard three times over.  Any one of these errors would warrant reversal of the district court's decision.

### A.     The district court incorrectly believed, contrary to decades of Supreme Court precedent, that a violation of a CWA effluent standard should almost always lead to injunctive relief.

The district court made no secret of the fact that it believed that *Winter*'s preliminary-injunction standard is too demanding for environmental plaintiffs.  *See* JA1622.  But the district court thought there was "a way through": "A continuing violation of federal environmental law *should presume irreparable harm* and clearly demonstrate a likelihood of success on the merits," and "[t]he balance of equities and public interest should tilt sharply towards the preservation of public resources and ecological health." *Id.* (emphasis added).  The district court believed, in other words, that a preliminary injunction should almost always follow—in large part because irreparable harm should be "presume[d]"—once a plaintiff has shown that a defendant is likely violating the CWA.  *See* JA1622-23 (contending that where there is a violation of the CWA's effluent limits, "the first three factors . . . will *almost invariably favor* the plaintiff" and "the balance of equities will rarely favor a violator") (emphasis added).

6

Contrary to the district court's apparent belief, there was nothing novel about its attempt to short-circuit the preliminary-injunction analysis. In fact, the Supreme Court has rejected nearly identical reasoning in a CWA case. More broadly, litigants for years have argued that a proven violation of statutes as diverse as the Emergency Price Control Act and the Copyright Act should automatically result in an injunction, or at least a presumption of irreparable harm. And for decades, the Supreme Court and this Court have rejected those arguments. Precedent requires the Court to do so again here.

1. This is the rare appeal where a Supreme Court case directly controls. In *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), Puerto Rico's governor sued to block the Navy from conducting weapons training on Vieques Island, alleging that the Navy was violating the CWA—which the Court referred to by its original name, the Federal Water Pollution Control Act[3]—by discharging munitions into the waters surrounding the island without a permit from the Environmental Protection Agency (EPA). *Id.* at 307-308. The district court agreed that discharging munitions into the waters near Vieques required a permit under the

---

[3] *See* EPA, *History of the Clean Water Act* (June 10, 2025), https://perma.cc/R852-QZCK (explaining that the "Federal Water Pollution Control Act of 1948 was the first major U.S. law to address water pollution" and that following "sweeping amendments in 1972," the "law became commonly known as the Clean Water Act.") The statutory citations in *Romero-Barcelo* make clear that the Court was discussing what we now call the Clean Water Act, even though it used the older name. *See Romero-Barcelo*, 456 U.S. at 308-309.

Act's plain text and directed the Navy to apply for one. *Id.* at 309-310. But the court refused to enjoin the Navy's weapons training in the interim because the munitions were not causing any appreciable harm to the environment and the island was an important training center for the Navy. *Id.*

The court of appeals reversed, holding that the district court had "erred in undertaking a traditional balancing of the parties' competing interests." *Id.* at 310-311. In the court of appeals' view, the Navy had "an absolute statutory obligation to stop any discharges of pollutants until the permit procedure has been followed." *Id.* at 311 (citation omitted).

The Supreme Court reversed the court of appeals. The Court stressed that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable harm may otherwise result to the plaintiff." *Id.* at 312 (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)). The Supreme Court emphasized that "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.* at 313.

Moreover, the Court pointed out that, under the CWA, "[a]n injunction is not the only means of ensuring compliance." *Id.* at 314. The Act, "for example,

8

provides for fines and criminal penalties." *Id.* (citing 33 U.S.C. §§ 1319(c), (d)). Indeed, the Act's text and structure "make[] clear that Congress did not anticipate that all discharges would be immediately enjoined." *Id.* at 317-318.  EPA should seek an injunction to immediately restrain discharges only if it finds the discharges to present "an imminent and substantial endangerment to the health of persons or to the welfare of persons."  33 U.S.C. § 1364(a).  Otherwise, EPA should "commence a civil action for appropriate relief, including a permanent or temporary injunction." *Id.* § 1319(b).  In fact, in most cases, EPA does not seek immediate cessation orders.  The agency instead obtains "a remedial order setting out a detailed schedule of compliance designed to cure the identified violation of the Act." *Romero-Barcelo*, 456 U.S. at 318 (citation omitted).

