No. 25-1924

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

WEST VIRGINIA RIVERS COALITION, INC.,
*Plaintiff-Appellee*,
and
LITTLE HOCKING WATER ASSOCIATION, INC.,
*Intervenor/Plaintiff-Appellee*,
v.
THE CHEMOURS COMPANY FC, LLC,
*Defendant-Appellant*.

---

On Appeal from the United States District Court for
the Southern District of West Virginia
The Honorable Joseph R. Goodwin (No. 2:24-cv-00701)

---

### RESPONSE BRIEF OF PLAINTIFF-APPELLEE WEST VIRGINIA
### RIVERS COALITION AND INTERVENOR/PLAINTIFF-APPELLEE
### LITTLE HOCKING WATER ASSOCIATION

---

AMANDA DEMMERLE
DEREK TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
(757) 650-2774
ademmerle@appalmad.org
dteaney@appalmad.org

(Counsel continued on next page)

JAMES M. HECKER
DANIEL SNYDER
PUBLIC JUSTICE
1620 L Street, N.W. Suite 630
Washington, DC 20036
(202) 797-8600 ext. 225
jhecker@publicjustice.net
dsnyder@publicjustice.net

*Counsel for Plaintiff-Appellee West Virginia Rivers Coalition*

D. DAVID ALTMAN
JUSTIN D. NEWMAN
ALTMANNEWMAN CO. LPA
15 E. 8th Street
Cincinnati, OH 45202
(513) 721-2180
daltman@environlaw.com
jnewman@environlaw.com

KIRK R. AUVIL
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
(304) 485-3058
theemploymentlawcenter@gmail.com

*Counsel for Plaintiff-Intervenor Little Hocking Water Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellees West Virginia Rivers Coalition and Little Hocking Water Association, by and through undersigned counsel, hereby submit the following disclosure statement:

West Virginia Rivers Coalition is a non-profit, tax-exempt organization incorporated in the State of West Virginia. The Coalition has no parent corporation and no publicly held company has 10% or greater ownership in the Coalition.

Little Hocking Water Association is non-profit, tax-exempt organization incorporated in the State of Ohio. The Association has no parent corporation and no publicly held company has 10% or greater ownership in the Association.

# TABLE OF CONTENTS

Corporate Disclosure Statement ………………………………………............ i

Table of Contents ……………………………………………………………… ii

Table of Authorities ………………………………………………………… iv

Introduction ……………………………………………………………………… 1

Issues Presented for Review ………………………………………………… 3

Counter-Statement of the Case ……………………………………………… 4

    Factual Background …………………………………………………………… 4

    The District Court's Decision ………………………………………………... 14

Standard and Scope of Review ……………………………………………….. 18

Summary of Argument ………………………………………………………….. 19

Argument ……………………………………………………………………... 23

I.    WVRC Made a Clear Showing that It Is Likely to Have Standing and the District Court Did Not Abuse Its Discretion or Commit Any Legal Error in Its Standing Analysis ……………………………………………….. 23

    A.    The District Court Found Standing Based on Ms. Robinson's HFPO-DA Exposure, Which Is the Same Basis that Chemours Advocates on Appeal …………………………………… 24

    B.    WVRC's Evidence Exceeded the Level Necessary to Prove Standing ……………………………………………………… 29

    C.    The Harm to Ms. Robinson's Recreational Interests Also Supports Standing ………………………………………………….. 32

II.    The District Court Did Not Abuse Its Discretion or Commit Legal
       Error in Determining that Chemours' Discharges Irreparably Harm
       WVRC and the Public ................................................................... 34

       A.    Injunctions Under the CWA, Like Those for Common
             Law Public Nuisance, Protect Both the Plaintiff and
             the Public from Shared Irreparable Harm to Shared
             Public Resources.................................................................. 34

       B.    The Meaning and Scope of Irreparable Harm Is Defined
             by the CWA's Central Purpose of Preventing Violations
             of Water Quality Standards ................................................. 40

       C.    Chemours' Violations of Its HFPO-DA Limits Cause
             Irreparable Harm to WVRC's Member and the Public .................... 44

       D.    The District Court's Finding that WVRC's
             Member Would Be Irreparably Harmed Absent
             an Injunction Is Not Clearly Erroneous ...............................46

III.   Regardless of Whether the District Court Abused Its Discretion,
       Dismissal Would Not be a Proper Remedy from This Court ..................... 50

Conclusion.................................................................................... 54

Statement Regarding Oral Argument …………………………………........ 55

Certificate of Compliance ....................................................………..56

Certificate of Service............................................................... 57

iii

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
    326 F.3d 505 (4th Cir. 2003) ……………………………………………….24

*Am. Iron & Steel Inst. v. EPA*,
    115 F.3d 979 (D.C. Cir. 1997) ………………………………………………..41

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) ……………………………………………34, 39-40, 43

*Ariz. Copper Co. v. Gillespie*,
    230 U.S. 46 (1913) ………………………………………………………36

*Arkansas v. Oklahoma*,
    503 U.S. 91 (1992) ………………………………………………………41

*City & County of S.F. v. EPA*,
    604 U.S. 334 (2025) ……………………………………………22, 35, 41, 43

*City of Martinsville v. Express Scripts, Inc.*,
    128 F.4th 265 (4th Cir. 2025) ………………………………………………..50-51

*City of Milwaukee v. Ill. & Mich.*,
    451 U.S. 304 (1981) ………………………………………………………35

*City of N.Y. v. Anglebrook Ltd. P'ship*,
    891 F.Supp. 908 (S.D.N.Y. 1995) …………………………………………42

*Coinbase, Inc. v. Bielski*,
    599 U.S. 736 (2023) ………………………………………………………50-51

*Courtland Co. v. Union Carbide Co.*,
    No. 2:19-cv-00894, 2024 WL 4339600
    (S.D. W. Va. Sept. 27, 2024)……………………………………………..38

*Cox v. City of Dall.*,
    256 F.3d 281 (5th Cir. 2001) ………………………………………………37

*Ctr. for Env't Health v. Regan*,
        103 F.4th 1027 (4th Cir. 2024) ……………………………………………5

*Davis v. Passman*,
        422 U.S. 228 (1979) …………………………………………………..36

*Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Fisheries Comm'n*,
        127 F.4th 509 (4th Cir. 2025) ……………………………………………51

*Denney v. Deutsche Bank AG*,
        443 F.3d 253 (2d Cir. 2006) …………………………………………..25

*Do No Harm v. Pfizer*,
        126 F.4th 109 (2d Cir. 2025) ……………………………………………51

*Doe v. Horne*,
        115 F.4th 1083 (9th Cir. 2024) ………………………………………18

*E. Tenn. Nat. Gas Co. v. Sage*,
        361 F.3d 808 (4th Cir. 2004) …………………………………………38

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
        528 U.S. 167 (2000) …………………………………………20, 24, 30-33

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
        204 F.3d 149 (4th Cir. 2000) (*en banc*) …………20, 22, 24, 26, 29-31, 41-42

*Food & Water Watch, Inc. v. Vilsack*,
        808 F.3d 905 (D.C. Cir. 2015) …………………………………………...51

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
        484 U.S. 49 (1987) ……………………………………………………37

*Hazardous Waste Treatment Council v. South Carolina*,
        945 F.2d 781 (4th Cir. 1991) …………………………………………38

*LHWA v. E.I. du Pont de Nemours & Co.*,
        91 F.Supp.3d 940, 955 (S.D. Ohio 2015) …………………………………...53

*Mayor & City Council of Balt. v. BP P.L.C.*,
    31 F.4th 178 (4th Cir. 2022) …………………………………………..35

*Mayor of Balt. v. Azar*,
    973 F.3d 258 (4th Cir. 2020) (*en banc*) ………………………………..51

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981) …………………………………………………23, 37

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
    22 F.3d 546 (4th Cir. 1994) …………………………………..46, 50

*Murthy v. Missouri*,
    603 U.S. 43 (2024) …………………………………………..18, 52

*NRDC v. Watkins,*
    954 F.2d 974 (4th Cir. 1992) …………………………………………27-28

*N. Va. Hemp & Agric., LLC v. Virginia*,
    125 F.4th 472 (4th Cir. 2025) ……………………………………18

*N.Y. Pub. Int. Rsch. Grp. v. Whitman*,
    321 F.3d 316 (2d Cir. 2003) …………………………………………..25

*OVEC v. Elk Run Coal Co.*,
    24 F.Supp.3d 532 (S.D. W. Va. 2014) ……………………………...41

*Pierce v. N.C. State Bd. of Elections*,
    97 F.4th 194 (4th Cir. 2024) …………………………………………..46

*PIRG v. Powell Duffryn Terminals*,
    913 F.2d 64 (3d Cir. 1990) …………………………………………..22, 42

*PIRG v. Powell Duffryn Terminals, Inc.*,
    720 F.Supp. 1158 (D.N.J. 1989) ……………………………………42

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) …………………………………………..39

*S.C. Dep't of Wildlife & Marine Res. v. Marsh*,
  866 F.2d 97 (4th Cir. 1989) …………………………………………...34

*Shaw v. Hunt*,
  154 F.3d 161 (4th Cir. 1998) …………………………………………53

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  981 F.3d 251 (4th Cir. 2020) ………………………………………34, 39

*Sommerville v. Union Carbide Corp.*,
  149 F.4th 408 (4th Cir. 2025) ………………………………………25

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) …………………………………………………..36

*Sports Form, Inc. v. United Press Int'l*,
  686 F.2d 750 (9th Cir. 1982) …………………………………………51

*Tull v. United States*,
  481 U.S. 412 (1987) ………………………………………………21, 35

*United States v. City of N. Adams*,
  No. 89-30048-F, 1992 WL 391318 (D. Mass. May 18, 1992) …………43, 46

*United States v. Hartsell*,
  127 F.3d 343 (4th Cir. 1997) …………………………………………41

*United States v. Midway Heights County Water Dist.*,
  695 F.Supp. 1072 (E.D. Cal. 1988) …………………………………...46

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) …………………………………………18

*United States v. Westvaco Corp.*,
  CV MJG-00-2602, 2015 WL 10323214 (D. Md. Feb. 26, 2015) …………..44

*Warth v. Seldin*,
  422 U.S. 490 (1975) …………………………………………………36-37

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) …………………………………………………35, 40

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) …………………………………...…17-18, 37-40, 42-43

**Statutes and Regulations**                    **Page(s)**

33 U.S.C.
    §1251(a) …………………………………………………………41
    §1313(c)(2)(A) …………………………………………………42
    §1319(d) …………………………………………………………37
    §1342 ……………………………………………………………..5
    §1365(a) ……………………………………………………21, 36-37
    §1365(f) …………………………………………………………..21, 36
    §1365(g) ……………………………………………………21, 23, 36

40 C.F.R.
    §122.44(d)(1) …………………………………………………41
    §141.50(a)(24) …………………………………………………7
    §141.50(b)(35) …………………………………………………7
    §141.61(c), tbl.2 …………………………………………………..8
    §141.900(b)(4) …………………………………………………8

89 Fed. Reg. 32532 (Apr. 26, 2024) …………………………………7-8, 48

W. Va. Code R. 47-02 App. B & D …………………………………..5, 43

**Other Authorities**                      **Page(s)**

Respondent's Motion for Partial Vacatur, *Am. Water Works Assoc. v. EPA*,
    No. 24-1188 (D.C. Cir. Sept. 11, 2025)………………………………9

## INTRODUCTION

The Chemours Company FC, LLC (Chemours) paints a distorted and inaccurate portrait of the district court's decision. The court did not decide that Clean Water Act (CWA) permit violations automatically confer standing on any affected water user. It did not hold that when such a violation occurs, the plaintiff and the public automatically suffer irreparable harm, regardless of their actual harm. It did not disregard Supreme Court precedent. Affirming the court's decision will not result in automatic injunctions for every statutory violation. Those are strawman arguments designed to make Judge Goodwin's decision easier to attack, rather than arguments that address the evidence the district court actually considered and the decision it actually made.

