No. 25-1924

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

WEST VIRGINIA RIVERS COALITION, INC.,

*Plaintiff-Appellee*,

and

LITTLE HOCKING WATER ASSOCIATION, INC.,
*Intervenor/Plaintiff-Appellee*,

v.

THE CHEMOURS COMPANY FC, LLC,

*Defendant-Appellant.*

On Appeal from the United States District Court for
the Southern District of West Virginia
The Honorable Joseph R. Goodwin (No. 2:24-cv-00701)

**DEFENDANT-APPELLANT'S REPLY BRIEF**

Joseph A. Ford
Clifford F. Kinney, Jr.
Niall A. Paul
James A. Walls
SPILMAN, THOMAS &
  BATTLE, PLLC
P.O. Box 615
Morgantown, WV 26507-0615
(304) 720-3408
JFord@spilmanlaw.com

Allison B. Rumsey
Allon Kedem
Elisabeth S. Theodore
Dirk C. Phillips
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Allon.Kedem@arnoldporter.com

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

Table of Contents................................................................i

Table of Authorities..........................................................ii

Introduction.....................................................................1

Argument.........................................................................4

I.  WVRC Lacks Article III Standing .......................................4

    A.  Mere Exposure in Excess of a CWA Permit Does Not Satisfy *Spokeo*'s Concreteness Requirement ...................4

    B.  WVRC's Lone Identified Member Lacks Article III Standing ...............................................................9

        1.  Robinson's tap water ............................................9

        2.  Boating on the Ohio River ....................................14

II.  WVRC Failed To Establish Irreparable Harm.......................16

    A.  The District Court Improperly Based the Preliminary Injunction on "Irreparable Harm to the Public" .........16

    B.  WVRC Failed to Establish Irreparable Harm to Robinson .........21

        1.  The violation of a permit level is not irreparable harm *per se*.......................................................23

        2.  The district court's conflation of HFPO-DA with PFOA requires vacatur ....................................25

        3.  The district court improperly equated the permitted source with Robinson's tap water .........................26

        4.  No credible evidence indicates tap-water drinkers face irreparable harm from Chemours' exceedances.................29

Conclusion.......................................................................34

Certificate of Compliance ....................................................35

Certificate of Service..........................................................36

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU v. NSA*,
   493 F.3d 644 (6th Cir. 2007)................................................................13

*Amoco Production Co. v. Village of Gambell*,
   480 U.S. 531 (1987)..............................................................................19, 20

*Davis v. Cap. One, N.A.*,
   No. 1:22-cv-00903, 2023 WL 6964051 (E.D. Va. Oct. 20, 2023) ......................8

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ................................................................9

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
   952 F.2d 802 (4th Cir. 1991)................................................................21

*Dreher v. Experian Info. Sols., Inc.*,
   856 F.3d 337 (4th Cir. 2017)................................................................5

*East Tennessee Natural Gas Co. v. Sage*,
   361 F.3d 808 (4th Cir. 2004)................................................................20

*Friends for Ferrell Parkway, LLC v. Stasko*,
   282 F.3d 315 (4th Cir. 2002)................................................................10, 11

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
   204 F.3d 149 (4th Cir. 2000)................................................................7, 8, 15

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,
   528 U.S. 167 (2000)..............................................................................6, 7

*Hazardous Waste Treatment Council v. State of S.C.*,
   945 F.2d 781 (4th Cir. 1991)................................................................20, 21

*Kansas v. United States*,
   124 F.4th 529 (8th Cir. 2024) ..............................................................17

*N. Va. Hemp & Agric., LLC v. Virginia,*
125 F.4th 472 (4th Cir. 2025) ..............................................21, 25, 29

*N.Y. Pub. Int. Rsch. Grp. v. Whitman,*
321 F.3d 316 (2d Cir. 2003) ..............................................................9

*NRDC v. Watkins,*
954 F.2d 974 (4th Cir. 1992)..............................................11, 12, 13

*Pashby v. Delia,*
709 F.3d 307 (4th Cir. 2013)..............................................................17

*Real Truth About Obama, Inc. v. Fed. Election Comm'n,*
575 F.3d 342 (4th Cir. 2009)........................................................16, 21

*Sierra Club v. U.S. Army Corps of Engineers,*
981 F.3d 251 (4th Cir. 2020)..............................................................20

*Sommerville v. Union Carbide Corp.,*
149 F.4th 408 (4th Cir. 2025) .............................................................9

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016)........................................................................1, 4

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998)..............................................................................11

*Thole v. U.S. Bank, N.A.,*
590 U.S. 538 (2020)..............................................................................5

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)..........................................................4, 6, 9, 14

*Trump v. Casa,*
606 U.S. 831 (2025)..............................................................................17

*Warth v. Seldin,*
422 U.S. 490 (1975)........................................................................11, 13

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982)..............................................................................18

*Winter v. NRDC*,
    555 U.S. 7 (2008)..........................................................2, 16, 17, 18, 19, 22, 23, 24

**Regulations**

40 C.F.R. § 141.2 .....................................................................................32

40 C.F.R. § 141.50(b) ..............................................................................32

40 C.F.R. § 141.60(a)(4)...........................................................................32

40 C.F.R. § 141.900(b)(4).........................................................................32

40 C.F.R. § 141.903 ..................................................................................32

89 Fed. Reg. 32532 (Apr. 26, 2024) ........................................................31

**Other Authorities**

EPA, *Risk Assessment Guidance for Superfund*, Vol. I (1989),
    https://www.epa.gov/sites/default/files/2015-
    09/documents/rags_a.pdf ...................................................................31

Greater Cincinnati Water Works, *2024 GCWW Water Quality
    Report*, (updated Mar. 2025), https://www.cincinnati-
    oh.gov/water/water-quality-and-treatment/water-quality-
    reports/2024-water-quality-report-updated-march-2025/ ...................33, 34

Louisville Water Company, *2024 Water Quality Report* (2025),
    https://louisvillewater.com/wp-content/uploads/2025/04/LW-
    CCR-2024-Final-Report.pdf..............................................................34

## INTRODUCTION[1]

The requirements for establishing Article III standing and irreparable harm for preliminary-injunctive relief are stringent, and intentionally so. Holding plaintiffs to these requirements does not give CWA permit-holders a free pass for ongoing exceedances, which are subject to broad enforcement and other measures by federal and state regulators. EPA and Chemours entered into an Administrative Order to address those at issue here. Even absent injunctive relief, Chemours is taking comprehensive action—with EPA review and approval—to address and comply with the permit. But Plaintiffs seek to turn *every* exceedance of any environmental permit, no matter how minor, into a basis for an injunction, substituting judicial relief for regulatory solutions.