Ultimately, the Court stressed that the CWA "contemplates equitable consideration." *Id.*  As a result, "[r]ather than requiring a district court to issue an injunction for any and all statutory violations, the [CWA] permits the district court to order that relief it considers necessary to secure prompt compliance with the Act." *Id.* at 320.  "That relief can include . . . an order of immediate cessation," to be sure, but "[t]he exercise of equitable discretion . . . must include the ability to deny as well as grant injunctive relief." *Id.*

This Court should "see nothing which distinguishes *Romero-Barcelo* from the instant case." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544

9

(1987). The district court believed that courts should almost never "deny injunctive relief even when the Clean Water Act has clearly been violated." JA1622-23. But the point of *Romero-Barcelo* is that even when there has been a violation of the CWA, an injunction need not always follow. 456 U.S. at 320. The district court believed that the "Clean Water Act's purpose" required it to grant an injunction essentially any time there is a continuing violation of a CWA permit. *See* JA1622. But *Romero-Barcelo* is explicit that "[a]n injunction is not the only means of ensuring compliance" with the CWA's aims. 456 U.S. at 314. The district court believed that any discharge that violates a permit's limits necessarily pollutes the water. *See* JA1625. But *Romero-Barcelo* makes clear that a discharge can violate the CWA and yet not injure the waters of the United States. 456 U.S. at 315. And although the district court dismissed Chemours' ongoing efforts to reduce its discharges consistent with its administrative order of compliance, JA1636-38, *Romero-Barcelo* recognized that administrative orders of compliance are the ordinary way that EPA addresses permit violations, 456 U.S. at 318.

In sum, *Romero-Barcelo* undermines every pillar of the district court's almost-always-issue-an-injunction rationale. The district court cited and even quoted *Romero-Barcelo*, JA1631, but never grappled with its core message that CWA cases are just like all others: They require a fact-sensitive analysis, shorn of presumptions and without a thumb on the scale in favor of an injunction.

10

2.  Even if *Romero-Barcelo* did not directly control, the Supreme Court's and this Court's other cases on preliminary injunctions would foreclose the district court's view that an injunction should almost always issue to prevent an ongoing violation of the CWA.  The Supreme Court has "repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Romero-Barcelo*, 456 U.S. at 312.  These principles, and *Winter*'s four-factor test generally, reflect a "practice with a background of several hundred years of history." *Hecht Co v. Bowles*, 321 U.S. 321, 329 (1944).  And as a result of that lengthy history, the Supreme Court does "not lightly assume that Congress has intended to depart from these established principles." *Romero-Barcelo*, 456 U.S. at 313.

Stretching back for over 80 years, then, the Supreme Court has rejected the argument that when a party proves a federal statutory violation, an injunction should invariably follow.  For instance, the Emergency Price Control Act provided that "upon a showing by the Administrator that" a defendant "has engaged or is about to engage in" practices that violate the Act, "a permanent or temporary injunction, restraining order, or other order shall be granted without bond." *Hecht Co.*, 321 U.S. at 322.  The government contended that the Act's command that an injunction "shall be granted" meant that the district court had no discretion to deny one once the government showed it was likely to succeed on the merits. *Id.* at 329-

11

330.  Yet the Supreme Court disagreed, explaining that even despite the word "shall," the Court was "dealing here with the requirements of equity practice" such that "if Congress desired to make such an abrupt departure from traditional equity practice as is suggested, it would have made its desire plain." *Id.*  The Court therefore read the Act "in favor of that interpretation which affords a full opportunity for equity courts to treat enforcement proceedings . . .  in accordance with their traditional practices." *Id.* at 330.

The Supreme Court has relied on these principles in the decades since to reject arguments that injunctions should automatically or presumably follow a statutory violation.  The Federal Circuit, for instance, had "articulated a 'general rule,' unique to patent disputes, 'that a permanent injunction will issue once infringement and invalidity have been adjudged,' " and "that injunctions should be denied only in the 'unusual' case, under 'exceptional circumstances' and 'in rare instances . . . to protect the public interest.' " *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-394 (2006) (citations omitted and ellipses in original).  The Supreme Court rejected the rule, explaining that even though a patent owner has "the right to exclude others from using his property," that right to exclude did not mean that an injunction was required every time a valid patent was infringed. *Id.* at 392-393.  The Court stressed that "the decision to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion

must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 394; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (the court of appeals had "presume[d] that an injunction is the proper remedy for a [National Environmental Policy Act] violation except in unusual circumstances," but "[n]o such thumb on the scales is warranted").