The undisputed evidence shows that for years Chemours discharged a highly toxic "forever chemical" called hexafluoropropylene oxide dimer acid (HFPO-DA) in amounts that greatly exceed its federally-enforceable permit limits under the CWA. The West Virginia Department of Environmental Protection (WVDEP) set those limits at the level necessary to comply with state water quality standards that protect drinking water, public health, and recreation. Millions of people, including at least one member of West Virginia Rivers Coalition (WVRC), use drinking water drawn from the Ohio River downstream from Chemours' discharge pipes. HFPO-DA concentrations in raw Ohio River water, untreated intake water, and treated

drinking water all exceeded 10 parts per trillion (ppt) on multiple days from 2023 to 2025. The U.S. Environmental Protection Agency (EPA) has set 10 ppt as the health-based risk assessment level for measuring harm to people from exposure to HFPO-DA. In interpreting that level, the district court credited the testimony of WVRC's expert toxicologist. She testified that human exposure above 10 ppt for even one day increases the risk of adverse health effects, including fatty liver disease. Because of health concerns and to reduce her exposure, WVRC's member stopped drinking the water, but still uses it to brush her teeth, bathe, and grow vegetables that she eats. Because of Chemours' permit violations, and to prevent inhalation of mist and sprays, she also stopped boating in the Ohio River.

Based on this undisputed record, the district court correctly held that WVRC likely has standing.[1] Human exposure to excessive levels of toxic "forever chemicals" in water that a person ingests and inhales, and avoidance of such exposure to drinking water or recreational water that a person desires to use or contact, are cognizable injuries under Article III and the CWA. The injuries are fairly traceable to Chemours because it is the only company using and discharging the

---

[1] In granting Little Hocking Water Association's (LHWA) Motion to Intervene, the district court found LHWA had standing under Article III and the CWA. JA1465. Neither the order granting intervention nor the standing determinations have been appealed.

chemical in the affected area. An injunction is likely to redress the injuries by reducing the illegal discharges and resulting human exposure.

The district court also correctly held that Chemours' continued discharges of HFPO-DA are likely to irreparably harm WVRC and the public. Human exposure to HFPO-DA for even one day at over 10 ppt is likely to increase health risks and cause irreparable harm to WVRC's member and the public. The preliminary injunction should therefore be affirmed.

## ISSUES PRESENTED FOR REVIEW

1.   Whether WVRC likely has Article III standing, where (a) Chemours discharged HFPO-DA at levels that exceed its water quality-based permit limits that are designed to protect drinking water and public health, (b) WVRC's member is exposed to HFPO-DA in the downstream water she ingests, and (c) WVRC's member avoids exposure to HFPO-DA in downstream drinking water and recreational water that she desires to use and contact.

2.   Whether WVRC and the public that use affected Ohio River water are likely to suffer irreparable harm from Chemours' ongoing violations of its permit limits for HFPO-DA, where (a) those limits are designed to protect the public from exposure to excess HFPO-DA in drinking water and recreational water, (b) the district court credited testimony by WVRC's expert toxicologist that human exposure to HFPO-DA in water above 10 ppt for one day increases the risk of

adverse health effects, including fatty liver disease, and (c) multiple daily measurements of HFPO-DA in Ohio River raw water, untreated intake water, and treated drinking water downstream from Chemours' discharge pipes have all exceeded 10 ppt.

3.     Whether remand for further proceedings is appropriate regardless of whether this Court affirms the preliminary injunction because no there is no final decision by the district court on standing and because WVRC and Intervenor LHWA have additional standing facts that were not presented at the preliminary injunction stage.

## COUNTER-STATEMENT OF THE CASE

### *Factual Background*

Chemours' Washington Works Plant produces fluoropolymers. JA680. Chemours previously used perfluorooctanoic acid (PFOA) in its fluoropolymer production process. JA701. Chemours developed HFPO-DA as a replacement for PFOA and began using that chemical in 2012. JA702. The more fluoropolymers Chemours produces, the more HFPO-DA it discharges in its wastewater. JA1065-1066, JA1404. Chemours discharges wastewater from Outlets 002 and 005 into the Ohio River at River Mile 190. JA99. Outlets 002 and 005 discharge 89.5% of the flow from the plant—56.4 million gallons per day (MGD) out of a total of 63 MGD. JA791. Those two outlets also discharge 86.7% of the Plant's permitted annual

HFPO-DA loading—195 pounds of the total of 225 pounds. JA791. PFOA and HFPO-DA are among the chemicals known as per- and polyfluoroalkyl substances (PFAS). PFAS are commonly referred to as "forever chemicals" because they "do not break down or degrade over time and are therefore highly persistent." *Ctr. for Env't Health v. Regan*, 103 F.4th 1027, 1031 (4th Cir. 2024) (internal quotation marks omitted).

Chemours' National Pollutant Discharge Elimination System (NPDES) permit, issued pursuant to Section 402 of the CWA (33 U.S.C. §1342), limits the PFOA and HFPO-DA concentrations in Chemours' discharges into the Ohio River from Outlets 002 and 005. JA110, JA119. Those limits are water quality-based effluent limitations (WQBELs), *i.e.*, they are designed to ensure compliance with West Virginia's water quality standards. JA681. In setting the limits in 2018, WVDEP used human health criteria of 70 nanograms per liter (ng/l) (or ppt) for PFOA and 140 ng/l (or ppt) for HFPO-DA. JA681. WVDEP found that those limits and criteria would "be protective of the State's narrative water quality criteria for human health and the designated uses of the Ohio River." JA681. Two of the designated uses of that river are for public drinking water and contact recreation, which includes boating. W. Va. Code R. 47-02 App. B & D.

In the fact sheet explaining the permit's issuance, WVDEP expressed concern about PFOA's and HFPO-DA's adverse human health effects. JA702-703. WVDEP

also stated that, although there were no federal health guidelines at that time for HFPO-DA, "[l]aboratory studies on animals show negative effects to the liver and blood, along with cancer of the liver, pancreas, and testicles." JA703. In 2021, EPA found that exposure to HFPO-DA through drinking water can result in "health effects … on the liver, kidneys, the immune system, [and] development of offspring," with the liver being especially vulnerable to HFPO-DA exposure. JA824.

In its monthly Discharge Monitoring Reports, Chemours reported that it violated its monthly average and daily maximum permit limits for HFPO-DA twenty-one times at Outlet 002 and twenty times at Outlet 005 between August 2023 and March 2025. JA682-683. The magnitude of the violations increased over time, with the highest between July 2024 and March 2025. JA562-566 (charts of daily maximum violations); JA682-683. In November 2024, the month before WVRC filed its Complaint, Chemours exceeded its monthly average HFPO-DA limit at Outlet 002 by 454% (7.76 µg/l vs. 1.4 µg/l limit) and at Outlet 005 by 166% (2.9 µg/l vs. 1.4 µg/l limit). JA682-683. In February 2025, Chemours violated its daily maximum HFPO-DA limit at Outlet 002 by 249% (8.0 µg/l vs. 2.3 µg/l limit) and at Outlet 005 by 286% (8.9 µg/l vs. 2.3 µg/l limit). JA682-683.

The Lubeck Public Service District is the downstream public water supply that is closest to the Washington Works Plant on the West Virginia side of the Ohio River. JA685. Lubeck's wells draw water from an aquifer adjacent to the Ohio River

at approximately River Mile 194, about four miles downstream from Outlets 002 and 005. JA685; *see also* JA636-638. The United States Geological Survey concluded that 39% of the volume pumped by Lubeck from that well field is derived from induced infiltration from the Ohio River. JA642, JA685. In its NPDES permit renewal application, Chemours used Lubeck as the CWA compliance point to define its proposed mixing zone for its wastewater discharges and to protect public drinking water. JA685, JA780.

In April 2024, EPA set the Maximum Contaminant Level Goal (MCLG) for PFOA at 0 ppt and for HFPOD-DA at 10 ppt under the Safe Drinking Water Act (SDWA). 89 Fed. Reg. 32532, 32744 (Apr. 26, 2024); 40 C.F.R. §§141.50(a)(24), (b)(35). EPA set the MCLG for PFOA at zero because PFOA is a likely human carcinogen. 89 Fed. Reg. at 32567. According to WVRC's expert toxicologist, whose qualifications were undisputed, the MCLG for HFPO-DA is the "health-based risk assessment value." JA1311-1314. According to EPA, the MCLG is based on a chronic toxicity value that "represents the *daily* exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime." 89 Fed. Reg. at 32546 (emphasis added). WVRC's expert explained that the MCLG is "based on a reference dose," which is "the amount of a chemical or contaminant that can be consumed on a daily basis without an increase in risk of an adverse health effect over a lifetime." JA1314.

7

She also testified that a person must "avoid exceeding that value [the MCLG of 10 ppt] *every day for your life* to avoid increased risks of adverse health effects." JA1314 (emphasis added). The district court credited WVRC's expert testimony and found that Chemours' expert testimony was "not persuasive." JA1626-1627 & n.21; *see also* JA1300-1301.