This Court should resist that effort, which contravenes controlling case law. On standing, Plaintiffs all but ignore *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), which articulates a concreteness requirement that cannot be satisfied by supposed harm to the public. Plaintiffs rely on the interests of WVRC's member, Charlise Robinson, in avoiding exposure to HFPO-DA. But they admit that she stopped drinking her water years before the Permit

---

[1] This brief uses abbreviations from Chemours' opening brief.

exceedances (traceability) and will not resume regardless of what Chemours does (redressability). And Plaintiffs abandon their argument about Robinson's aesthetic interests for a post-hoc argument about boating that is unsupported by the evidence.

On irreparable harm, Plaintiffs again rely on harm to the public, ignoring the Supreme Court's instruction—supported by centuries of equity jurisprudence—that "[a] plaintiff seeking a preliminary injunction must establish … that *he* is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. NRDC*, 555 U.S. 7, 20 (2008) (emphasis added). Indeed, Plaintiffs' contrary theory, which would make injunctive relief automatic for the tens-of-thousands of minor CWA permit violations that occur each quarter, inverts *Winter*'s admonition that preliminary-injunctive relief "is an extraordinary remedy never awarded as of right." *Id.* at 24.

Plaintiffs' attempts to show irreparable harm to Robinson fare no better. They argue any "increase" in risk constitutes irreparable harm. But *Winter* expressly rejected a "possibility" standard, instead requiring "plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in absence of an injunction." *Id.* at 22.

Plaintiffs cannot establish likely harm. They stress that WVDEP set effluent limits in Chemours' Permit to achieve a level the agency deemed "protective of the State's narrative water quality criteria for human health." JA703. But that level was 140 ppt—a figure to which *no* measurement of HFPO-DA in the Ohio River, the Lubeck aquifer, or Lubeck's treated drinking water has *ever* come close. Plaintiffs also rely on the 10 ppt MCL Goal set by EPA. But that figure reflects *daily* exposure to the level-exceeding water for a *lifetime* (70 years). No evidence supports treating the exceedances at issue here as implicating that standard—even setting aside Robinson's non-use of her drinking water.

Finally, Plaintiffs do not even address the district court's improper reliance on evidence relating to a different chemical (PFOA), rather than the one actually at issue here (HFPO-DA). Any of these errors independently warrants vacating the preliminary injunction.

## ARGUMENT

I.    **WVRC LACKS ARTICLE III STANDING**

   A.    **Mere Exposure in Excess of a CWA Permit Does Not Satisfy *Spokeo*'s Concreteness Requirement**

As Chemours explained, Opening Br. 25-28, an Article III injury must be "both concrete *and* particularized." *Spokeo*, 578 U.S. at 340. And where an alleged injury consists of a risk of *future* harm, plaintiffs must establish "a degree of risk sufficient to meet the concreteness requirement." *Id.* at 343. For the "risk of future harm [to] satisfy the concrete-harm requirement in the context of a claim for injunctive relief to prevent the harm from occurring, … the risk of harm [must be] sufficiently *imminent and substantial*." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 415 (2021) (emphasis added).

The decision below ignores Article III's concreteness requirement, deeming it sufficient that WVRC alleged the "unlawful discharge of toxic pollutants" (statutory violation) and "concrete exposure [by its member] to that unlawful discharge" (particularization). JA1614. Yet under *Spokeo*—and this Court's cases—a statutory violation that causes "exposure to the risk of future harm" is *not* sufficient, unless the risk is so high as to amount to a "serious likelihood" that possible harm *in fact* will "materialize." *TransUnion*, 594 U.S. at 436, 438 (cleaned up).

Plaintiffs double-down on the decision below, arguing (at 30) CWA "citizen plaintiffs need not prove injury to the environment or to health to establish Article III standing," but instead must simply show "toxic exposure"—*i.e.*, use of permit-exceeding water. According to Plaintiffs (at 30), "WVRC never needed to prove Ms. Robinson's water was contaminated at all—let alone at a specific level—to establish Article III standing."

That argument is irreconcilable with *Spokeo*, which Plaintiffs barely acknowledge. Nor can it be squared with this Court's cases applying *Spokeo*, under which "a statutory violation absent a concrete and adverse effect does *not* confer standing," even where the violation is "particularized to" the plaintiff's own statutory rights. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345-46 (4th Cir. 2017) (emphasis added). As Plaintiffs do not dispute, their approach "would give plaintiffs a roving commission to bring suits for minor regulatory violations in any industry in which a federal statute provides for citizen suits." Opening Br. 30.

Plaintiffs argue (at 29) the concreteness requirement does not apply "in CWA citizen suits." But "the cause of action does not affect the Article III standing analysis." *Thole v. U.S. Bank, N.A.*, 590 U.S. 538, 544 (2020) (citing *Spokeo*). While Congress may give a statutory standard "actionable legal

status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 594 U.S. at 426 (citation omitted).