The Supreme Court reiterated these principles just last year. The National Labor Relations Board argued that because it is responsible for adjudicating unfair-labor-practice charges and its decisions are reviewed deferentially by the courts of appeals, district courts reviewing the Board's petitions for preliminary injunctions against employers' allegedly violative conduct should "apply the traditional criteria in a less exacting way." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 349 (2024). It was enough, the Board argued, that its case was "substantial and not frivolous." *Id.* at 350.

The Supreme Court refused to water down the preliminary-injunction standard, emphasizing that it has "consistently employed" its presumption that the traditional four-factor test applies "when interpreting a wide variety of statutes that authorize preliminary and permanent injunctions." *Id.* at 346. There was nothing in the National Labor Relations Act that "overcomes the presumption that traditional equitable principles govern," so "district courts considering the Board's

13

request for a preliminary injunction must apply the *Winter* framework, which embodies those traditional principles." *Id.* at 348. And the Court emphasized that "statutory context" could not "salvage" the Board's argument for a more relaxed preliminary-injunction standard. *Id.* at 351.

These principles, too, sink the district court's holding that injunctions should almost always issue in CWA cases. Nothing in the CWA suggests that Congress intended to deviate from the usual four-factor test. The Act simply says that in citizen suits like the one filed here, district courts "have jurisdiction" to issue orders to enforce CWA requirements, not that such orders are mandatory. 33 U.S.C. § 1365(a); *cf. id.* § 1365(d) ("The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure."); *id.* § 1319(b) (authorizing EPA's Administrator to bring civil actions "for appropriate relief, including a permanent or temporary injunction," in certain cases; vesting jurisdiction in district courts "to restrain such violation and to require compliance"). And the district court's appeals to congressional purpose fall flat because the Supreme Court has rejected similar attempts to loosen the *Winter* factors. The partial dissent in *Starbucks* argued that a more generous standard should apply in light of "congressional intent." 602 U.S. at 354 (Jackson, J.,

14

dissenting in part), yet the Court rejected that approach, *id.* at 350-351. The same result is required here.

3. This Court's decisions follow and reinforce the Supreme Court's precedent on these issues. Following *eBay*, for example, a copyright plaintiff had "argue[d] affirmatively that when copyright infringement has been proved and there is a threat of continuing infringement, the copyright holder is entitled to an injunction." *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (citation and internal quotation marks omitted). This Court dismissed that view, explaining that "[i]nsofar as [the plaintiff] suggests that it is *entitled* to injunctive relief, we reject that argument." *Id.* The Court explained that *eBay* "rejected any notion that 'an injunction automatically follows a determination that a copyright has been infringed.' " *Id.*

In *Bethesda Softworks, L.L.C. v. Interplay Enterprise Corp.*, 452 F. App'x 351, 354 (4th Cir. 2011), this Court relied on *Phelps & Associates* to reject the logically related argument that irreparable harm follows any time a copyright is infringed. This Court acknowledged that, "[a]t one time, federal courts, including this circuit, presumed irreparable harm in copyright cases once the plaintiff established probable likelihood of success on the merits." 452 F. App'x at 354. But with *eBay*, "the Supreme Court declared such presumptions inappropriate." *Id.* Although *Phelps & Associates* had observed that "[i]rreparable injury often

15

derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights," reading that passage as creating a presumption of irreparable harm was "impermissibly broad." *Id.* at 355 (citation omitted). And this Court similarly rejected a presumption of irreparable harm in the labor context, holding that the National Labor Relations Board was not entitled to a presumption of irreparable harm following a finding that an employer has not bargained in good faith. *Henderson v. Bluefield Hosp. Co.*, 902 F.3d 432, 440 (4th Cir. 2018).

In the district court's view, whenever a plaintiff has established it is likely to show that a permit holder has discharged in excess of its permit's limits, the plaintiff has necessarily established that irreparable harm is likely as well. But this Court's decisions, like the relevant Supreme Court case law, are just not consistent with the district court's position.

**B.    The district court incorrectly granted a preliminary injunction based on the possibility, rather than likelihood, of irreparable harm.**

1. The district court also erred in granting a preliminary injunction based essentially on a possibility of harm rather than the likelihood of harm that *Winter* requires. Before *Winter*, this Court "balance[d] the irreparable harm to the respective parties, requiring only that the harm to the plaintiff outweigh the harm to the defendant." *Roe v. Department of Defense*, 947 F.3d 207, 229 (4th Cir. 2020) (quoting *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir.