Chemours does not mention the MCLG on brief. Instead, Chemours and its toxicologist, Catherine Boston, relied entirely on the Maximum Contaminant Level ("MCL") for HFPO-DA at the preliminary injunction hearing. Unlike the MCLG, which is based solely on health considerations, the MCL is set "as close to that public health goal as feasible, taking costs into consideration." 89 Fed. Reg. at 32573. WVRC's expert testified that the HFPO-DA MCL is a "risk management" tool that includes "consideration of other factors [other than health], such as economic, social and political factors." JA1313-1314. Chemours did not rebut this testimony. EPA set the MCL for HFPO-DA at 10 ppt, like the MCLG. But unlike the MCLG, the MCL is measured as a running annual average rather than as a daily value. 89 Fed. Reg. at 32745; 40 C.F.R. §141.61(c), tbl.2. That running annual average component is a risk-management consideration and is not health-based. JA1314.

Although the MCLG and the MCL for HFPO-DA are final, the MCL is not currently enforceable. The deadline for compliance with the MCL is April 26, 2029. 89 Fed. Reg. at 32533; 40 C.F.R. §141.900(b)(4). EPA has placed its future

enforceability in doubt by asking a court in September 2025 to vacate the MCL for HFPO-DA. Chemours Br. 13 n.2. EPA's motion is based on purported procedural deficiencies, not the scientific validity of the numeric thresholds. Respondent's Motion for Partial Vacatur, *Am. Water Works Assoc. v. EPA,* No. 24-1188 (D.C. Cir. Sept. 11, 2025).

For most of the past 24 years, WVRC's member Charlise Robinson has obtained her household domestic water from the Lubeck water system. JA918-919. In 2006, tests showed that Ms. Robinson had PFAS in her blood at levels up to 21.9 ppt. JA919. "[T]he median level of PFOA measured in people living in Lubeck between 2005 and 2006 was 17 times the … mean level of PFOA measured in a general population in the United States." JA1321. Due to their past exposure to PFAS and high body burden, Ms. Robinson and other Lubeck residents are "starting with already an increased health risk." JA1321-1322. They have been exposed to multiple PFAS compounds, which "will act together to increase toxicity." JA1356. Because of her health concerns, Ms. Robinson wants to reduce her exposure to PFAS as much as possible. JA922, JA1595. As a result, Ms. Robinson stopped using water from the Lubeck system for drinking and cooking, but she still uses that water for brushing her teeth, bathing, laundry, cleaning, and watering her plants (including vegetables). JA920, JA1587-1589.

Ms. Robinson sampled her drinking water for PFAS once on December 26, 2024, and no PFAS were detected. JA1537. Lubeck's own test results shortly before and after that date show its treatment system was working at that time, reducing PFAS contamination to undetectable levels. JA1569 (LAG beds 2N and 2S, After Carbon Treatment Sample). However, on at least seven other days, the system fared poorly.[2] Most recently, on March 17, 2025, the HFPO-DA level in finished water after treatment was measured at 22 and 14 ppt, well above the MCLG. JA1569 (LAG beds 2N and 2S, After Carbon Treatment Sample).

Ms. Robinson also avoids direct contact with the Ohio River, which has reduced her use and enjoyment of that River. JA921. Ms. Robinson previously recreated on the Ohio River—specifically, by riding in a speed boat—but no longer goes boating on the river because of Chemours' permit violations. JA1581-1586. Riding in a speed boat inevitably generates mists and sprays of river water. EPA recognizes PFAS inhalation as a human exposure pathway.[3] Since 2022, Chemours has repeatedly measured HFPO-DA in the Ohio River at levels over 10 ppt and up

---

[2] The parties stipulated that it exceeded 10 ppt on six days: October 16, 2023 (14 and 15 ppt), November 13, 2023 (23 and 24 ppt), April 9, 2024 (13 ppt), April 29, 2024 (30 ppt), May 20, 2024 (11 and 40 ppt), October 21, 2024 (20 and 14 ppt). JA686. It also exceeded 10 ppt on March 17, 2025 (22 and 14 ppt). JA1569.

[3] EPA has advised that "[p]eople can be exposed to GenX chemicals through several different pathways, including drinking contaminated water and inhaling contaminated air." JA823.

to 53 ppt, five times higher than the MCLG. JA934, JA948 (Report Result column), JA1377-1382; ECF 179-2 at 7. Chemours has also measured elevated PFOA levels in the Ohio River as high as 14 ppt in 2025. ECF 179-3 at 4 ("DWNWEST" sample on 2/4/25, measured as 0.014 µg/l). Ms. Robinson would resume recreating on the Ohio River if Chemours ceased violating its permit limits for PFOA and HFPO-DA. JA1551.

Chemours has installed a treatment system at Lubeck and monitors the finished (post-treatment) drinking water for HFPO-DA and PFOA. Br. 16; JA557-558. Chemours measured HFPO-DA in Lubeck's finished water at levels above 10 ppt on seven days between October 2023 and March 2025, with levels up to 40 ppt, four times the MCLG. JA686, JA1558-1559, JA1569. In June 2024, Lubeck notified its customers that because of a faulty valve in the treatment system, the level of PFOA in its finished drinking water spiked to 179.5 ppt in March 2024, far higher than the MCLG of zero. JA559, JA685. Ms. Robinson did not receive Lubeck's public notice of that exceedance until three months after the severely contaminated water was distributed to her and other customers for use and consumption. JA920-921.

The effects of Chemours' HFPO-DA discharges extend far downstream to drinking water systems in Cincinnati and Louisville, which together supply drinking water to more than two million people. JA949, JA953. Those systems draw water

from the Ohio River at about River Miles 475 and 610 (285 and 420 miles downstream from Chemours' Outlets), respectively. JA925. Since July 2024, both systems monitored elevated levels of HFPO-DA in their raw water intakes, with levels as high as 17 ppt at Cincinnati and 52 ppt at Louisville. JA950-952, JA954. The managers of both systems submitted declarations in which they correlated those levels with Chemours' discharges and expressed concerns that those levels posed an adverse health risk to their customers. JA950-952, JA954-955.

WVRC's fate-and-transport expert testified that some of the HFPO-DA discharged by Chemours from Outlets 002 and 005 likely shows up in Louisville's drinking water intake. JA1391-1393. Chemours did not rebut this testimony. According to a report Chemours' relied upon, HFPO-DA "can reach any area in the world" before substantial degradation occurs. JA812, JA821-822. Chemours is the only known source of HFPO-DA within 100 miles of its Washington Works Plant that could account for the levels found at Lubeck or in the Ohio River. JA1385, JA1422, JA1431.

Three weeks after the preliminary injunction hearing, the district court granted LHWA's motion to intervene as a plaintiff. JA1469. LHWA's wellfield is in Ohio (1,300 feet directly across the Ohio River from the Washington Works Plant) and services 12,000 water users. JA1465. The wellfield's "capture zone" is downriver from Chemours' outlets. JA1681-1682. The wellfield has high levels of HFPO-DA

12

that have increased from 32 ppt to 870 ppt since 2018. ECF 203-1 at 4; ECF 203-4 at 4. A hydrogeologist has attributed that contamination to Chemours' excessive discharges of that toxin. JA1680-1682. Based on that information, the district court found that LHWA had Article III and statutory standing to intervene. JA1463-1465. The court also found that LHWA has unique economic interests distinct from WVRC because it is concerned about the capacity of its granular activated carbon (GAC) treatment system to effectively treat increasing levels of HFPO-DA and protect its wellfield. JA1468.

EPA issued an Administrative Order on Consent (AOC) to Chemours in April 2023 for its PFOA and HFPO-DA permit violations from September 2018 through March 2023. JA395-401. The AOC did not impose any penalties but required, *inter alia*, that Chemours submit a compliance plan within 120 days. JA403. Chemours submitted an initial plan in August 2023. JA274. Chemours revised that plan in April 2025. JA716. According to Chemours, its plan is not designed to achieve compliance with the average monthly limits in its 2018 permit. Instead, Chemours predicts that its upgraded treatment system would achieve the following average concentrations:

| Outlet | HFPO-DA ($\mu$g/l) | 2018 permit limit ($\mu$g/l) |
|--------|--------------------|------------------------------|
| 001 | 1030 | 1400 |
| 002 | **1560** | 1400 |
| 005 | 220 | 1100 |
| 006 | **1620** | 140 |

ECF 65-10 at 8, tbl.2; JA752-753 & n.3. Thus, by Chemours' own admission,

Outlets 002 and 006 would still be in noncompliance even after its treatment plan is completed.

A year after Chemours submitted its initial compliance plan, EPA still had not approved it and PFAS violations were continuing. As a result, WVRC notified Chemours, WVDEP, and EPA in April 2024 that it intended to file a citizen suit. ECFs 7-22, 7-23 ¶2. WVRC then learned that EPA and Chemours were engaging in settlement discussions. But with no resolution to that process in December 2024, WVRC filed its Complaint. JA22. In that same month, Chemours applied to WVDEP for a NPDES renewal permit and requested three years to upgrade its treatment system to comply with limits for HFPO-DA and PFOA. JA84. Because WVRC viewed further delayed compliance as unacceptable, it moved for a preliminary injunction.

### *The District Court's Decision*

Chemours does not question the district court's finding that it is violating its HFPO-DA permit limits. Nor does it challenge the court's application of two of the injunctive relief factors—balance of harms and public interest. Chemours challenges only the court's analysis of WVRC's standing and irreparable harm.

On standing, the district court started from the principle that "[w]here a statute [like the CWA] identifies unlawful discharge of toxic pollutants like HFPO-DA as a harm, and where plaintiffs allege concrete exposure to that unlawful discharge,"

14

they "have asserted an injury in fact sufficient to support standing." JA1614. The court then found that WVRC's member, Ms. Robinson, satisfied that test in several ways: "the use of her own tap water is severely diminished; she avoids any contact with the Ohio River; and she cannot enjoy the aesthetics of the Ohio River due to the Defendant's excess discharges of HFPO-DA." JA1616. The court explained, given the toxicity of HFPO-DA and her exposure to that chemical in her drinking water, "it is entirely reasonable that Ms. Robinson has limited her exposure." JA1617. Her avoidance of her water supply is a "measurable intrusion" into her daily life that is "concrete and particularized to her" and "constitutes a cognizable injury for purposes of Article III." JA1617-1618. She is also injured because she limits her recreational activities "to avoid touching the Ohio River." JA1618-1619. Her injuries are traceable to Chemours' permit violations—Chemours is discharging excessive HFPO-DA into the Ohio River where she avoids recreating in it and that chemical also travels downstream to the Lubeck system where she avoids drinking it. JA1619. Her injuries are redressable because an injunction will abate Chemours' violations and reduce HFPO-DA contamination in Ohio River water. JA1620.