Plaintiffs' cases are not to the contrary. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000), the Supreme Court found standing to challenge mercury discharges into a river based on "extensive" statements from the plaintiff's members describing how the discharges concretely affected their activities and resulted in "lower [property] value" for their nearby "homes." *Id.* at 182; *see, e.g.*, *id.* at 181 (river "looked and smelled polluted"); *id.* at 182 (identifying "specific spot" where member "would like to fish"); *id.* (member "would like to purchase a home near the river").

Plaintiffs read *Laidlaw* as not requiring "proof of harm to the environment or of any health risk from [a defendant's] unlawful discharges." Response Br. 30 (cleaned up). But the Court found the discharges caused *other* concrete harms, relying on testimony that the exceedances "cause[d] nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." 528 U.S. at 184. *Laidlaw* thus makes clear that exposure to a permit-exceeding source is *in*sufficient to

confer standing: If exposure alone were enough, the Court would not have relied on testimony that the discharges "directly affected those affiants' recreational, aesthetic, and economic interests." *Id.*

Nor is Plaintiffs' argument helped by *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000) (en banc). The Court there similarly relied on evidence about recreational and economic injuries—including that the plaintiff-organization's member "fishes in the [permit-exceeding] lake approximately every other week and swims in it about twice per year," that his grandchildren "swim and fish in the lake nearly every summer day," and that the permit violation "diminishes the value of his property." *Id.* at 153.

Based on that testimony, the Court found that the member's "reasonable fear and concern about the effects of [the] discharge, supported by objective evidence, directly affect[ed] his recreational and economic interests." *Id.* at 161. Thus, *Gaston Copper* undermines Plaintiffs' argument that mere exposure to a permit-violating source is enough. Indeed, the Court found it a "closer question[]" whether the plaintiff's *other* members "demonstrated

injury in fact," and remanded for further testimony—even though there was no dispute those members were exposed to the lake. *Id.* at 161 n.1.[2]

Plaintiffs cherry-pick quotations from *Gaston Copper* that address issues not relevant here. In agreeing that a plaintiff "must merely show" a discharge "causes or contributes to the kinds of injuries alleged," *id.* at 161 (citation omitted), the Court was not purporting to specify *which* "kinds of injuries" count. While the Court found irrelevant the lack of evidence "concerning the chemical content of the waterways" or their "salinity," *id.* at 155 (citation omitted), that was because there was concrete harm to the plaintiff's member's "recreational and economic interests," *id.* at 161, so proof of environmental harm was unnecessary. And the Court referred to "a citizen who sits squarely in the discharge zone" in discussing traceability (not injury-in-fact)—drawing a "distinction" to "those who are [too] far downstream." *Id.* at 162. None of those statements addresses whether the CWA is exempt from Article III's concreteness requirement. It is not.[3]

---

[2] Insofar as *Gaston Copper* held "that Article III standing can be established merely by the invasion of a legally protected interest," *Spokeo* definitively "rejected that view." *Davis v. Cap. One, N.A.*, No. 1:22-cv-00903, 2023 WL 6964051, at *4 (E.D. Va. Oct. 20, 2023).

[3] Plaintiffs cite cases (at 25 n.5) for the proposition that "[e]xposure to a harmful substance also confers standing in other, non-CWA contexts." But each case—two of which predate *Spokeo*—relied on injuries that were

### B.    WVRC's Lone Identified Member Lacks Article III Standing

Where the plaintiff seeks "injunctive relief to prevent the harm from occurring, … the risk of harm [must be] sufficiently *imminent and substantial*." *TransUnion*, 594 U.S. at 415 (emphasis added). The alleged risk here is neither. The district court predicated standing on two supposed consequences: (1) Robinson's "use of her own tap water is severely diminished"; and (2) "she avoids any contact with the Ohio River" and so "cannot enjoy [its] aesthetics." JA1616. But Robinson's testimony (among other evidence) refutes her tap-water argument. And Plaintiffs abandoned the aesthetics ruling in favor of a new argument about boating—one that is equally meritless.

#### 1.  Robinson's tap water

Plaintiffs cannot base standing on Robinson's tap water given that she: (a) does not drink the water at issue; (b) stopped drinking it years before

---

concrete, not merely particularized. *Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 420 (4th Cir. 2025) (plaintiff's injury was "not that … emissions *may* have harmed her by putting her 'at a higher risk of eventually getting cancer,'" but rather her need, based on "a qualified physician's opinion, [to] pay for and undergo periodic diagnostic medical examinations *now*."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) (RICO plaintiffs "received allegedly negligent or fraudulent tax advice, and took some action in reliance on that advice."); *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 326 (2d Cir. 2003) (plaintiff alleged "personal and economic injury" to its members).

Chemours' alleged permit exceedances; (c) does not claim she would resume drinking the water if Chemours changed its conduct; and (d) would not be exposed to a dangerous amount of HFPO-DA even if she resumed. Plaintiffs' contrary arguments are unpersuasive.

**First**, Plaintiffs argue (at 26) that requiring Robinson to "specify when she stopped or whether it was due to Chemours' HFPO-DA exceedances" would be overly "stringent." But a "plaintiff's injury [must be] caused by the *challenged conduct* of the defendant." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (emphasis added).

Here, Robinson stated vaguely in her declaration that she avoids tap water "[d]ue to … concerns about PFAS, including HFPO-DA," JA920, but later clarified her water avoidance began in 2018—*years prior* to Chemours' challenged violations. Opening Br. 15 & n.4. Any alleged injury from "avoidance of her water supply," Response Br. 15, accordingly cannot be traced to the violations.

**Second**, Robinson's testimony confirms she would not resume drinking or cooking with tap water even "if Chemours no longer had any Clean Water Act violations at Washington Works." JA1549-1550. Asked if she would resume drinking it, she stated: "I wouldn't." JA1549-JA1550. Asked if she

would cook with it, she stated: "no, I wouldn't." JA1550. Asked if her "use of the Ohio River [would] change in any way," she stated: "I personally wouldn't." JA1550. Robinson's unequivocal testimony shows her water avoidance is *not* traceable to Chemours' "challenged conduct." *Friends for Ferrell Parkway*, 282 F.3d at 320.