16

2009)).  Under this Court's previous test, "upon a strong showing on the probability of success, the moving party could obtain a preliminary injunction by demonstrating only a possibility of irreparable injury."  *Id.* (brackets omitted).  But *Winter* "has since rejected" this Court's old test, requiring the current "demonstrat[ion] that irreparable injury is *likely* in the absence of an injunction." *Id.* (quoting *Winter*, 555 U.S. at 22).

As *Winter* explained, a " 'possibility' standard is too lenient."  555 U.S. at 22.  A preliminary injunction "will not be issued simply to prevent the possibility of some remote future injury."  *Id.* (quoting 11A Charles Wright, Arthur Miller, & Mary Kane, *Federal Practice & Procedure* § 2948.1, p. 139 (2d ed. 1995)).  That is because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.*

2.  The district court gave *Winter*'s likelihood standard lip service.  JA1623. But the court then side-stepped the test, equating an increase in the possibility of irreparable harm with the irreparable harm itself.  The district court stated that each exposure to pollutants over Chemours' permit limit is a "micro-injury" that will "accumulate over time and *can* cause serious adverse health effects."  JA1627 (emphasis added).  But the harm that counts is a *likely* health effect; an exposure

17

that speculatively increases the risk, or perceived risk, of a health effect is not—in and of itself—an irreparable harm. And the district court freely conceded that the evidence did not establish a demonstrable health effect would likely result from Chemours' discharges in excess of its permit. *See* JA1628 (contending that the irreparable harm "lies not in the immediacy of symptoms, but in the unpredictability and permanence of future health consequences").

The district court appeared to think that unless it adopted its "micro-injury" theory of irreparable harm, it would be too hard for CWA plaintiffs to obtain preliminary injunctions. *See* JA1623. But to the extent that the district court was correct that irreparable harm is hard to prove in CWA actions, that is the natural consequence of the high bar for preliminary injunctions. *SAS Inst.*, 874 F.3d at 385. As this Court has explained, "[i]njunctive relief is not casually granted because of its prospective character." *Id.* That is, "[i]njunctions by their nature attempt to anticipate the future, but the future sometimes declines stubbornly to be prophesied." *Id.* If it is too difficult to pinpoint when discharges add up to irreparable harm, an injunction should be denied because an injunction "does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. The difficulty is not license to change the preliminary-injunction standard. *See Geertson Seed Farms*, 561 U.S. at 158 ("It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an

18

injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test . . . .").

### C. The district court improperly considered harm to the public at large as part of its irreparable-harm analysis.

Finally, the district court erred by considering harm to the public as part of its irreparable-harm analysis. *See* JA1628-34. As the district court observed, *Winter*'s standard states that "a plaintiff must establish 'that *he* is likely to suffer irreparable harm in the absence of preliminary relief.' " JA1628 (quoting *Winter*, 555 U.S. at 20). The Supreme Court's formulation, "[o]n its face, . . . forecloses consideration of the irreparable harm to the public." *Id.* But the district court believed that *Winter*'s statement somehow did not apply to CWA cases because *Winter* arose under the National Environmental Policy Act—a procedural statute— whereas the CWA is a substantive law aimed at protecting the public's interest in clean water. JA1628-29.

The district court was simply wrong that *Winter*'s focus on the plaintiff in the preliminary-injunction analysis was somehow limited to procedural statutes like NEPA. Time and again, this Court has in non-NEPA cases articulated the irreparable-harm analysis as focused on preventing irreparable harm to the plaintiffs. *See*, *e.g.*, *Salomon & Ludwin, LLC v. Winters*, __ F.4th __, 2025 WL 2314652, at *7 n.7 (4th Cir. Aug. 12, 2025) (explaining, in a trade-secrets case, that "[i]rreparable harm requires a plaintiff to make a 'clear showing that *it* will

19

suffer harm that is neither remote nor speculative, but actual and imminent' ")
(emphasis added and citation omitted); *HIAS, Inc. v. Trump*, 985 F.3d 309, 325-
326 (4th Cir. 2021) (asking, in a Refugee Act case, "whether *the plaintiffs* are
likely to suffer irreparable harm in the absence of an injunction") (emphasis
added); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236
(4th Cir. 2014) (explaining, in a voting-rights case, that "[t]o win such a
preliminary injunction, Plaintiffs must demonstrate that . . . *they* will likely suffer
irreparable harm absent an injunction") (emphasis added).