As to irreparable harm, the district court started from the indisputable premise that such harm "must be considered in light of the CWA's purpose," which is to establish and maintain compliance with water quality standards. JA1624. Those standards are "at the heart of the substantive policy of the CWA." JA1624.

Chemours' PFOA and HFPO-DA permit limits are WQBELs that are designed to preserve those standards and protect public health. JA1624-1625. Contrary to Chemours' main argument on appeal, the court did not assume that permit violations automatically constitute irreparable harm. Instead, it found that Chemours' violation of *these* WQBELs for HFPO-DA designed to protect public health, combined with exposure to the pollutant, causes irreparable harm. JA1625.

The district court did not stop there. It weighed the evidence of harm that WVRC presented at the hearing. That evidence showed Ms. Robinson's household water was contaminated with the HFPO-DA that Chemours discharged. The court cited evidence that Lubeck's "water is not clean as shown in samples from 2023 and 2024." JA1625. Chemours stipulated to the accuracy of those samples, which showed that HFPO-DA levels in Lubeck's finished water exceeded 10 ppt on six days in 2023 and 2024. JA1625 (citing JA686). The court credited WVRC's evidence and expert testimony that Ms. Robinson's exposure to those levels is harmful but impossible to quantify and calculate. JA1625-1627.

The district court rejected Chemours' argument that HFPO-DA is harmless unless the annual average concentration in drinking water exceeds the MCL under the SDWA. JA1626. It also rejected Chemours' argument that there is no irreparable harm until a person develops a serious illness. JA1626. The court concluded that

"[t]he irreparability lies not in the immediacy of symptoms" but in the "continued exposure to a recognized human health hazard." JA1628.

After finding sufficient evidence of irreparable harm to Ms. Robinson, the court turned to the issue of irreparable harm to the public. JA1628. The court correctly concluded that the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), did not foreclose consideration of such harm. JA1628-1629. Contrary to Chemours' accusations, the district court sought "not to disregard [that] precedent but to apply it faithfully to the actual case before me." JA1643. The court explained that the purpose of the CWA was to protect the public from unlawful discharges. JA1629. Citizen plaintiffs under the CWA assume the role of private attorneys general to protect public rights. JA1629. The court found that Chemours' discharges endanger not only Ms. Robinson, "but all those served by facilities along the Ohio River," including the Cincinnati and Louisville drinking water systems. JA1632-1633. Chemours' HFPO-DA discharges "hamper treatment facilities' ability to treat water," resulting in "the ongoing breach of a prophylactic system Congress created to prevent … pollution." JA1633-1634. Consequently, the court found irreparable harm to the public "in addition to the Plaintiff." JA1634. Judge Goodwin concluded "the facts and statutory framework align so decisively in favor of enforcement" that "the equitable principles underlying

*Winter* … are not only satisfied[,] they compel granting the injunction." JA1643-1644.

## STANDARD AND SCOPE OF REVIEW

This Court reviews a district court's decision to grant a preliminary injunction for abuse of discretion. *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025). In so doing, it reviews the court's factual findings for clear error and legal conclusions *de novo*. *Id*. "Faithful to the abuse-of-discretion standard, we are obliged to affirm [a grant of a preliminary injunction when] the district court applied a correct preliminary injunction standard, made no clearly erroneous findings of material fact, and demonstrated a firm grasp of the legal principles pertinent to the underlying dispute." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013). "At the preliminary injunction stage … , the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citing *Winter*, 555 U.S. at 22).

The Court's review of a district court's findings is normally restricted to the record available to the district court when it granted or denied the motion. *Doe v. Horne*, 115 F.4th 1083, 1100 (9th Cir. 2024). On brief, Chemours relies on standing evidence that it submitted after the preliminary injunction hearing in conjunction with the parties' cross-motions for summary judgment. Br. 15-16; JA1536-1552. The district court denied those motions without prejudice. JA1800. Chemours cites

authority supporting its reliance on the evidence. Br. 15 n.3. Because Chemours has opened the door to such evidence about standing on appeal, WVRC and LHWA are also citing and relying on evidence submitted at the summary judgment stage. JA1553-1596.

## SUMMARY OF ARGUMENT

1. WVRC made a clear showing that it likely has standing. The district court applied the correct legal standard for standing: "Where a statute identifies unlawful discharge of toxic pollutants like HFPO-DA as a harm, and where plaintiffs allege concrete exposure to that unlawful discharge … , such plaintiffs have asserted an injury in fact sufficient to support standing." JA1614. Thus, the court required both a statutory violation and a harmful exposure, not just a statutory violation. Chemours has repeatedly discharged excessive amounts of HFPO-DA into the Ohio River in violation of its CWA permit limits. Lubeck's public water system is downstream and uses some of that water. Lubeck measured HFPO-DA in its finished water on six days in 2023 and 2024 at levels higher than the MCLG of 10 ppt. The HFPO-DA concentration in untreated Ohio River water also exceeds that level. The MCLG is a health-based risk assessment value and is measured on a daily basis, not as an annual average. Credible expert testimony established that exposure to water containing

HFPO-DA in amounts exceeding the MCLG for even one day creates a risk to human health.

Because of health concerns and to reduce her exposure, Ms. Robinson reasonably avoids using Lubeck's treated water for drinking and cooking, but is still exposed to that water when she bathes, brushes her teeth, and eats home-grown vegetables. She also avoids boating in the Ohio River to avoid contact with, and inhalation of, untreated river water. If Chemours complied with its permit and reduced its discharges, her risk of harm from exposures to HFPO-DA in drinking water and river water would be reduced, and she would resume boating. That evidence is more than sufficient to demonstrate standing. Ms. Robinson satisfies Chemours' own proffered test for injury-in-fact: she "reasonably avoided the affected water as a result of the exceedance." Br. 30.

Ms. Robinson's standing is also equal to or greater than the plaintiff's standing in similar CWA citizen suits. In *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) ("*Laidlaw*"), the Supreme Court found that the citizen plaintiffs had standing to challenge NPDES permit violations for excessive mercury discharges even though there was "no demonstrated proof of harm to the environment" or of "any health risk." 528 U.S. at 181-82. Similarly, in *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 155-56 (4th Cir. 2000) (*en banc*), this Court found that the citizen plaintiffs had standing to

20

challenge NPDES permit violations for excessive discharges even though "no evidence was presented concerning the chemical content of the waterways affected by defendant's facility."

2. WVRC also demonstrated that Chemours' excessive HFPO-DA discharges irreparably harm WVRC's member and the public. By contaminating Ohio River water used to provide drinking water for millions of people, including household water supplied by Lubeck to WVRC's member, Chemours has created a public nuisance. Under common law, a public nuisance is an offense to the public's enjoyment of its common rights, resulting in an injury shared by the public. WVRC's CWA claim is a Congressionally-created cause of action that resembles public nuisance. *Tull v. United States*, 481 U.S. 412, 420 (1987).

Congress authorized citizens to act as private attorneys general to abate and deter a shared public injury, so long as the citizen has an interest that "is or may be affected" by a permittee's violation of "an effluent standard or limitation" under the CWA. 33 U.S.C. §§1365(a), (f), (g). The citizen plaintiff's remedial authority is limited to the same public remedies available to the government to abate and deter injuries shared by the public—injunctive relief and civil penalties. The scope of irreparable harm in CWA citizen suits therefore logically includes harm to both the citizen plaintiffs and the public. Citizen plaintiffs may invoke "[t]he general public

interest in clean waterways" to establish irreparable harm. *PIRG v. Powell Duffryn Terminals*, 913 F.2d 64, 73 (3d Cir. 1990).

The district court followed the principle that "[i]rreparable harm should be determined by reference to the purposes of the statute being enforced." JA1624. The CWA's central purpose is to require dischargers to obtain NPDES permits that prevent violations of water quality standards. WVDEP set Chemours' WQBELs for HFPO-DA at the level necessary to comply with West Virginia's water quality standards for the Ohio River, which protect its designated uses for drinking water and recreation. The Supreme Court has recognized that WQBELs allow "only those discharges that may be made without unduly impairing water quality." *City & County of S.F. v. EPA*, 604 U.S. 334, 341 (2025). Thus, violations of those WQBELs "necessarily means that these uses may be harmed." *Gaston Copper*, 204 F.3d at 157.

Chemours' excessive HFPO-DA discharges irreparably harm the health of individuals who are exposed to the contaminated water by drinking it, brushing their teeth with it, bathing in it, or inhaling it while boating on the Ohio River—including Ms. Robinson. Those discharges also irreparably harm the environment because HFPO-DA cannot be fully recaptured and remains in the environment essentially "forever." The district court credited the testimony of WVRC's expert toxicologist that a person's exposure to water with HFPO-DA above 10 ppt on just one day

increases that person's risk of an adverse human health effect such as fatty liver disease. Chemours' own counsel agreed. JA1354-1355 ("I agree with you, there's an increased risk."). The court's reliance on that testimony and other record evidence to find irreparable harm to Ms. Robinson, the public, and the environment, and that WVRC has no adequate remedy at law, was not clearly erroneous.

3. This Court should therefore affirm the preliminary injunction and remand the case for further proceedings. However, even if the Court were to vacate the preliminary injunction, the appropriate remedy would still be to remand for further proceedings, not to dismiss the case. WVRC and/or LHWA would likely be able to establish standing and irreparable harm at summary judgment or trial based on additional evidence and witnesses. Chemours' appeal challenges neither LHWA's intervenor status nor its standing. Even if this Court were to dismiss WVRC as a party, LHWA could continue the case on its own because it has standing.

## ARGUMENT

I.    **WVRC Made a Clear Showing that It Is Likely to Have Standing and the District Court Did Not Abuse Its Discretion or Commit Any Legal Error in Its Standing Analysis**

CWA Section 505(g) authorizes the filing of a citizen suit by "any person or persons having an interest which is or may be adversely affected." 33 U.S.C. §1365(g). That provision confers standing to the limits of the U.S. Constitution. *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16

23

(1981). To have constitutional standing, a plaintiff must suffer an actual or threatened injury-in-fact that is fairly traceable to the challenged action by the defendant and is likely to be redressed by a favorable decision. *Laidlaw*, 528 U.S. at 180-81.[4] As this Court previously explained, "[i]n the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). The claimed injury "need not be large, an identifiable trifle will suffice." *Gaston Copper*, 204 F.3d at 156-57 (cleaned up).