It also means she fails Article III's "redressability" prong, which requires "that prospective relief will remove the harm" alleged. *Warth v. Seldin*, 422 U.S. 490, 505 (1975). Here, Robinson's alleged injury is avoiding her tap water, but "a favorable decision from the court" is *not* "likely" to "remedy" that "injury." *Friends for Ferrell Parkway*, 282 F.3d at 320. Indeed, Robinson repeatedly declared it "wouldn't." JA1550; *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (no standing where "none of the relief sought by respondent would likely remedy its alleged injury in fact").

Plaintiffs rely (at 27-28) on *NRDC v. Watkins*, 954 F.2d 974 (4th Cir. 1992), to argue this Court rejects "but-for" causation for Article III's traceability prong. But in *Watkins*, the defendant challenged traceability on the ground that "polluters other than the [defendant] substantially contribute[d] to the current polluted state of the Savannah River." *Id.* at 980. In such a multi-polluter case, a plaintiff need only "show[] that the [challenged]

11

discharge *contributes* to the pollution that interferes with the [plaintiff's] use of the" affected water. *Id.* That rule makes sense; otherwise, the existence of multiple polluters would make it impossible to establish standing.

In a multi-polluter case, therefore, plaintiffs need not "show to a scientific certainty that defendant's effluent, and defendant's effluent alone caused the precise harm suffered by the plaintiffs." *Id.* at 980 n.7 (citation omitted). In that limited respect, traceability "is not equivalent to a requirement of tort causation." *Id.* (citation omitted). But the plaintiff still must show her "decision to avoid the area was … caused, at least in part, by environmental damage inflicted by the" violations. *Id.* at 980.

This is not a multi-polluter case. And Robinson's testimony that she ceased using tap water in 2018—years before the permit exceedances first occurred—makes clear her "decision to avoid" its use "was *not* caused" by those exceedances. *Id.* (emphasis added).

Nor can Plaintiffs rely (at 28) on *Watkins*'s statement that the plaintiff there established redressability even though its member "did not return to the vicinity of the [water] immediately upon the shutdown of the [polluting] reactor." 954 F.2d at 980. In reaching that conclusion, the Court pointed to

"evidence" that the "effects of the thermal pollution caused by the … reactor will take decades to reverse." *Id.* at 979.

Robinson's testimony did not identify the supposed persistence of HFPO-DA (or any "time lag" in its movement, Response Br. 28) as the reason she would still avoid tap water even if "Chemours had no future Clean Water Act violations." JA1550. Instead, she said she "personally wouldn't" due to her "*past* exposure and experience." JA1550 (emphasis added); *see* JA1549 (Robinson "would have concerns" even if "no more" violations occurred). She accordingly has not shown "[s]he personally would benefit in a tangible way from the court's intervention." *Warth*, 422 U.S. at 508; *see ACLU v. NSA*, 493 F.3d 644, 671 (6th Cir. 2007) (no standing where, "even with the imposition of" judicial relief, plaintiffs' "fears will not be abated").

***Finally***, Plaintiffs cannot rely (at 27) on evidence that Robinson uses tap water for "showers, brush[ing] her teeth, and eat[ing] her homegrown vegetables." Plaintiffs identify *no* evidence of risk from those activities. To the contrary, when Plaintiffs' expert Jennifer Schlezinger was asked whether Robinson is likely to suffer harm even though she "stopped drinking the water" and only uses it for "brushing her teeth and … washing her vegetables and cooking," Schlezinger answered: "I cannot come to a conclusion." JA1333.

That complete absence of evidence falls short of establishing "risk of harm [that] is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 415.

### 2. Boating on the Ohio River

Plaintiffs abandoned the basis for the district court's ruling—namely, its conclusion that Robinson "cannot enjoy the aesthetics of the Ohio River." JA1616; *see* Opening Br. 38-41. Instead, Plaintiffs introduce an argument (at 10, 20, 22, 32) that the discharges affect Robinson's interest in "boating." That argument fails.

WVRC never raised boating in connection with its preliminary-injunction motion below. Robinson's declaration does not mention boating or recreation on the Ohio River. JA918-922. Nor was boating mentioned at the preliminary-injunction hearing. In its post-hearing briefing, moreover, WVRC stated that Robinson was "concerned about a river as her drinking water source, rather than a river she uses only recreationally." Dist. Ct. Doc. 110 at 16; *see id.* at 15 (WVRC discussing what it would have to prove "[i]f this case were about recreational harms to Ms. Robinson and the Ohio River," rather than about her "drinking water").

Even when Robinson first claimed—weeks after the hearing—that she once boated on the river, her testimony was tentative, vague, and equivocal.

14

Robinson initially said she had "been on a boat several times before." JA1581. But then, apparently acknowledging it was only one time, stated: "I can't give you an accurate date of when I was on the boat." JA1581. Asked what kind of boat, she responded: "I would say it's a speed boat. Somebody was driving it." JA1583. And she could not say *when* the ride occurred. *See* JA1582 ("I can't give you an accurate time of when that was."); JA1582 ("Right now I can't recall."). Notably, Robinson "could not recall" whether "it would have been in the last ten years." JA1582-1583.

This post-hoc testimony is nothing like cases where plaintiffs testified that they recreated on the affected water source "every other week" or "nearly every summer day." *Gaston Copper*, 204 F.3d at 153. And Robinson's inability to recall whether she boated on the river "in the last ten years," JA1582, also calls into question whether her recent lack of boating has anything to do with the challenged Permit violations (which began in 2022).