The irreparable-harm prong of the preliminary-injunction test looks to the
irreparable harm to the plaintiff, not the public, for two reasons. *First*, "[t]he
traditional office of a preliminary injunction is to protect the status quo and to
prevent irreparable harm during the pendency of a lawsuit ultimately to preserve
the court's ability to render a meaningful judgment on the merits." *In re Microsoft
Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). A preliminary injunction is
thus meant to protect the *plaintiff* from harm until the case is completed, not
undifferentiated members of the public not before the Court. *See Winter*, 555 U.S.
at 22 (preliminary-injunction applicant "must demonstrate that in the absence of a
preliminary injunction, the applicant is likely to suffer irreparable harm before a
decision on the merits can be rendered") (citation and internal quotation marks
omitted).

20

*Second*, and relatedly, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.' " *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)).  The question when granting injunctive relief is "whether [the] injunction will offer complete relief to the plaintiffs before the court."  *Id.* at 852 (emphasis omitted).  It therefore follows that the irreparable harm that matters when granting injunctive relief is the plaintiff's irreparable harm.[4]

**II.    THE DISTRICT COURT'S ERRORS, IF INCORPORATED INTO THIS COURT'S CASE LAW, WOULD THREATEN PERVERSE CONSEQUENCES, INCLUDING ADVERSE IMPACTS ON EFFECTIVE ENFORCEMENT OF THE CWA.**

If the district court's approach is affirmed, there is a substantial risk that preliminary injunctions would go from extraordinary remedies to routine interim relief in CWA citizen-suit cases involving even technical violations of the statute.  That, in turn, would threaten a variety of perverse and damaging consequences, including adverse impacts on effective CWA enforcement.

---

[4] Of course, plaintiff-specific injunctions sometimes benefit the public.  An anti-nuisance injunction requiring a neighbor to turn down her loud music will benefit the entire neighborhood, not just the plaintiff that brought the suit.  *CASA, Inc.* 606 U.S. at 851-852.  But even though the "court's injunction might have the practical effect of benefiting nonparties, that benefit is merely incidental."  *Id.* at 852 (citation, quotation marks, emphasis, and brackets omitted).  So too here.

21

1.  Although many businesses work diligently to comply with their CWA permit obligations, violations do exist.  According to EPA, at the end of Fiscal Year 2023, 9.3% of all individually permitted National Pollutant Discharge Elimination System facilities were in "significant" noncompliance with their permits, and about half of those were effluent-limit violations.  *See* EPA, *National Enforcement and Compliance Initiative: Reducing Significant Non-Compliance with National Pollutant Discharge Elimination (NPDES) Permits* (Dec. 13, 2024), https://perma.cc/P8U4-652X (approximately 4.5% of approximately 46,000 permits are in significant noncompliance for exceeding effluent limitations).  EPA's annual noncompliance report indicates that there were *62,321* facilities with violations in 2024.  *See* EPA, *NPDES Noncompliance Annual Report*, https://echo.epa.gov/npdes-noncompliance-annual-report (visited Sept. 29, 2025).

It would be infeasible to shut down even a small fraction of all such noncompliant facilities, which include critical infrastructure like municipal sewer systems and plants that produce vital chemical and other products for the national supply chain.  National Enforcement and Compliance, *supra*.  Unsurprisingly, then, federal and state regulators do not routinely shut down facilities for violations.  One analysis found that EPA resolved 70% of all CWA violations informally through measures like warning letters and telephone calls, William L. Andreen, *Motivating Enforcement: Institutional Culture and the Clean Water Act*,

22

24 Pace Env't L. Rev. 67, 89 (2007), and another found that 90% of all formal CWA enforcement actions result in administrative orders, *see* Alexandria A. Polk, Comment, *The Clean Water Act and Evolving Due Process: The Emergence of Contemporary Enforcement Procedures*, 65 Okla. L. Rev. 717, 719 n.17 (2013).