### A. The District Court Found Standing Based on Ms. Robinson's HFPO-DA Exposure, Which Is the Same Basis that Chemours Advocates on Appeal

Chemours insists that the district court improperly assumed that a CWA permit violation automatically establishes sufficient harm for standing. Br. 24-25. That argument is a strawman. The court did no such thing. The opinion excerpt that Chemours quotes undermines its argument: "Where a statute identifies unlawful discharge of toxic pollutants like HFPO-DA as a harm, *and where plaintiffs allege concrete exposure to that harm,* such plaintiffs have asserted an injury in fact sufficient to support standing." Br. 29 (citing JA1614) (emphasis added). Thus, the

---

[4] WVRC alleges associational standing through its member Ms. Robinson, and Chemours does not challenge any aspect of WVRC's standing other than whether Ms. Robinson herself has standing.

court required both a statutory violation *and* a harmful exposure, not just a statutory violation.[5] Chemours also quotes this sentence from the same opinion: "[F]or the Article III standing analysis, I consider the whole of injuries suffered only by the Plaintiff's member, Ms. Robinson." Br. 34 (citing JA1619). That sentence squarely refutes Chemours' argument that the district court ignored those injuries and rested its standing analysis solely on Chemours' statutory violations.

Chemours advocates for the same test that the district court actually applied: "In the CWA context, the plaintiff must show that exposure to a contaminant in water in excess of permit limits at least placed the plaintiff at imminent risk of harm, or else that the plaintiff reasonably avoided the affected water as a result of the exceedance." Br. 30. Although that framing overstates the height of the standing hurdle, WVRC nonetheless made precisely that showing below. WVRC showed that Chemours repeatedly discharged excessive amounts of HFPO-DA into the Ohio

---

[5] Exposure to a harmful substance also confers standing in other, non-CWA contexts. *See, e.g.*, *Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 419 (4th Cir. 2025) (Article III standing exists when there is "'exposure *itself*' to 'environmental toxins' tortiously emitted … , '[which] affect the body in ways that often do not become manifest for several years'"); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264-65 (2d Cir. 2006) (exposure to toxic substances sufficient for injury-in-fact "even without physical symptoms of injury caused by the exposure, and even though exposure alone may not provide sufficient ground for a claim under state tort law"); *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 325 (2d Cir. 2003) ("allegations about the health effects of air pollution and of uncertainty as to whether the EPA's actions expose them to excess air pollution are sufficient to establish injury-in-fact").

River. Lubeck's drinking water system is downstream and undisputedly uses some of that water. JA685. Lubeck measured HFPO-DA in its finished water on six days in 2023 and 2024 at levels higher than the MCLG of 10 ppt. JA686. The MCLG is a health-based risk assessment value and is measured on a daily basis, not as an annual average. Exceeding the MCLG for even one day creates a risk to human health. JA1314. Ms. Robinson reasonably avoids using that water for drinking and cooking and is still exposed to that water when she bathes, brushes her teeth, and eats her homegrown vegetables.  JA920, JA1587-1589.

Chemours argues that Ms. Robinson's drinking water avoidance is not a sufficient injury because she does not claim that her avoidance is "because of concerns about Chemours' permit exceedances." Br. 34. That is false. As Chemours acknowledges, Ms. Robinson stated in her declaration that she stopped drinking the water "due to concerns 'about PFAS, including HFPO-DA.'" Br. 35 (quoting JA920). Chemours tries to dismiss that statement because Ms. Robinson did not specify when she stopped or whether it was due to Chemours' HFPO-DA exceedances. *Id.* Chemours cites no case to support such stringent standing requirements, and this Court has rejected them. *See Gaston Copper*, 204 F.3d at 161. It is enough that Ms. Robinson stopped drinking the water because she believed (correctly) that it was polluted by Chemours' discharges of HFPO-DA and she was

26

in the downstream geographic area of concern for that chemical. The "fairly traceable" standard is "not equivalent to a requirement of tort causation." *Id.*

In a similar vein, Chemours argues that Ms. Robinson lacks standing because she would not resume drinking the water even if Chemours complied with its permit. Br. 36. Again, Chemours cites no case imposing such a requirement of "but-for" causation. This Court has expressly rejected it:

> the trial court's implicit "but for" test, which would not confer standing unless the affiants had shown that they had resumed their activities while the K reactor was shut down, was inappropriate. In the first place, the court assumed that any effects caused by the K reactor discharge would immediately disappear, making the area instantly suitable for recreation. However, the evidence is uncontroverted that some effects of the thermal pollution caused by the K reactor will take decades to reverse. The fact that the affiants did not return to the vicinity of the SRS immediately upon the shutdown of the K reactor does not mean that their decision to avoid the area was not caused, at least in part, by environmental damage inflicted by the K reactor.

*NRDC v. Watkins,* 954 F.2d 974, 979-80 (4th Cir. 1992). This Court therefore held that "the 'but-for' standard … is inappropriately stringent for determining standing under the [CWA]." *Id.* at 980.

Redressability is not affected even if Ms. Robinson never drinks her water again. She is still exposing herself to the water every time she showers, brushes her teeth, and eats her homegrown vegetables. As she stated in her declaration, her risk of harm from those exposures would be reduced if Chemours complied with its permit and discharged less HFPO-DA. JA922.

Moreover, HFPO-DA is a "forever chemical" that persists in the environment for as long or longer than the thermal pollution at issue in *Watkins*. *See* JA823-824. As a result, even if Chemours stopped its violations, that would not mean that the water immediately would become safe to drink. In addition, as Chemours itself asserts, "there is a significant 'time lag' between when the water moves through the river and its infiltration into Lubeck's aquifer." Br. 14. This uncertainty about HFPO-DA transport and persistence justifies a precautionary approach for household water users rather than the immediate about-face for which Chemours advocates.

Chemours next argues that Ms. Robinson's health concerns are unreasonable because the Lubeck filtration system "effectively removes HFPO-DA" and Lubeck's "water is safe to drink." Br. 37. Those claims are belied by Chemours' own witness's testimony that the GAC treatment system installed at Lubeck is not as effective at removing HFPO-DA (compared to PFOA). JA1189. They are further undermined by the delay in public notification of treatment failures, such as the three-month delay Ms. Robinson experienced when learning of Lubeck's March 2024 treatment failure for PFOA. JA685. Regardless, the district court correctly rejected that argument when it found that Lubeck's finished water had more than 10 ppt of HFPO-DA on six days between 2023 and 2024. JA686, JA1625. That daily level is EPA's current health-based risk assessment value in the MCLG. Chemours' reliance on the

running annual average level in the MCL is misplaced, because the MCL is a risk management tool that is based on factors other than health. JA1314. The district court did not abuse its discretion in crediting the testimony of WVRC's expert toxicologist that the MCLG is the proper health reference point.

Chemours also characterizes Ms. Robinson's water as safe because it tested "clean" on a single day in December 2024. Br. 37. That test result is unremarkable because Lubeck had no PFAS breakthroughs in that month. JA1569. Finished water from the same system tested above 10 ppt on seven other days in 2023 through 2025. JA686, JA1558-1559, JA1569. Chemours admits treatment at Lubeck is not as effective at removing HFPO-DA, JA1189, and admits it will take more than two years to achieve compliance with its 2018 permit limits for HFPO-DA. JA1606. The risk of harm is therefore continuing and sufficient to support standing.

### B. WVRC's Evidence Exceeded the Level Necessary to Prove Standing

This Court has held that to show standing in CWA citizen suits,

> a plaintiff "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged" in the specific geographic area of concern [that plaintiff uses]. In this way a plaintiff demonstrates that a particular defendant's discharge has affected or has the potential to affect his interests.

*Gaston Copper*, 204 F.3d at 161 (citations omitted). This Court warned that to "have standing hinge on anything more in a [CWA] case would necessitate the litigation of complicated issues of scientific fact that are entirely collateral to the question

29

Congress wished resolved—namely, whether a defendant has exceeded its permit limits." *Id.* at 162. Remarkably, in attacking Ms. Robinson's standing, Chemours does not even bother to cite *Gaston Copper*, let alone make any effort to distinguish it, even though it is the controlling decision that the district court relied upon in making its standing determination. JA1613-1620. Instead, Chemours cites inapposite, non-CWA cases involving statutory injuries with no toxic exposure—a far cry from the scenario here.

As both *Laidlaw* and *Gaston Copper* make clear, WVRC never needed to prove Ms. Robinson's water was contaminated at all—let alone at a specific level— to establish Article III standing. In *Laidlaw*, the Supreme Court rejected the same argument that the plaintiffs lacked standing because there was "no demonstrated proof of harm to the environment" or of "*any health risk*" from its unlawful discharges. 528 U.S. at 181-82 (emphasis added). The Supreme Court explained that citizen plaintiffs need not prove injury to the environment or to health to establish Article III standing because that would "raise the standing hurdle higher than the necessary showing for success on the merits." *Id.*

Similarly, in *Gaston Copper*, this Court found that the plaintiff had standing even though "[n]o evidence was presented concerning the chemical content of the waterways affected by the defendant's facility" and "[n]o evidence of any increase in the salinity of the waterways, or any other negative change in the ecosystem of

the waterway was presented." 204 F.3d at 155-56 (cleaned up). This Court explained that denying standing in *Gaston Copper* would have essentially recreated "the old system of water quality standards whose failure led to the enactment of the [CWA] in the first place" and ignored Congress's "shift to end-of-pipe standards" in order to eliminate complex scientific questions in enforcement proceedings. *Id.* at 163.

Even if there were no evidence that Ms. Robinson's water (source water or finished household water) was contaminated with HFPO-DA, she would still have standing because Chemours' unlawful discharges threaten her drinking water, leading her to be reasonably concerned that her water is unsafe since she is in the zone of Chemours' discharge. *Gaston Copper*, 204 F.3d at 162 ("But to turn away a citizen who sits squarely in the discharge zone of a polluting facility seems more calculated to negate the strict liability standard of the [CWA] than to articulate any meaningful distinction." (cleaned up)). However, Chemours' predecessor-in-interest DuPont previously contaminated the Lubeck wellfield and, as a result of a SDWA Consent Order, Chemours is now required to routinely monitor and treat the Lubeck water for PFOA. Because of that, WVRC has Chemours' own publicly-available data showing Ms. Robinson's water was contaminated with PFAS and thus was able to far surpass the standing hurdle set out in *Gaston Copper* and *Laidlaw*.