Finally, while Plaintiffs imply (at 2) Robinson's lack of boating is attributable to concerns about "inhalation of mist and sprays," they cite *no* evidence to support that insinuation—and none does. Even in her post-hearing testimony, Robinson never mentioned mists or sprays. There is also no evidence to support Plaintiffs' assertions (at 10) that "[r]iding in a speed boat

15

inevitably generates mists and sprays of river water" that lead to "inhalation." Nor is there evidence that any inhalation—even if it occurred—would occur in amounts necessary to raise a meaningful health risk. To the contrary, the fact sheet accompanying Chemours' permit states that river water with 140 ppt HFPO-DA or lower is "protective" of river uses, including recreation. JA703. Yet HFPO-DA has *never* been measured in the Ohio River downstream of Washington Works anywhere near 140 ppt.

## II.    WVRC FAILED TO ESTABLISH IRREPARABLE HARM

### A.    The District Court Improperly Based the Preliminary Injunction on "Irreparable Harm to the Public"

1.    Plaintiffs endorse (at 34) the district court's ruling that a preliminary injunction may be based on irreparable harm to the public, rather than to the plaintiff itself. *See* JA1628. But *Winter* requires a plaintiff to show "that *he* is likely to suffer irreparable harm in the absence of preliminary relief." 555 U.S. at 20 (emphasis added). While Plaintiffs argue (at 39) this statement need not be taken literally, this Court has repeatedly admonished that "each" *Winter* factor "must be satisfied as articulated." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), overturned on other grounds following *Citizens United*, 130 S. Ct. 2371 (2010);

*see Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013) (similar). Plaintiffs ignore those admonitions.

Plaintiffs also ignore precedent establishing that "[t]he irreparable-harm analysis focuses on the *moving* party, not the nonmoving party *or some third party*." *Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) (citation omitted); *see* Opening Br. 42-43. Plaintiffs similarly ignore the "party-specific principles that permeate" the traditional "understanding of equity." *Trump v. Casa*, 606 U.S. 831, 844 (2025); *see* Opening Br. 43-44. Nor do Plaintiffs dispute that relying on public harm would make the preliminary-injunction test incoherent, blurring the irreparable-harm prong with the balance-of-equities and public-interest prongs. *See* Opening Br. 44-45.

Plaintiffs separately endorse the district court's view that irreparable harm is established *per se* "when the Defendant discharges pollutants in violation of" state CWA standards. Response Br. 43 (quoting JA1625). For this novel proposition, Plaintiffs attempt (at 35-38) to analogize CWA violations with public-nuisance claims. But that conflates the cause of action (the CWA's citizen-suit provision) with the standard for granting preliminary injunctions as a "remedy" for violations. *Winter*, 555 U.S. at 24. Indeed, Plaintiffs' observation that "Congress decides who may enforce statutory rights and in

what manner," Response Br. 36 (cleaned up), cuts *against* them here: Congress sometimes chooses to displace *Winter* with a lower standard for injunctive relief, *see* Opening Br. 47-48 (citing examples), but chose *not to* do so for CWA cases.

Plaintiffs' argument also ignores that treating permit violations as irreparable harm *per se* would invert *Winter*'s admonition that a "preliminary injunction is an extraordinary remedy never awarded as of right." 555 U.S. at 24. Plaintiffs quote the Supreme Court's instruction that, when exercising equitable discretion, district courts must "consider the 'purpose and language of the statute.'" Response Br. 40 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982)). But they ignore *Romero-Barcelo*'s holding: that a district court *need not* "enjoin immediately all discharges of pollutants that do not comply with the [CWA's] permit requirements." 456 U.S. at 306-07. In so ruling, moreover, the Court *rejected* the plaintiff's argument "that Congress intended to deny courts their traditional equitable discretion in enforcing the statute." *Id.* at 316. In other words, *Winter*'s traditional rules still apply.

Finally, Plaintiffs do not dispute their *per se* rule would "radically transform CWA litigation," since tens of thousands of NPDES permit violations occur each quarter. Opening Br. 45. Nor do Plaintiffs identify any

18

reason why relaxing the irreparable-harm requirement under the CWA is *necessary*. Plaintiffs' failure to identify a member facing irreparable harm—forcing them to rely on supposed irreparable harm to the public—underscores the weakness of their case, not the need to change the rules.

**2.** None of Plaintiffs' cases (at 38-40) excuses a plaintiff from having to establish irreparable harm to itself. Plaintiffs cite *Winter*'s background section, which talks generally about threats to marine mammals, 555 U.S. at 12-20; but they ignore its analysis section, which makes clear that irreparable harm turned on whether those threats "would adversely affect *their* [*i.e.*, the plaintiffs'] scientific, recreational, and ecological interests," *id.* at 22; *see id.* at 26 (considering whether such threats "impair[] plaintiffs' ability to study and observe the animals"). And even proof of harm to wildlife would be irrelevant if, as Plaintiffs claim, a statutory violation constitutes irreparable harm to the public *per se*.

Plaintiffs' reliance (at 34) on *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987), is similarly misplaced. There, Alaska Native villages claimed the challenged government action "would adversely affect their aboriginal rights to hunt and fish" in the affected area. *Id.* at 535. The

19

opinion mentions "environmental impact," but only as relevant to "injury to subsistence resources." *Id.* at 545-46.

Plaintiffs' other cases similarly relied on plaintiff-focused harm. In *Sierra Club v. U.S. Army Corps of Engineers*, 981 F.3d 251 (4th Cir. 2020), the plaintiffs claimed proposed discharges would cause "harms to their aesthetic, recreational, and/or property interests." Pet. Br., 2018 WL 4182358, at *7 (Aug. 22, 2018) (br. in related appeal). The Court's one-sentence reference to "[e]nvironmental injury," 981 F.3d at 264 (citation omitted), accordingly refers to such harms.