2.  Under Congress's statutory design, EPA and state regulatory agencies—subject to EPA's oversight and authority—play the primary role in implementing and enforcing the CWA.[5]  Duty-bound to act in the public interest, these regulatory agencies enjoy broad-ranging powers to enforce that enactment's requirements, including the power to seek penalties and injunctive relief.  Citizen suits play a limited and interstitial role in enforcing the CWA and other statutes—a role that must supplement and not supplant the primary role of regulatory agencies.  Indeed, the Supreme Court has warned against applications of the CWA citizen-suit provision that would "potentially intru[de]" on the "discretion of state [and federal]

---

[5] Forty-seven States in total administer NPDES programs to various degrees subject to EPA oversight, and States play an active role in enforcing permit requirements—again, subject to EPA oversight. *See* EPA, *NPDES Permit Basics* (June 3, 2025), https://bit.ly/4eNhUjM. NPDES permits are therefore usually issued, not by the federal government, but by individual state programs. *See* Claudia Copeland, Cong. Rsch. Serv., RL30030, *Clean Water Act: A Summary of the Law* 6 (2016), https://www.congress.gov/crs-product/RL30030. Indeed, the States issue the vast majority of NPDES permits nationwide. *See id.*; *NPDES Permit Basics*, *supra*; EPA, *NPDES State Program Authority* (Aug. 29, 2025), https://bit.ly/3UfLAOd.

23

enforcement authorities." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 61 (1987).

The Supreme Court has similarly recognized that "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). Private plaintiffs "are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.* Courts therefore should decline private litigants' invitation to exercise "continuing superintendence" over a company's or industry's regulatory compliance. *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 193 (2000).

Exercising their discretion, EPA and its state counterparts often calibrate their responses to the magnitude of a violation to deploy their limited resources most effectively. Compliance that is material and significant can often be obtained through a collaborative process that will protect the environment faster, and far more efficiently, than protracted adversarial litigation.

The district court's presumption in favor of a preliminary injunction in CWA cases threatens to upset this proportionate-response enforcement system. Under the district court's approach, environmental groups would have a roving

24

commission to shut down any point source that exceeds its effluent limits by any amount, notwithstanding the costs or collateral consequences.

That approach is unworkable. EPA and state regulators—subject to EPA's ultimate authority—are the authorities empowered to determine enforcement priorities and balance the costs and benefits that relate to the public interest. These authorities have expertise continuously supervising enormous facilities to resolve compliance issues. Citizen suits, by contrast, adjudicate and redress concrete injuries to individual plaintiffs. This dual structure is critical to the regulated community, not least because compliance with environmental laws can require years of planning and millions of dollars in capital expenditures, for even a single project or facility.

3. Finally, there is a substantial risk that the district court's errors, if affirmed, would not be limited to the CWA. The Clean Air Act uses a similar structure of emissions limits and permits, administered by EPA and by States pursuant to EPA guidance, to ensure clean air. *See North Carolina ex rel. Cooper v. Tennessee Valley Auth.*, 615 F.3d 291, 299-300 (4th Cir. 2010) (explaining the structure of Clean Air Act air-pollution regulation); Richard K. Lattanzio, Cong. Rsch. Serv., RL30853, *Clean Air Act: A Summary of the Act and Its Major Requirements* 4 (2022), https://www.congress.gov/crs-product/RL30853. And like the CWA, the Clean Air Act has a citizen-suit provision, which authorizes any

person to commence a civil action for repeated or ongoing violations of an "emission standard or limitation," including a permit "term" or "condition." 42 U.S.C. § 7604(a)(1), (f).  Other statutory regimes could be affected as well.  That consideration underscores the importance of correcting the district court's approach in this case—which, as explained above, is irreconcilable with *Winter* and other binding decisions.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's preliminary injunction.

Respectfully submitted,

/s/ Sean Marotta

ANDREW R. VARCOE
AUDREY DOS SANTOS
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of the United States of America*

SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

*Counsel for Amici Curiae*

ELLIOTT ZENICK
AMERICAN CHEMISTRY COUNCIL
700 2nd Street, N.E.
Washington, D.C. 20002
(202) 249-6744

*Counsel for American Chemistry Council*

September 29, 2025

26

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,899 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Times New Roman 14-point font.

/s/ Sean Marotta
Sean Marotta

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing by using the appellate

CM/ECF system on September 29, 2025.  I certify that all participants in the case

are registered CM/ECF users and that service will be accomplished by the

appellate CM/ECF system.

<u>/s/ Sean Marotta</u>
Sean Marotta