### C. The Harm to Ms. Robinson's Recreational Interests Also Supports Standing

Finally, Chemours argues that the district court erred in finding that Ms. Robinson was suffering aesthetic harm because HFPO-DA causes no visual degradation of the river and knowledge of pollution is not aesthetic. Br. 38-41. In so arguing, Chemours ignores Ms. Robinson's recreational injuries entirely. Even assuming that imperceptible HFPO-DA pollution cannot cause aesthetic harm (it can),[6] the court correctly found that Ms. Robinson's avoidance of recreational contact with the Ohio River is a cognizable injury. JA1618. That injury is sufficient to independently confer Article III standing on Ms. Robinson.

Ms. Robinson is harmed because she refrains from boating in water that has been measured to have HFPO-DA concentrations over the MCLG of 10 ppt. Boating can expose her to breathing an aerosolized form of that chemical in mists and water sprays—an exposure pathway that EPA has recognized as a health risk. JA823.

*Laidlaw* directly applies here. In that case, the Court held that a plaintiff's member who refrained from canoeing 40 miles downstream from the defendant's mercury discharges had standing. 528 U.S. at 183. Dissolved mercury, like HFPO-

---

[6] *See Laidlaw*, 528 U.S. at 183-84 (holding affidavits established harm to recreational, economic, *and* aesthetic interests, notwithstanding that the pollutant at issue (mercury) was imperceptible). Even if the Ohio River remains objectively beautiful in perception, notwithstanding the invisible toxins that Chemours discharges into it, that does not necessarily mean that someone's aesthetic interest in appreciating that beauty cannot be injured by knowledge of those invisible toxins.

DA, is imperceptible. There is no indication in *Laidlaw* that the mercury concentration at the canoer's location violated any health standards. Nevertheless, the Court stated that there is "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway." *Laidlaw*, 528 U.S. at 184. Ms. Robinson's standing is equal to or greater than that canoer's standing in *Laidlaw*, because she is much closer to the discharge point and the Ohio River water has measurably exceeded the health standard in the MCLG. Ms. Robinson therefore satisfies Chemours' own proffered test for injury-in-fact: she "reasonably avoided the affected water as a result of the exceedance." Br. 30. Her injuries are redressable because she would resume boating if Chemours' HFPO-DA violations stopped. JA1551.

\*          \*          \*

In sum, Ms. Robinson's health, aesthetic, and recreational interests are injured by Chemours' conduct, those injuries are traceable to Chemours' excessive HFPO-DA discharges, and an injunction redresses those injuries by reducing her exposure and allowing her to resume boating.[7] The district court committed no error.

---

[7] A summary of LHWA's standing, unchallenged in this appeal, is included in Section III below.

## II. The District Court Did Not Abuse Its Discretion or Commit Legal Error in Determining that Chemours' Discharges Irreparably Harm WVRC and the Public

### A. Injunctions Under the CWA, Like Those for Common Law Public Nuisance, Protect Both the Plaintiff and the Public from Shared Irreparable Harm to Shared Public Resources

It is well-settled that irreparable harm to the environment can support injunctive relief. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 264 (4th Cir. 2020); *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989). Nonetheless, Chemours argues that if a defendant's conduct harms both the public and a plaintiff, the Court can only consider the plaintiff's harm in evaluating irreparable harm. Br. 42-53. That is myopic and misguided.

Consider the following scenario. To protect drinking water, a state permits a company to discharge a limited amount of a chemical into a river that provides drinking water to millions of people. In violation of its permit, the company discharges three times that amount of the chemical into the river. The public health standard for that chemical in drinking water is 10 ppt. Downstream Utility A measures the chemical in its finished drinking water at 40 ppt, and Downstream Utilities B and C measure it in their raw intake water at 17 and 53 ppt. An environmental group with a member served by Downstream Utility A sues the company to enforce the permit limit and seeks a preliminary injunction. Can the

court consider the irreparable harm to millions of people, or is it limited to the harm to only that one person? Chemours' answer is the court can only consider the harm to that one person.

Although simplified, that scenario is the same as this case. To protect Ohio River drinking water, WVDEP set Chemours' limit for HFPO-DA at Outlet 005 at 2.3 µg/l or 2300 ppt. JA120. In February 2025, Chemours discharged 8.9 µg/l, or 8900 ppt, of HFPO-DA from Outlet 005 into the Ohio River. JA683. That River provides drinking water to millions of people between Lubeck and Louisville. The MCLG for HFPO-DA in drinking water is 10 ppt. Utilities A, B, and C are Lubeck, Cincinnati, and Louisville, and each measured HFPO-DA in the amounts listed above. JA686, JA950, JA954. WVRC's member, Ms. Robinson, is served by Lubeck.

Chemours' excessive HFPO-DA discharges are a public nuisance to those in Lubeck, Little Hocking, Cincinnati, and Louisville, and other communities in between that draw drinking water from the Ohio River. The Supreme Court has stated that CWA claims "resemble" public nuisance claims. *Tull,* 481 U.S. at 420.[8]

---

[8] *See also City & County of S.F.*, 604 U.S. at 339 (recognizing the purpose of the predecessor of the CWA was to abate "pollution of certain interstate waters [that] had become a public nuisance"). Indeed, the Supreme Court has construed the CWA to displace the federal common law of public nuisance with respect to water pollution. *City of Milwaukee v. Ill. & Mich.*, 451 U.S. 304, 317 (1981); *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 204 (4th Cir. 2022) (recognizing that displacement).

"The objective of [the CWA] is in some respects similar to that sought in nuisance suits." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982). A public nuisance involves a shared injury to the public at large. *E.g.*, *Ariz. Copper Co. v. Gillespie*, 230 U.S. 46, 57 (1913) (recognizing contamination of the Gila River constituted a public nuisance affecting "a large community of riparian owners and users of the waters"). Under common law, a plaintiff cannot sue to abate a public nuisance unless it has a "special injury" that is distinct from the injury it shares with the public. *Id.*

But Congress decides "who may enforce [statutory rights] and in what manner." *Davis v. Passman*, 422 U.S. 228, 241 (1979). Congress may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). It "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id*. Under Article III, a plaintiff "must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim." *Id.*

In the CWA, Congress effectively gave citizens a new cause of action resembling common-law public nuisance. "Nuisance principles form the core doctrinal foundation for modern environmental statutes." *Cox v. City of Dall.*, 256 F.3d 281, 289 (5th Cir. 2001). To bring a CWA citizen suit, citizens must have "an interest which is or may be adversely affected" by a violation of "an effluent standard or limitation" under the CWA. 33 U.S.C. §1365(f), (g). But they need not satisfy the common-law requirement of a special injury distinct from the public. A plaintiff in a CWA citizen suit sues not merely "on his own behalf," 33 U.S.C. §1365(a), but also as a "private attorney[] general," *Middlesex County Sewerage*, 453 U.S. at 16-17. The citizen's remedial powers are limited to the same public remedies available to the government to abate and deter injuries shared by the public—injunctive relief and civil penalties. 33 U.S.C. §§1319(d), 1365(a). A citizen plaintiff "cannot obtain money damages for himself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 61 (1987). Citizens can only sue to abate and deter the shared harm to themselves and the public. The scope of irreparable harm in CWA citizen suits therefore logically includes harm to both the citizen plaintiffs and the public. Citizen plaintiffs may invoke "[t]he general public interest in clean waterways" to establish irreparable harm. *Powell Duffryn*, 913 F.2d at 73. They may "seek relief on the basis of the legal rights and interests of others." *Warth*, 422 U.S. at 501.

37

In cases involving widely shared injuries to public resources, courts in this Circuit have assessed irreparable harm to the plaintiff *or the public* in the context of injunctive relief, both pre- and post-*Winter*. For example, in *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 (4th Cir. 1991), a case challenging state laws limiting importation of hazardous waste, this Court evaluated whether "the absence of a new facility to handle waste, including out-of-state waste, would create irreparable harm, not only to [the plaintiff organization] but to the public, because of the possible creation of additional untreated waste." In another case, this Court also looked beyond the movant and found irreparable harm sufficient to support preliminary injunction based on, *inter alia*, "negative impacts" on non-party natural gas consumers and hindrances to economic development in the absence of an injunction. *See E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 829 (4th Cir. 2004). And in *Courtland Co. v. Union Carbide Co.*, No. 2:19-cv-00894, 2024 WL 4339600, at *5-6 (S.D. W. Va. Sept. 27, 2024), *aff'd,* 2025 WL 2827873 (4th Cir. Oct. 6, 2025), a citizen suit challenging releases of arsenic into groundwater, the court evaluated whether the plaintiff "or the public has suffered an irreparable injury" and denied an injunction because there were "no known public or private groundwater wells within a mile radius" of the releases. Judge Goodwin's decision to consider harm to both WVRC's member and the public is consistent with these decisions.

38

Chemours argues that *Winter* precludes consideration of harm to the public when evaluating whether irreparable harm is likely. Br. 42. It does so based on the Court's statement in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish … that he is likely to suffer irreparable harm in the absence of preliminary relief." 555 U.S. at 20. Chemours argues that the pronoun "he" is limited to the plaintiff, and excludes the public. But "the language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). Moreover, the Court's analysis does not support Chemours' myopic reading.

**First,** the type of irreparable harm examined in *Winter* was harm to marine mammals from sonar. 555 U.S. at 12, 17, 19, 20. In *Amoco*, the Court classified similar harm to marine mammals from oil spills as irreparable environmental harm. 480 U.S. at 545. The defendant in *Winter* (the United States Navy) insisted that injuries to marine mammals were insufficient and that the harm had to affect the plaintiffs. *Winter*, 555 U.S. at 21–22. The Court did not accept that argument. *Id.* at 23–24.

Instead, *Winter* cited *Amoco* as authority for its summary of the preliminary injunction factors. *Id.* at 20. In doing so, it implicitly reaffirmed that environmental harm—not just harm to environmentalists—is irreparable harm. Chemours ignores *Amoco* and this Court's decisions relying on it. *See, e.g.*, *Sierra Club*, 981 F.3d at

264 (citing *Amoco* and finding irreparable harm based solely on irreparable harm to the environment without mentioning harm to the movant).

**Second,** the Court resolved *Winter* based on the balance of equity and public interest injunction factors, not irreparable harm. 555 U.S. at 23–24. The Court held that "even if plaintiffs have shown irreparable injury from the Navy's training exercises, any such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors." *Id.* at 23. Thus, the Court assumed that irreparable harm existed and decided the case based on the failure to satisfy other injunction factors. Its decision contains no definitive analysis of the contours and scope of irreparable harm. *Winter* therefore does not support Chemours' argument.