In *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 829 (4th Cir. 2004), the Court observed that "[w]ithout a preliminary injunction, ETNG would be forced to breach [its] contracts" and "would lose in excess of $5 million." The Court's subsequent statement that the company's "inability to satisfy these commitments would [also] have negative impacts on its customers and the consumers they serve," *id.*, does not support Plaintiffs' claim (at 38) that the Court found harm to the public "sufficient" in absence of plaintiff-specific harm.

Finally, in *Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781 (4th Cir. 1991), the Court applied its pre-*Winter* "test of the balance

20

of the hardships." *Id.* at 788. In applying that test—which "may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit," *Real Truth*, 575 F.3d at 347—the Court stated that the challenged action "would create irreparable harm, not only to [the plaintiff] but to the public." 945 F.2d at 788. But even under that no-longer-applicable test, the Court did not find harm to the public *sufficient*; indeed, it faulted the district court for failing to "make clear whether or not [the plaintiff] will suffer irreparable harm." *Id.*

3.      Plaintiffs do not dispute that, in cases involving equitable discretion, "reliance on an impermissible factor—like the district court's reliance here on irreparable harm to the public—automatically requires reversal." Opening Br. 52. Nor do they dispute that "the district court's reliance on public harm was central to its ruling." Opening Br. 53. By "appl[ying] an incorrect preliminary injunction standard," the court "abuse[d] its discretion." *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025).

## B.    WVRC Failed to Establish Irreparable Harm to Robinson

"[A] *risk* of irreparable harm is not enough," *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

(emphasis added). Nor may "a preliminary injunction [be] based only on a *possibility* of irreparable harm." *Winter*, 555 U.S. at 22 (emphasis added). Instead, "irreparable injury [must be] *likely* in the absence of an injunction." *Id.*

Plaintiffs disagree, arguing (at 45) *any* exposure that "increases [a] person's risk of an adverse human health effect"—no matter how minute the increase—constitutes irreparable harm. Plaintiffs tout (at 45) their expert's statement that "just one day" of exposure to HFPO-DA in excess of 10 ppt suffices because it "increases" the risk of adverse health effects. They also emphasize (at 45) that "Chemours' counsel agreed" with their expert that "there's an increased risk," JA1355.

But there's a clear difference between an *increased* risk of harm too diminutive to quantify and risk that is *significant* enough to make harm "*likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Chemours' counsel, whom Plaintiffs quote out of context, made this precise point:

> [A]lmost everything increases the risk. But if I decide to cross the street, it's going to increase the risk of me being hit by a car versus if I stand on the street corner and never cross the street, right?
>
> …
>
> But when I cross the street, it doesn't mean [that] because I have an increased risk of getting hit by a car that I'm going to suffer

irreparable harm -- that I'm likely to suffer, you know, getting hit
by a car, right?

JA1305; *see* JA1350 (similar).

Plaintiffs cannot obtain a preliminary injunction merely by
demonstrating a general increased risk. Nor can they rely (at 49) on the fact
that their expert testified that any exposure above 10 ppt "incalculably
increases risks of adverse health outcomes," if the increment of increase is
*incalculably small*. Instead, to merit the "extraordinary remedy" of a
preliminary injunction, Plaintiffs must "clear[ly]" establish a risk so
substantial that meaningful harm is "*likely*" to materialize absent relief.
*Winter*, 555 U.S. at 22. They failed to do so here.

### 1. The violation of a permit level is not irreparable harm *per se*

Plaintiffs defend (at 40-43) the district court's decision to treat any
violation of state water quality-based limits as a *per se* "micro-injury" to every
person who uses the affected water, whether directly or indirectly. JA1615.
But even that overbroad approach would not make injunctive relief
appropriate here, since Robinson *does not* use the affected water and *will not*,
no matter what happens in the litigation. *See* pp. 10-11, 13, *supra*.

If accepted, moreover, that approach would yet again invert the
principle that "[a] preliminary injunction is an extraordinary remedy never

awarded as of right." *Winter*, 555 U.S. at 24. No authority supports it. *See* Chamber Amicus Br. 6-16.

In any event, the "micro-injury" argument fails on its own terms. WVDEP set the Permit's effluent limits based on a "goal for HFPO-DA (GenX) in drinking water at 140 nanograms per liter (ng/L) or parts per trillion (ppt)," reflecting the agency's judgment that 140 ppt is appropriately "protective of the State's narrative water quality criteria for human health." JA703; *see* Response Br. 5 (acknowledging 140 ppt as appropriate "limit[]" under WVDEP's "human health criteria"). So any level of HFPO-DA "in drinking water" *below* 140 ppt would, according to WVDEP, be sufficiently "protective" of "human health." JA703.

That inescapable fact precludes the district court's *per se* reliance on Permit exceedances: HFPO-DA has *never* been found in excess of 140 ppt— not in the Ohio River, not in the Lubeck aquifer, and certainly not in Lubeck's treated drinking water. Chemours made this point, Opening Br. 63-64, but Plaintiffs failed to respond. Given their reliance (at 41) on "[t]he importance of [state water quality-based limits] to accomplishing the CWA's purpose," Plaintiffs also cannot explain why the risk of irreparable harm here is

24

substantial and imminent *despite* an unbroken record of findings *below* WVDEP's 140 ppt "goal for HFPO-DA (GenX) in drinking water." JA703.

### 2. The district court's conflation of HFPO-DA with PFOA requires vacatur

Plaintiffs do not dispute that the district court "conflated evidence about HFPO-DA with evidence about PFOA." Opening Br. 56. Nor do Plaintiffs dispute that this mistake was material. *See* JA1627 (district court's reliance). That "clearly erroneous finding of material fact," in itself, requires vacatur. *N. Va. Hemp*, 125 F.4th at 492.