### B. The Meaning and Scope of Irreparable Harm Is Defined by the CWA's Central Purpose of Preventing Violations of Water Quality Standards

In exercising its equitable discretion to grant or deny injunctive relief, the Supreme Court instructs district courts to consider the "purpose and language of the statute." *Romero-Barcelo*, 456 U.S. at 314. The district court followed that instruction and held that "[i]rreparable harm must be considered in light of the CWA's purpose." JA1624. The CWA's purpose is to preserve "[t]he integrity of the Nation's waters" and its objective is "restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Romero-Barcelo*, 456 U.S. at 314

40

(quoting 33 U.S.C. §1251(a)). The NPDES permitting program is the "centerpiece of the CWA." *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 990 (D.C. Cir. 1997). Section "301(b)(1)(C) [of the CWA] expressly identifies the achievement of state water quality standards as one of the Act's central objectives." *Arkansas v. Oklahoma*, 503 U.S. 91, 106 (1992).[9]

When states issue NPDES permits, they must include WQBELs that prevent violations of the state's water quality standards, including the state's narrative water quality criteria. 40 C.F.R. §122.44(d)(1). WQBELs are established "to attain a particular water quality" and "are set at the level necessary to protect the designated uses of the receiving waterways." *Gaston Copper*, 204 F.3d at 157. The importance of WQBELs to accomplishing the CWA's purpose is underscored by the fact that they are imposed "without regard to cost or technology availability." *City & County of S.F.*, 604 U.S. at 341 (internal quotation marks omitted). Protecting water uses "is the overriding purpose of West Virginia's water quality standards and the goal of the state's permit requirements." *OVEC v. Elk Run Coal Co.*, 24 F.Supp.3d 532, 579

---

[9] Because irreparable harm is determined by the purpose of the CWA, Chemours' argument that there needs to be a SDWA MCL violation to show irreparable harm is wrong. As this Court has explained, the CWA reasonably imposes more stringent limits than those under the SDWA because "the regulated pollutants [under the CWA] could harm waterways and aquatic life, and could introduce chemicals which hamper treatment facilities' ability to treat wastewater, even at levels where they might not directly harm humans." *United States v. Hartsell*, 127 F.3d 343, 351-52 (4th Cir. 1997).

(S.D. W. Va. 2014). Indeed, water uses are themselves water quality standards that must be protected. 33 U.S.C. §1313(c)(2)(A).

When "discharge restrictions are set at the level necessary to protect the designated uses of the receiving waterways, their violation necessarily means that these uses may be harmed." *Gaston Copper*, 204 F.3d at 157. "[A]ny violation of … water quality-based effluent limitations causes some degree of harm to the water quality of the receiving body of water." *PIRG v. Powell Duffryn Terminals, Inc*., 720 F.Supp. 1158, 1162 (D.N.J. 1989), *aff'd in relevant part,* 913 F.2d 64 (3d Cir. 1990).

Contrary to Chemours' argument (Br. 54), WVRC does not contend, and the district court did not hold, that every CWA permit violation causes irreparable harm. Rather, WVRC contended that violations *of WQBELs* are evidence of irreparable harm. ECF 110 at 23-24. WVRC acknowledged that a plaintiff "must prove more than procedural permit violations in order to secure an injunction." ECF 110 at 24 & n.2 (citing *City of N.Y. v. Anglebrook Ltd. P'ship*, 891 F.Supp. 908, 926 (S.D.N.Y. 1995), *aff'd*, 58 F.3d 35 (2d Cir. 1995)). "But in distinguishing between procedural and substantive violations, courts look to the substantive policy of the Act, which is, here, the protection and maintenance of our Nation's navigable waterways." *Anglebrook*, 891 F.Supp. at 926. Water quality standards "are at the heart of the [CWA]" and violations of those standards "directly and critically upset the [CWA's] objective." *Id.* at 927 (internal citation omitted). The district court therefore properly

held that "when the Defendant discharges pollutants in violation of those WQBELs—the limits designed to protect the nation's waterways—the Defendant harms those waterways." JA1625.

Contrary to Chemours' argument (Br. 46), this conclusion is consistent with Supreme Court precedent, including *Winter.* Environmental injury, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco*, 480 U.S. at 545, cited in *Winter*, 555 U.S. at 20. That proposition squarely applies to violations of WQBELs, because those limits allow "only those discharges that may be made without unduly impairing water quality." *City & County of S.F.*, 604 U.S. at 341. Chemical harm to drinking water quality is irreparable, especially when the contaminants are "forever chemicals." HFPO-DA contamination is the quintessential example of harm that is "of long duration, *i.e.* irreparable." *Amoco*, 480 U.S. at 545. Chemours does not identify any way to remove it from the Ohio River, and treatment systems like Lubeck and LHWA are at risk of contaminant breakthrough and other types of treatment failure. For instance, LHWA's treatment system is not as effective at treating for HFPO-DA as it is for PFOA, and HFPO-DA levels are increasing. JA1659-1660. In short, "[t]he risk of injury to the public health posed by substandard drinking water fulfills the irreparable harm requirement." *United States v. City of N. Adams*, No. 89-30048-F, 1992 WL 391318, at *5 (D. Mass. May 18, 1992).

43

## C. Chemours' Violations of Its HFPO-DA Limits Cause Irreparable Harm to WVRC's Member and the Public

Chemours has undisputedly violated its HFPO-DA WQBELs. WVDEP set those limits at the level necessary "to be protective of the State's narrative water quality criteria for human health and the designated uses of the Ohio River." JA681, JA703. Two of the designated uses of that river are for public drinking water and contact recreation, which includes boating. W. Va. Code R. 47-02 App. B & D. ECF 7-9 at 16. Consequently, violations of those limits endanger the health of individuals *who are exposed to the contaminated water* by drinking it, showering in it, brushing their teeth with it, eating vegetables grown with it, or inhaling it while boating on the Ohio River, as Ms. Robinson has while living near Chemours' Washington Works Plant. The millions of people in Lubeck, Little Hocking, Cincinnati, and Louisville who rely on the Ohio River for drinking water are also irreparably harmed.

The harm from these excessive HFPO-DA discharges is irreparable because the discharges cannot be recaptured and remain in the environment essentially "forever." *Cf. United States v. Westvaco Corp.*, CV MJG-00-2602, 2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015) (finding no adequate remedy at law "for the damaging effects of the pollutants emitted by the Luke Mill" because "pollutants cannot be recaptured"). HFPO-DA "is subject to long range transport over vast distances by water, can "reach any area in the world before any significant amount

44

of substance degradation has occurred," and "is very likely to stay in the water compartment for a very long time." JA821-822. Chemours admits that it is the only source of any HFPO-DA found within 100 miles of its Washington Works Plant. JA1422. Chemours failed to rebut the testimony of WVRC's expert that Chemours' HFPO-DA travelled as far downstream as Louisville (420 miles downriver). JA1391, JA1393.

WVRC's expert toxicologist, Dr. Schlezinger, testified that based on the levels of HFPO-DA Chemours is discharging, the Ohio River is "compromised" as a drinking water source. JA1327. She also testified that a person's exposure to drinking water with HFPO-DA above 10 ppt on just one day increases that person's risk of an adverse human health effect, such as fatty liver. JA670, JA1314-1315, JA1318, JA1319-1320, JA1349, JA1351. Chemours' counsel agreed. JA1354-1355 ("I agree with you, there's an increased risk."). Dr. Schlezinger also testified that individuals like Ms. Robinson who already have a high PFAS body burden from previous exposures are "starting from an already increased health risk" and face higher future risks because their exposure to multiple PFAS compounds "produce combined toxicity that is greater than the toxicity of each individual PFAS." JA667-668, JA1321-1322, JA1335, JA1356. Dr. Schlezinger could not quantify that harm or assign a monetary value to it, JA1317, which makes it irreparable by definition. "[F]uture injury of uncertain date and incalculable magnitude is irreparable harm,

and protection from such an injury is a legitimate end of injunctive relief." *Phillips v. Crown Cent. Petroleum Corp.*, 602 F.2d 616, 630 (4th Cir. 1979).

Moreover, harm in the form of an increased health risk is sufficient. This is not a toxic tort case. WVRC need not show a likelihood of actual disease to prove irreparable harm from a CWA violation. An increased risk to human health is sufficient. *N. Adams*, 1992 WL 391318, at *5; *see also* ECF 110 at 24, 30-31. A court "need not wait to exercise its authority until water district customers have actually fallen ill from drinking [contaminated] water." *United States v. Midway Heights County Water Dist.*, 695 F.Supp. 1072, 1076 (E.D. Cal. 1988).

### D. The District Court's Finding that WVRC's Member Would Be Irreparably Harmed Absent an Injunction Is Not Clearly Erroneous.

Even if Chemours were correct that lower courts may not consider irreparable harm to the public, the record in this case establishes irreparable harm to WVRC's member. Indeed, the district court stated four times that WVRC's member experienced irreparable harm in the form of incremental adverse exposures to a toxin in toxic amounts—a harm that cannot be undone. JA1623-1628.

This Court "review[s] finding[s] of irreparable harm under the clearly erroneous standard." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994). That means that if the record, in its entirety, renders the district court's choice between two views of the evidence plausible, this Court must affirm. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194,

210 (4th Cir. 2024). The record in this case, in its entirety, supports the district court's repeated finding of irreparable harm to WVRC's member.

*First*, the record includes expert testimony that WVRC's member had been irreparably injured, in part because of her past and current exposure to other PFAS compounds in combination with HFPO-DA. JA667-668, JA1341, JA1356. The district court expressly asked WVRC's toxicology expert whether WVRC's member had suffered harm or injury, and the expert answered affirmatively. JA1332. The court then asked whether that harm would continue if the member continued to be exposed to drinking water above the MCLG, and the expert answered affirmatively. JA1332-1333. The court then asked whether the fact that WVRC's member had stopped drinking the water would change her opinion. JA1333. Dr. Schlezinger's immediate response was that she could not come to a conclusion on that question. JA1333.

But Chemours' counsel's first line of cross examination gave Dr. Schlezinger the time to reach a conclusion on that question:

> Q.     And can you tell me again – your opinion is that between now and let's say the end of September of this year, if [WVRC's member] continues to be exposed to the levels of Dimer Acid in her drinking water *that she's been exposed to in the past, let's say 24 months*,[10] she's going to suffer harm?