Plaintiffs repeat the same error, discussing the two compounds (at 5, 9, 22, 28) as if they shared the same properties. In fact they differ in many ways, including those important for the irreparable-harm analysis. Most significantly, as WVRC's own expert explained, PFOA and HFPO-DA have different half-lives in the human body. PFOA has a "half life" of "between 2 and 10 years," JA1335, whereas HFPO-DA will "*completely* leave [the] body" in at most "*14 days*." JA1352 (emphases added); *see* JA824 (EPA stating that HFPO-DA "do[es] not appear to accumulate as much in humans as longer chain PFAS"). As noted, Robinson has not drunk her tap water for *7 years*. JA920.

### 3. The district court improperly equated the permitted source with Robinson's tap water

The district court committed reversible error by treating "[e]ach unlawful discharge of HFPO-DA" as if it constituted "a direct toxic exposure to every person served by the affected water system." JA1627. Equating water in outfalls at the Washington Works facility with Lubeck's finished drinking water, as the court did, ignores: (a) how much of the affected water is used, and where it is drawn from; and (b) the effects of Lubeck's granular activated-carbon filtration system. Opening Br. 57-60. Plaintiffs address only the latter point, and their responses are unpersuasive.

First, Plaintiffs stress (at 43) testimony from Chemours' witness that the "treatment system is not as effective at treating for HFPO-DA as it is for PFOA." But *relative* effectiveness is irrelevant. What matters is whether the system removes HFPO-DA effectively; as he testified, "it does." JA1188.

Second, Plaintiffs assert (at 43) that Lubeck's filtration system is "at risk of contaminant breakthrough." The ruling below includes no such finding, which no evidence supports. Rather, Chemours monitors the system and samples post-treatment water monthly, routinely changing carbon beds as they age. JA1187-1188; JA557-558. Water-sampling results confirm the system's effectiveness. *See, e.g.*, JA581.

The only malfunction Plaintiffs point to (at 28) occurred when a valve in Lubeck's system was slightly open in March 2024. JA569; JA609. Chemours identified the issue and replaced the valve within 48 hours. JA570; JA1189. EPA "expressed [its] complete satisfaction and thought [Chemours] did a great job addressing the problem so quickly." JA1190.

Plaintiffs suggest (at 49) Lubeck's system is *currently* deficient, such that "it was more likely than not that the annual average concentration of HFPO-DA in [Lubeck's] treated water … exceeded 10 ppt in 2024." Plaintiffs rely on Schlezinger's testimony, but her conclusion rests on cherry-picked water-sample data:

| Sample Date | Sample 1 (ng/L) | Sample 2 (ng/L) |
|---|---|---|
| 1/16/2024 | <1.9 | <1.9 |
| 2/19/2024 | <1.8 | <1.9 |
| 3/18/2024 | 3.4 | <2.0 |
| 4/9/2024 | <1.9 | 13 |
| 4/29/2024 | 2.7 | 30 |
| 5/20/2024 | 11 | **40** |
| 6/17/2024 | <1.9 | <1.9 |
| 7/15/2024 | <1.8 | <1.8 |
| 8/19/2024 | <1.9 | <2.0 |
| 9/17/2024 | 3.5 | **6.2** |
| 10/21/2024 | 20 | **14** |
| 11/20/2024 | <1.9 | <1.9 |

JA511-512. To calculate an average concentration of "15.05 ppt," Schlezinger averaged *only* the three highlighted numbers. Response Br. 49.[4] But she never explained why those numbers were chosen, or why others were ignored. Neither do Plaintiffs.

Toxicologist Catherine Boston, by contrast, used *all* the data to calculate an annual average HFPO-DA concentration of "5.6 ng/L" in 2024. JA512; *see*

_____

[4] ng/L is equivalent to ppt. JA703.

JA512 (calculating 5.3 ng/L for 2023). That is well below 10 ppt. And *none* of those numbers comes anywhere close to the 140 ppt figure that WVDEP, under the current Permit, deemed "protective of the State's narrative water quality criteria for human health." JA703.

### 4. No credible evidence indicates tap-water drinkers face irreparable harm from Chemours' exceedances

Plaintiffs offer three reasons (at 46-50) for accepting the district court's finding of irreparable harm. Even if all were valid, that could not save the preliminary injunction, since as explained above, the court also "applie[d] an incorrect preliminary injunction standard" and "rest[ed] its decision on … clearly erroneous finding[s] of material fact." *N. Va. Hemp*, 125 F.4th at 492. But Plaintiffs' reasons fail regardless.

***First***, Plaintiffs argue (at 47-48) the harm finding is supported by evidence that Robinson (1) is currently exposed to PFAS compounds "in combination with HFPO-DA" and (2) has "a high body burden of PFAS." Yet she does not drink her tap water, JA920, which was measured "clean" and "non-detect" for all PFAS (including HFPO-DA) anyway, JA1537. And no evidence establishes Robinson's "body burden of PFAS"—let alone her exposure "in combination with HFPO-DA." Response Br. 47.

The only evidence regarding PFAS in Robinson's body is a blood test, *conducted in 2006*, showing detectable levels of PFOA. JA919. Moreover, the system that filters PFOA and HFPO-DA from Lubeck's water became operational in 2007, the year after Robinson's test, JA557, and she has not drunk the water since 2018, Opening Br. 15 & n.4. This evidence suggests Robinson *does not* have a significant "body burden of PFAS" or concurrent exposure to PFAS, including HFPO-DA. *See* JA1352 (HFPO-DA "completely" leaves human body in at most 14 days).

Plaintiffs argue (at 20, 22) Robinson is exposed to HFPO-DA when she brushes her teeth, washes dishes, bathes, and eats home-grown vegetables. JA920. But Plaintiffs offer *no* evidence that these pathways result in ingestion of HFPO-DA in meaningful amounts. Indeed, the district court asked Schlezinger if Robinson is likely to suffer harm even though she "stopped drinking the water" and only "brushes her teeth and so forth" with it. JA1333. Schlezinger conceded: "I cannot come to a conclusion." JA1333.