---

[10] Notwithstanding Chemours' repeated false assertions on brief (*e.g.*, at 54, 58) that WVRC's member does not use her tap water, Chemours' counsel knew when he asked that question that the member's exposure to her household water in

A. Yes.

JA1334 (emphasis added). Chemours' counsel then asked what parts of the member's declaration informed her opinion. JA1334. WVRC's expert first noted that WVRC's member has a high body burden of PFAS compounds because of prior contamination of her water by Chemours' predecessor and continuing contamination of it with PFOA by Chemours in March 2024. JA1334. The district court subsequently asked WVRC's toxicologist whether WVRC's member, whose blood revealed PFAS body burdens, would be harmed by an exposure to HFPO-DA in concentrations greater than 10 ppt. JA1341. Once more, WVRC's toxicologist answered in the affirmative. JA1341. And in further questioning by Chemours' counsel, WVRC's expert explained that the exposure routes at issue included dermal and inhalation exposure. JA1345-1346.

**Second**, the record supports the district court's finding of irreparable harm because it includes credible evidence that exposure to HFPO-DA at a concentration greater than 10 ppt on just one day causes harm that cannot be undone. *See, e.g.*, JA1325. That is because—as Chemours' expert, WVRC's expert, and EPA all agree—the 10 ppt value is derived from a reference dose, which is "an estimate of a *daily* oral exposure to the human population (including sensitive populations) that is

---

the past 24 months included through bathing, tooth-brushing, laundry, and dishwashing (JA920, JA1333, JA1546).

likely to be without an appreciable risk of deleterious effects during a lifetime." 89 Fed. Reg. at 32536, 32563, 32544 (emphasis added); JA1285-1286, JA1314. WVRC's expert explained during cross examination that exposure to HFPO-DA in concentrations greater than 10 ppt incalculably increases risks of adverse health outcomes.[11] JA1314-1315, JA1342, JA1349-1352, JA1355.

*Third,* even using Chemours' exaggerated standard (exposure to concentrations of HFPO-DA at greater than 10 ppt on an annual average (JA0989)), the record supports the district court's finding of irreparable harm. WVRC's expert testified that, based on the magnitude and frequency of instances where the levels of HFPO-DA in Lubeck's water supply exceeded 10 ppt, it was more likely than not that the annual average concentration of HFPO-DA in that treated water supply exceeded 10 ppt in 2024. JA1328. Her conclusion was based on a measurement of 40 ppt in 2Q24, of 6.2 ppt in 3Q24, and 14 ppt in 4Q24, JA1329-1330, because the sum of those numbers is 60.2, which divided by four is 15.05 ppt.

Chemours relies (Br. 61-62) on its own expert's disputed testimony that the annual average HFPO-DA concentration did not exceed 10 ppt on a running annual

---

[11] At one point, after a back and forth between WVRC's expert and Chemours' counsel on the meaning of one of his questions, WVRC's expert agreed that a single day's exposure at that level would cause an adverse health effect. JA1353. She immediately clarified that she meant an increased risk of such an effect, and Chemours' counsel recognized that they had "missed each other." JA1354. Chemours' counsel admitted that WVRC did not need to show actual physical injury or disease. JA988.

average. But an appellate court must "give due regard to the opportunity of the district court to judge the credibility of the witnesses." *Multi-Channel TV Cable*, 65 F.3d at 1122. Chemours' expert was remarkably unfamiliar with EPA's averaging protocols (JA1263-1265), and admitted that, in her averaging, she used non-detect results to "compensate" for the levels that exceeded 10 ppt (JA1269). The district court expressed doubts about her credibility during the hearing (JA1300-1301), and in its decision recognized that Chemours' expert's opinion on this point was based on "mathematical manipulations" and "not persuasive" (JA1626). Giving due regard to the district court's opportunity to judge the credibility of the parties' witnesses, this Court cannot conclude that the court's finding of irreparable harm to WVRC's member was clearly erroneous.

## III. Regardless of Whether the District Court Abused Its Discretion, Dismissal Would Not be a Proper Remedy from This Court.

As shown above, the district court correctly determined that WVRC likely has standing and that WVRC has demonstrated a likelihood of irreparable harm to its member and the public. This Court should therefore affirm the preliminary injunction and remand the case for further proceedings.[12] However, even if the Court

---

[12] The district court stayed further proceedings on the merits pending the outcome of this appeal. JA1796-1800. It interpreted *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), and *City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265 (4th Cir. 2025), to mean that Chemours' notice of appeal of the preliminary injunction automatically divested the court of its power to decide the standing an irreparable harm issues that were scheduled for trial on the merits of a permanent injunction.

were to conclude that the district court abused its discretion in some way, the appropriate remedy would be to remand for further proceedings, not to dismiss the case.

When the plaintiff meets its burden to establish standing for purposes of the pleading stage but fails to show a substantial likelihood that it has standing, this Court reverses the grant of the preliminary injunction but allows the case to progress as usual below, rather than remanding the case with instructions to dismiss for lack of standing. *Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Fisheries Comm'n*, 127 F.4th 509, 514-15 (4th Cir. 2025). The Second and D.C. Circuits agree. *Do No Harm v. Pfizer,* 126 F.4th 109, 120 (2d Cir. 2025); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). That is because, at the preliminary injunction stage, the plaintiff must only make a "clear showing" that it is "likely" to

---

JA1797-1799. That decision was erroneous. Legal treatises and nine federal courts of appeal agree that "an appeal from an order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the action on the merits." ECF 209 at 8 n.2&3. *Coinbase* and *Express Scripts* did not change that well-settled principle. Rather they addressed interlocutory appeals of arbitration agreements and remand orders—not preliminary injunctions. In *Mayor of Baltimore v. Azar*, 973 F.3d 258, 266 (4th Cir. 2020) (*en banc*), this Court consolidated an appeal of a preliminary injunction with a later appeal of a permanent injunction in the same case and decided the second appeal first. Furthermore, this Court's decision on a preliminary injunction will not necessarily control a decision on the merits of a permanent injunction. *See Sports Form, Inc. v. United Press Int'l*, 686 F.2d 750, 753 (9th Cir. 1982) ("our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits").

establish each element of standing, rather than conclusively establish standing. *Murthy*, 603 U.S. at 58.

At the preliminary injunction stage, the case is usually not fully developed and the parties do not present all of their evidence. That is true here. After the preliminary injunction hearing, the district court found that LHWA had standing to intervene. JA1465. The parties engaged in extensive discovery, including multiple expert reports and depositions. JA12-17.

WVRC and LHWA each moved for partial summary judgment on standing. ECFs 179, 181. WVRC relied on both Ms. Robinson and another WVRC member, Monty Fowler, for standing. ECF 180. Mr. Fowler drinks water from the Huntington public water system, which is roughly 100 miles downstream from Chemours. ECFs 179-6, 179-7.

LHWA claimed injury to its business and property interests. LHWA is also likely to be able to establish Article III standing, providing an additional and alternative basis upon which to uphold the injunction. LHWA's business is supplying potable water to its 12,000 users. It owns a wellfield that is severely contaminated with HFPO-DA that Chemours has discharged into the Ohio River upstream within the capture zone of that wellfield. JA1653-1662, JA1680-1682. Its injuries include owning contaminated property that is rapidly increasing in HFPO-DA contamination, threatened impacts to the long-term operation of GAC with a

chemical GAC is not designed to remove, and diversion of organizational resources to monitoring and controlling the HFPO-DA from Chemours' facility, just 1,300 feet across the river. JA1653-1662. The district court stated that "[t]he declaration of Dr. Schwartz [LHWA's expert hydrogeologist] supports that this injury is fairly traceable to the Defendant's unpermitted and illegal discharge into the Ohio River due to the wells at LHWA pulling in downstream water from the river to the Wellfield." JA1465; *see also LHWA v. E.I. du Pont de Nemours & Co.*, 91 F.Supp.3d 940, 955 (S.D. Ohio 2015). LHWA is also reasonably concerned about its potential liability as a direct discharger, as the HFPO-DA from LHWA property naturally reenters the river at certain times of year, and as an indirect discharger, as the HFPO-DA it takes into its system discharges back into the river. The district court did not decide these issues because it stayed the case and denied the parties' cross-motions for summary judgment on standing without prejudice. JA1800. That denial is neither final nor appealable.

Chemours' brief in this Court also does not seek dismissal. Br. 64. Thus, even if this Court determined that Ms. Robinson is not likely to have standing, WVRC and/or LHWA could still establish standing at summary judgment or trial based on additional evidence and witnesses. Further, even if this Court were to dismiss WVRC as a party, LHWA could continue the case on its own as an intervenor because it has direct organizational standing. *Shaw v. Hunt*, 154 F.3d 161, 165-66

(4th Cir. 1998). Therefore, regardless of this Court's injunction holding, the Court should remand the case for further proceedings and not dismiss the case for lack of standing.

## CONCLUSION

This Court should affirm the district court's order and remand for further proceedings.

DATED: October 22, 2025

*/s/ Amanda Demmerle*
AMANDA DEMMERLE
DEREK TEANEY
APPALACHIAN MOUNTAIN
ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
(757) 650-2774
ademmerle@appalmad.org
dteaney@appalmad.org

JAMES M. HECKER
DANIEL SNYDER
PUBLIC JUSTICE
1620 L Street, N.W. Suite 630
Washington, DC 20036
(202) 797-8600 ext. 225
jhecker@publicjustice.net
dsnyder@publicjustice.net

*Counsel for Plaintiff-Appellee West Virginia Rivers Coalition*

*/s/ David Altman*
D. DAVID ALTMAN
JUSTIN D. NEWMAN
ALTMANNEWMAN CO. LPA
15 E. 8th Street
Cincinnati, OH 45202
(513) 721-2180
daltman@environlaw.com
jnewman@environlaw.com

KIRK R. AUVIL
THE EMPLOYMENT LAW CENTER, PLLC
1208 Market Street
Parkersburg, WV 26101
(304) 485-3058
theemploymentlawcenter@gmail.com

*Counsel for Plaintiff-Intervenor Little Hocking Water Association*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not believe oral argument is necessary. Given the ample controlling Supreme Court and Fourth Circuit precedent applicable to the issues on appeal, the robust record from a three-day preliminary injunction hearing, and the standard of review for the Court's factual and credibility findings, Appellees do not believe that oral argument would assist the Court in its decisional process. *See* Loc. R. 34(a).

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 and is set in 14-point Times New Roman font.

Dated: October 22, 2025                    */s/ Amanda Demmerle*
                                           Amanda Demmerle

                                           *Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2025, I electronically filed the foregoing document and accompanying materials with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Amanda Demmerle*
Amanda Demmerle

*Counsel for Plaintiff-Appellee*