**Second**, Plaintiffs assert (at 48) the record "includes credible evidence that exposure to HFPO-DA at a concentration greater than 10 ppt on just one day causes harm that cannot be undone." But the only supposed "evidence" is Schlezinger's testimony, which is *not* "credible."

30

Schlezinger predicted likely harm from ingesting water with just 10.1 ppt HFPO-DA "[o]ne time" on "[o]ne day." JA1353-1354. Indeed, she stated that a person is likely to get *liver disease* when ingesting any amount of water with HFPO-DA above 10 ppt on just "one day." JA1354. When asked whether she "really believe[s] that," she initially testified: "Yes." JA1354. But when later asked the same question, she said: "No." JA1355. Plaintiffs ignore her retraction.

Plaintiffs also misconstrue what 10 ppt means. EPA set 10 ppt HFPO-DA as the MCL Goal, or MCLG, which is "derive[d]" from "the *daily* exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects *during a lifetime*." 89 Fed. Reg. 32532, 32546 (Apr. 26, 2024) (emphases added). Plaintiffs point (at 7, 28, 48) to the phrase "daily exposure," but misstate what it means. As EPA has explained, a "daily exposure" means exposure to a substance "365 days/year." EPA, *Risk Assessment Guidance for Superfund*, Vol. I at 6-22 (1989).[5] That is the opposite of exposure for just "[o]ne day." JA1354.

Moreover, "daily" exposure above the MCLG must persist "during a lifetime" for there to be "an appreciable risk of deleterious effects." 89 Fed.

---

[5] https://www.epa.gov/sites/default/files/2015-09/documents/rags_a.pdf.

Reg. at 32546; *see* 40 C.F.R. §§ 141.2, 141.50(b) (defining "[h]ealth-based water concentration," which is 10 ppt for HFPO-DA, as "level below which … no known or anticipated adverse health effects" are expected "over a lifetime of exposure"). EPA defines "lifetime" as roughly 70 years.[6] That means seven decades of daily exposure—a striking mismatch with Schlezinger's "[o]ne day" testimony.

Plaintiffs' argument proves too much. If EPA believed that drinking water even slightly in excess of 10 ppt HFPO-DA is harmful to human health, it would not allow drinking-water providers to show compliance with the 10 ppt MCL by using running annual averages. 40 C.F.R. § 141.903. Nor would the agency give water-treatment facilities five years to implement technology to achieve the MCL. *Id.* § 141.900(b)(4); *id.* § 141.60(a)(4) (setting April 2029 as MCL effective date for HFPO-DA). Accepting Plaintiffs' invitation to treat "one day" of MCLG exceedance as irreparable harm would also subject drinking-water providers (water districts) to injunctions every time a *single* sample reads above an MCLG—even when in compliance with the relevant MCL. That is not the law, nor should it be.

---

[6] https://www.epa.gov/expobox/exposure-factors-handbook-2011-edition.

***Finally***, Plaintiffs quote the district court's statement "that Chemours' discharges endanger not only Ms. Robinson, 'but all those served by facilities along the Ohio River,' including the Cincinnati and Louisville drinking water systems." Response Br. 17 (quoting JA1632-1633). It is doubtful whether that statement constitutes a factual finding; nor would any such finding be supportable.

The district court cited declarations from the Greater Cincinnati Water Works and the Louisville Water Company stating that the systems' *untreated* intake water had detectable levels of HFPO-DA, which "correspond" with Chemours' discharges. JA950; JA954. The declarations state that these detections "may present an increased public health risk," JA951, or an "adverse health risk," JA955.

Yet annual water-quality reports from those same utilities indicate their *finished* water is safe and fully compliant with drinking-water standards. Cincinnati says that its "water meets or exceeds every health standard developed by both the USEPA and Ohio EPA," and its average level of HFPO-DA for 2024 was 1 ppt. Greater Cincinnati Water Works, *2024 GCWW Water*

*Quality Report*, at 6, 8 (updated Mar. 2025).[7] Likewise, Louisville's "annual average[]" concentration of HFPO-DA for 2024 was "0 ppt." Louisville Water Company, *2024 Water Quality Report*, at 12 (2025).[8]

Finally, even detections in the *untreated* water of the Cincinnati and Louisville utilities are well below 140 ppt. JA952; JA954.

## CONCLUSION

This Court should reverse.

Dated: November 12, 2025               Respectfully submitted,

                                       */s/ Allon Kedem*

Joseph A. Ford                         Allison B. Rumsey
Clifford F. Kinney, Jr.                Allon Kedem
Niall A. Paul                          Elisabeth S. Theodore
James A. Walls                         Dirk C. Phillips
SPILMAN, THOMAS &                      ARNOLD & PORTER
   BATTLE, PLLC                           KAYE SCHOLER LLP
P.O. Box 615                           601 Massachusetts Avenue, NW
Morgantown, WV 26507-0615              Washington, DC 20001-3743
(304) 720-3408                         (202) 942-5000
JFord@spilmanlaw.com                   Allon.Kedem@arnoldporter.com

*Counsel for Defendant-Appellant*

---

[7] https://www.cincinnati-oh.gov/water/water-quality-and-treatment/water-quality-reports/2024-water-quality-report-updated-march-2025/.

[8] https://louisvillewater.com/wp-content/uploads/2025/04/LW-CCR-2024-Final-Report.pdf.

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 and is set in 14-point Century Expanded BT font.


Dated: November 12, 2025        */s/ Allon Kedem*
          Allon Kedem
          ARNOLD & PORTER
            KAYE SCHOLER LLP
          601 Massachusetts Avenue, NW
          Washington, DC 20001-3743
          (202) 942-5000
          Allon.Kedem@arnoldporter.com

          *Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Allon Kedem
Allon Kedem

*Counsel for Defendant-Appellant*

36